UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADRIAN ALEXANDRU, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> APPLIED THERAPEUTICS, INC., SHOSHANA SHENDELMAN, and RICCARDO PERFETTI, <br><br> Defendants. | Case No. 1:24-cv-09715 (DLC) (VF) |
| MOHAMMAD ALI IKRAM, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> APPLIED THERAPEUTICS, INC., and SHOSHANA SHENDELMAN, <br><br> Defendants. | Case No. 1:24-cv-09973 (DLC) (VF) |

**MEMORANDUM OF LAW IN SUPPORT OF DR. MARTIN DIETRICH'S MOTION FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF, AND <u>APPROVAL OF SELECTION OF LEAD COUNSEL</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

I.      PRELIMINARY STATEMENT .................................................................................. 1

II.     FACTUAL AND PROCEDURAL BACKGROUND.................................................... 2

        A.      The Defendants .............................................................................................. 2

        B.      The Defendants' Alleged False and Misleading Statements ................................. 3

        C.      The Truth Concerning the Defendants' Alleged False and Misleading Statements
                is Revealed ..................................................................................................... 6

        D.      Procedural History .......................................................................................... 8

III.    ARGUMENT............................................................................................................. 9

        A.      The Actions Should Be Consolidated For All Purposes......................................... 9

        B.      Dr. Dietrich Is the Most Adequate Plaintiff and Should Be Appointed Lead
                Plaintiff ...................................................................................................... 10

                1.      The Lead Plaintiff Framework Under the PSLRA .................................. 10

                2.      Dr. Dietrich Has Satisfied the PSLRA's Procedural Requirements ......... 10

                3.      Dr. Dietrich Has the "Largest Financial Interest" in the Relief Sought by
                        the Class .................................................................................... 11

                4.      Dr. Dietrich Satisfies the Typicality and Adequacy Requirements of Rule
                        23............................................................................................... 13

        C.      Dr. Dietrich's Selection of Wolf Popper to Serve as Lead Counsel Should Be
                Approved....................................................................................................... 14

V.      CONCLUSION....................................................................................................... 16

WORD COUNT CERTIFICATION ................................................................................. 16

i

## TABLE OF AUTHORITIES

**Cases**

*Devlin v. Transp. Commc'ns Int'l Union*,
  175 F.3d 121 (2d Cir. 1999) ........................................................................................ 9

*Gruber v. Gilbertson*,
  647 F. Supp. 3d 100 (S.D.N.Y. Dec. 21, 2022) ........................................................ 12

*Hoare v. Oddity Tech. Ltd.*,
  No. 1:24-CV-06571 (MMG),
  2024 U.S. Dist. LEXIS 220596 (S.D.N.Y. Dec. 5, 2024) .......................................... 11, 13, 14

*Hom v. Vale, S.A.*,
  No. 15-cv-9539-GHW,
  2016 U.S. Dist. LEXIS 28863 (S.D.N.Y. Mar. 7, 2016) ............................................. 1

*In re Olsten Corp. Sec. Litig.*,
  3 F. Supp. 2d 286, 295 (E.D.N.Y. 1996) .................................................................... 11

*Martinek v. AmTrust Financial Services, Inc.*,
  No. 19-cv-08030-KPF,
  2022 U.S. Dist. LEXIS 209097 (S.D.N.Y. Nov. 16, 2022) ........................................ 15

*Martinek v. AmTrust Financial Services, Inc.*,
  No. 19-cv-08030-KPF, ECF No. 111 (Final Judgment) (S.D.N.Y. Nov. 16, 2022) ................ 15

*Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance
  Corp. I*,
  No. 2:09-cv-01713, ECF No. 230 (Transcript) (E.D.N.Y. July 24, 2014) ............................ 15

*Steiner v. UiPath, Inc.*,
  No. 1:24-cv-04702 (JPC) (SDA),
  2024 U.S. Dist. LEXIS 160225 (S.D.N.Y. Sept. 5, 2024) .......................................... 9

**Statutes**

15 U.S.C. § 78j(b) ............................................................................................................ 1

15 U.S.C. § 78t(a) ............................................................................................................ 1

15 U.S.C. § 78u-4(a) ................................................................................................. passim

15 U.S.C. § 78u-4(e) ........................................................................................................ 12

**Rules**

17 C.F.R. § 240.10b-5 ...................................................................................................... 1

Fed. R. Civ. P. 42(a) ........................................................................................................ 9

## I.    **PRELIMINARY STATEMENT**

The two above captioned litigations are securities class actions brought on behalf of a "Class" of persons who purchased or otherwise acquired Applied Therapeutics, Inc. ("Applied Therapeutics" or the "Company") securities between January 3, 2024 and December 2, 2024, inclusive (the "Class Period").[1] The complaints filed in the actions allege that defendants made materially false and misleading statements concerning Applied Therapeutic's New Drug Application ("NDA") for govorestat, a drug candidate intended to treat rare metabolic diseases, and defendants' interactions with the U.S. Food and Drug Administration ("FDA") concerning govorestat, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

Class member Dr. Martin Dietrich respectfully seeks appointment as Lead Plaintiff in the actions. Dr. Dietrich meets all the requirements of the Private Securities Litigation Reform Act ("PSLRA") for appointment as Lead Plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii). Dr. Dietrich timely filed this motion, and believes he has the largest financial interest in the relief sought by the Class of investors in Applied Therapeutics securities during the Class Period. Dr. Dietrich purchased 76,759 shares of Applied Therapeutics common stock during the Class Period and incurred $357,163 in losses related to those purchases. *See* Burke Decl. Ex. 4.[2] In addition, Dr.

---

[1] The complaint in *Alexandru v. Applied Therapeutics, Inc.*, No. 1:24-cv-09715, alleges claims on behalf of a Class of "all investors who purchased or otherwise acquired Applied Therapeutics *securities.*…" *Alexandru* ECF No. 1, ¶ 1 (emphasis added). The complaint in *Ikram v. Applied Therapeutics, Inc.*, No. 1: 24-cv-09973, alleges claims on behalf of a Class of "all purchasers of Applied [Therapeutics] *common stock.*…" *Ikram* ECF No. 1, ¶ 1 (emphasis added). The appointed lead plaintiff will file a consolidated complaint that harmonizes the class definition. For purposes of this motion, lead plaintiff movant Dr. Martin Dietrich uses the class definition set forth in *Alexandru* as "it encompasses more potential class members." *Hom v. Vale, S.A.*, No. 15-cv-9539-GHW, 2016 U.S. Dist. LEXIS 28863, at *13 (S.D.N.Y. Mar. 7, 2016) (citation and quotation omitted, collecting cases).

[2] Declaration of Emer Burke in Support of Dr. Martin Dietrich's Motion for Consolidation, Appointment as Lead Plaintiff, and Approval of Selection of Lead Counsel ("Burke Declaration" or "Burke Decl.").

Dietrich purchased an additional 62,875 shares on December 3, 2024 (immediately after the Class Period), while additional new information was entering the market,[3] and incurred an additional $31,429 in losses on those trades. Thus, in total, Dr. Dietrich incurred $388,591 in losses attributable to defendants' fraud. Dr. Dietrich also satisfies the adequacy and typicality requirements of Rule 23. Notably, as a board-certified oncologist, Dr. Dietrich will provide invaluable assistance to the litigation of this action.

Dr. Dietrich further requests that the Court approve his selection of Wolf Popper LLP to serve as Lead Counsel for the Class. Wolf Popper is a nationally recognized securities litigation firm with a consistent record of achieving substantial recoveries for the benefit of injured investor classes, and has the expertise and resources necessary to provide high quality legal representation to the Class.

The Court should also consolidate the above captioned actions pursuant to Rule 42(a). The actions present common issues of law and fact. Both actions allege the same class period. Both actions allege violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 against Applied Therapeutics and its senior executives related to the defendants' materially false and misleading statements concerning the development of govorestat.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Defendants

Applied Therapeutics states that it is a clinical stage biopharmaceutical company engaged in the development of drug candidates to treat rare diseases. *Ikram* ECF No. 1, ¶ 2. Its lead drug candidate is govorestat, which was intended to treat rare metabolic diseases, including

---

[3] While the Class Period ends on December 2, 2024 additional new information and resulting stock price declines are alleged in the complaints on December 3 and 4, 2024 (*see Ikram* ECF No. 1, ¶¶ 78-79), and will undoubtably be included in any amended complaint.

Galactosemia, a pediatric metabolic disease that affects how the body processes simple sugar called galactose, and for which there is no known cure or approved treatment available. *Id.* ¶¶ 2, 46. During the Class Period, Applied Therapeutics did not have any drug candidates that were approved for sale, and had not generated any revenue. *Id.* ¶ 3.

Defendant Shoshana Shendelman is the Founder of Applied Therapeutics, and during the Class Period was the Chief Executive Officer ("CEO"), President, Secretary, and Chair of the Board of Directors of the Company. *Id.* ¶ 47. On December 20, 2024, 18 days after the end of the Class Period, the Company issued a press release announcing that Shendelman had resigned all of her positions with the Company. *Id.* ¶ 40. Defendant Riccardo Perfetti is, and during the Class Period was, the Chief Medical Officer of the Company. *Alexandru* ECF No. 1, ¶ 17-18.

**B.      The Defendants' Alleged False and Misleading Statements**

The Class Period begins on January 3, 2024, when Applied Therapeutics issued a press release and announced that it had submitted the NDA for govorestat to the FDA. *Ikram* ECF No. 1, ¶¶ 8, 56. The NDA submission included, among other things, clinical and preclinical data, including data from a Phase 3 registrational study, called ACTION-Galactosemia Kids study, in children aged 2-17, and a Phase 1 dosing study. *Id.* ¶ 8. On February 28, 2024, the Company announced the FDA accepted the filing of the NDA and had scheduled a Prescription Drug User Fee Act ("PDUFA") target action date of August 28, 2024 to respond to the NDA. *Id.* ¶ 12.

Undisclosed to investors during the Class Period, the NDA did not adhere to FDA requirements and omitted material information. In March and June 2021, Applied Therapeutics clinical test sites administered the wrong dose – 80% of the protocol required dose – to subjects in Phase 1 dosing study, and at least 19 of the 47 study subjects received a lower dosage (the "Dosing Error"). *Id.* ¶ 10. Defendants learned of and corrected the Dosing Error on June 29, 2021. *Id.* However, Applied Therapeutics did not include information on or a description of the Dosing Error

3

in the NDA, and "reported dose levels for subjects as stated in the protocol, rather than the actual dose levels administered." *Id.* This information was ultimately relevant to the FDA's analysis of the safety and effectiveness of govorestat.

Also unknown to investors during the Class Period, on March 27, 2024, two days after the FDA preannounced an inspection of one of Applied Therapeutics' clinical testing sites, a third-party vendor contracted by the Company deleted certain electronic study data results, including associated audit trails for all 47 subjects enrolled in the Phase 3 ACTION-Galactosemia Kids study (the "Study Data Deletion"). *Id*. ¶ 14.

On March 28, 2024, the Company announced that the FDA had extended the PDUFA date to November 28, 2024. *Id.* ¶ 15. The Defendants reassured investors that the delay was due to "supplemental analyses of previously submitted data that had been provided by the Company in response to the FDA's routine information requests…." *Id*. ¶ 59; *see also id.* ¶ 15.

Undisclosed to investors during the Class Period, from April 29 to May 3, 2024, the FDA conducted an inspection of the Company and learned of the Study Data Deletion. *Id.* ¶¶ 17-18. At the conclusion of the FDA's inspection, FDA investigators discussed their findings with Defendant Shendelman and presented the Company with its findings, limited to the deletion of source data for 11 subjects at one clinical study site, in an FDA form. *Id.* ¶ 19. On May 9, 2024, the Company responded to the FDA, and stated, among other things it could not recover the deleted data for the 11 subjects. *Id.* ¶ 20.

On May 9, 2024, despite knowing the undisclosed facts described above, the Company issued a press release announcing its first quarter 2024 financial results, and stated, among other things, "Preparations are underway for the potential approval and commercial launch of govorestat

4

for the treatment of Classic Galactosemia in the US and EU, following the significant regulatory progress we have already made in 2024." *Id.* ¶ 60.

On May 14, 2024, during an investor conference call, Shendelman was asked about the "status of the FDA review" of the NDA for govorestat and the reasons for the PDUFA delay. Shendelman assured investors that the govorestat NDA was "going very well with the FDA," "there's a lot of interactions with the FDA…and that's all going very well and on track and we feel very encouraged," that "We actually don't think that there are any major sticking points" with the FDA, and that "the positive interactions that we've had [with the FDA] have also provided a lot of additional comfort…. We don't think there are any big issues." *Id.* ¶¶ 23, 61. Shendelman also stated that communications with the FDA had "been a very positive and sort of normal course." *Id.* ¶ 62.

On August 7, 2024, the Company announced a positive update to calculation of cognition data in the Phase 3 ACTION-Galactosemia Kids Study that showed improved cognition. However, the Company did not disclose the negative Dosing Error or Study Data Deletion issues. *Id.* ¶¶ 24, 64. In fact these issues were not disclosed until after the Class Period.

On September 10, 2024, Shendelman stated at a Baird Global Healthcare Conference that, among other things, "we see an approval in galactosemia in the near term." *Id.* ¶¶ 29, 66.

On September 18, 2024, the Company issued a press release announcing a regulatory update on govorestat, and stated that the FDA had informed the Company that an advisory committee meeting, which was previously scheduled for October 9, 2024, would no longer be required. In the press release, Shendelman stated:

> We are incredibly pleased by the ongoing collaborative dialogue with the FDA during the NDA review process, and we look forward to continuing to work together with the agency to bring the first potential treatment to Classic Galactosemia patients. [*Id.* ¶ 67.]

Later that day, Shendelman characterized the cancellation of the advisory committee meeting as a positive development, stating at a Cantor Fitzgerald Global Healthcare Conference that:

> We had some positive news this morning . . . We recently completed our late cycle review meeting with [the] FDA, which was very positive. They had previously communicated maybe there would be an advisory committee meeting. They let us know at the late cycle meeting that they no longer felt that was needed. Our next interaction with them will be in about a month when we discuss post-marketing requirements. [*Id.* ¶ 68.]

> And overall, our message [with FDA approval for govorestat] is that things are going well. We're very encouraged by the dialogue with [the] FDA and we're excited about moving forward into this late stage of regulatory review." [*Id.* ¶ 69.]

The complaints allege, among other things, that Defendants' statements during the Class Period concerning the NDA and the Company's interactions with the FDA concerning the NDA, including those alleged above, were materially false and misleading at the time they were made, and as a result the price of Applied Therapeutics common stock was artificially inflated. Among other things, when the Defendants made their alleged false statements, they were aware of material negative undisclosed information and problems with the NDA, many of which were identified and discussed with the FDA during the Class Period. The Defendants however omitted to state this material negative information, which rendered their statements materially misleading. *Id.* ¶ 71, 81-82; *Alexandru* ECF No. 1, ¶¶ 3, 37. The complaints also allege that the Defendants took advantage of Applied Therapeutics' inflated stock price because (a) on February 28, 2024, the Company sold $100 million of stock and warrants in a private placement (*Ikram* ECF No 1, ¶ 13), and (b) from August 12 to August 14, 2024, Shendelman sold 777,014 shares of Applied Therapeutics common stock for net proceeds of over $4.7 million (*Id.* ¶ 26).

> ### C.    The Truth Concerning the Defendants' Alleged False and Misleading Statements is Revealed

On November 27, 2024, after the close of trading, Applied Therapeutics disclosed in a Form 8-K that the FDA issued a Complete Response Letter ("CRL") rejecting the NDA of

6

govorestat, and that "[t]he CRL indicates that the FDA…determined that it is unable to approve the NDA in its current form, citing deficiencies in the clinical application." *Id.* ¶ 32. As a result of this news, shares of Applied Therapeutics' common stock declined $6.53 per share, or over 76%, from a closing price of $8.57 per share on November 27, 2024, to a close at $2.03 per share on November 29, 2024. *Id.* ¶ 33.

However, unknown to investors, also on November 27, 2024, Applied Therapeutics received a "Warning Letter" from the FDA noting two problems relating to the govorestat NDA: the Dosing Error and the Study Data Deletion. According to the Warning Letter, these issues, which were not an all-inclusive list of deficiencies, "raise[d] significant concerns about the validity and reliability of data collected for this clinical investigation." *Id.* ¶ 34.

On December 2, 2024, after the close of trading, the Company disclosed the receipt of the Warning Letter, but not the letter itself. *Id.* ¶ 35. On December 3, 2024, the FDA posted the Warning Letter to its website, and on December 4, 2024 and December 5, 2024, news sources published articles on the Warning Letter. *Id.* ¶¶ 36-39. For example, on December 5, 2024, an article was published in Stat News titled "Why Applied Therapeutics has a credibility problem," which stated, among other things:

> Applied Therapeutics' CEO Shoshana Shendelman has a debilitating credibility problem: ***She repeatedly misled investors prior to the Food and Drug Administration's rejection of the company's rare-disease drug***.

> Throughout 2024, Shendelman assured investors that Applied's drug, called govorestat, was sailing through the FDA review process without major hitches. ***We now know she was lying by omission. The company was aware of significant problems with the govorestat application identified by the FDA, but Shendelman said nothing publicly***. [*Id.* ¶ 39 (emphasis added).]

As a result of the disclosure and reporting of the Warning Letter, the price of Applied Therapeutics common stock declined from a closing price of $1.75 per share on December 2, 2024, to a closing price of $1.69 per share on December 3, 2024 before falling further to a closing price

7

of $1.38 per share on December 4, 2024 and a closing price of $1.29 per share on December 5, 2024, a total three day decline of $0.46 per share, or 26.3%. *Id.* ¶ 38, *Alexandru* ECF No. 1, ¶ 41.

### D.     **Procedural History**

On December 17, 2024, the *Alexandru* action was filed in this Court alleging violations of Sections 10(b) and 20(a) and Rule 10b-5 against defendants Applied Therapeutics, Shendelman, and Perfetti.

Also on December 17, 2024, Alexandru and his counsel published the PSLRA required notice of pendency (15 U.S.C. § 78u-4(a)(3)(A)(i)) on *Accesswire*, announcing that the *Alexandru* securities class action had been filed against Applied Therapeutics and advising the putative class members that they may move the Court no later than 60 days from the date of the notice for appointment as Lead Plaintiff (the "Notice," Burke Decl. Ex. 1).

On December 20, 2024, the Court issued an Order (the "Alexandru Scheduling Order," *Alexandru* ECF No. 9), stating that members of the purported Class had until February 18, 2025 to move the Court for appointment as lead plaintiff. The Court further scheduled a conference hearing to consider application for appointment as lead plaintiff for March 7, 2025 at 2:00 p.m.

On December 27, 2024, the *Ikram* action was filed in this Court alleging violations of Sections 10(b) and 20(a) and Rule 10b-5 against Applied Therapeutics and Shendelman.

On January 7, 2025, this Court accepted the *Ikram* class action as related to the *Alexandru* class action. On January 14, 2025, this Court issued an Order (*Ikram* ECF No. 11) that the *Ikram* class action "was bound by the *Alexandru* Scheduling Order" and that the deadline to seek appointment as lead plaintiff in the *Ikram* case was February 18, 2025.

## III.   ARGUMENT

### A.   The Actions Should Be Consolidated For All Purposes

The PSLRA provides that "[i]f more than one action on behalf of a class asserting substantially the same claim or claims arising under this title has been filed, and any party has sought to consolidate those actions for pretrial purposes or for trial," then the Court "shall not [appoint a lead plaintiff] until after the decision on the motion to consolidate is rendered." 15 U.S.C. § 78u-4(a)(3)(B)(ii). Rule 42(a) provides that the Court may consolidate actions before it that "involve a common question of law or fact." Fed. R. Civ. P. 42(a). "In assessing whether consolidation is appropriate in given circumstances," a court "should consider both equity and judicial economy." *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999).

The two actions should be consolidated for all purposes. The actions both concern common questions of law and fact. The actions both assert violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 arising out of materially false and misleading statements by Applied Therapeutics and its senior executives concerning the NDA for govorestat and defendants' interactions with the FDA concerning the govorestat. "Consolidation of multiple actions alleging securities fraud is appropriate where those actions relate to the same public statements and reports." *Steiner v. UiPath, Inc.*, No. 1:24-cv-04702 (JPC) (SDA), 2024 U.S. Dist. LEXIS 160225, at *5 (S.D.N.Y. Sept. 5, 2024) (citations and quotations omitted). The actions also both allege the same Class Period. In fact, the Court has already recognized that the actions have common questions of law and fact in its January 14, 2025 Order (*Ikram* ECF No. 11) that the *Ikram* class action "was bound by the *Alexandru* Scheduling Order" and that the deadline to seek appointment as lead plaintiff in the *Ikram* case was the deadline in *Alexandru* of February 18, 2025.

9

### B.     Dr. Dietrich Is the Most Adequate Plaintiff and Should Be Appointed Lead Plaintiff

#### 1.     The Lead Plaintiff Framework Under the PSLRA

The PSLRA instructs that in a securities class action, a court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter referred to as the 'most adequate plaintiff')." 15 U.S.C. § 78u-4(a)(3)(B)(i). The PSLRA creates a rebuttable presumption that the most adequate plaintiff is the "person or group of persons that has either filed the complaint or made a motion [for appointment as lead plaintiff]; in the determination of the court, has the largest financial interest in the relief sought by the class; and…otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa)-(cc). The PSLRA allows that the presumption may only be rebutted "upon proof" that the most adequate plaintiff "will not fairly and adequately protect the interests of the class; or … is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa)-(bb).

Dr. Dietrich satisfies each requirement of the PSLRA, and respectfully submits that he is the presumptive "most adequate plaintiff." Dr. Dietrich has complied with the PSLRA procedural requirements, holds the largest financial interest of any known movant, and satisfies Rule 23's typicality and adequacy requirements.

#### 2.     Dr. Dietrich Has Satisfied the PSLRA's Procedural Requirements

Dr. Dietrich timely filed the instant motion seeking appointment as Lead Plaintiff for the Class and approval of his selection of lead counsel for the Class. Dr. Dietrich has also submitted the PSLRA required a sworn certification attesting to his willingness to serve as Lead Plaintiff for the Class and to provide testimony at deposition and trial, if necessary. Burke Decl. Ex. 2. Dr.

10

Dietrich therefore satisfies the first element of the PSLRA's "presumptively most adequate plaintiff" analysis. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

### 3. Dr. Dietrich Has the "Largest Financial Interest" in the Relief Sought by the Class

The PSLRA states that the Court should award the most adequate plaintiff presumption to the movant who "has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). The PSLRA does not specify a method to determine which lead plaintiff movant has the largest financial interest, and neither the Supreme Court nor the Second Circuit have specified a method for the calculation. *See Hoare v. Oddity Tech. Ltd.*, No. 1:24-CV-06571 (MMG), 2024 U.S. Dist. LEXIS 220596, at *6 (S.D.N.Y. Dec. 5, 2024) (citations and quotations omitted). However,

> [D]istrict courts throughout the Second Circuit generally consider four factors, called the Lax/Olsten factors, to evaluate the financial interest of prospective lead plaintiffs: "(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period."

*Id*. (quoting *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1996)). "Courts consider the fourth factor to be the most important factor in this analysis." *Id.* (citation omitted).

Dr. Dietrich purchased 76,759 total shares of Applied Therapeutics common stock during the Class Period in transactions on August 23, 2024 and October 9, 2024, for a total cost of $496,044, sold 52 shares on October 31, 2024 for total proceeds of $450, and sold 53,475 shares on December 2, 2024, the last day of the Class Period, and after the first corrective disclosure and dramatic stock price decline on November 27, 2024 alleged in the complaints, for total proceeds of $110,074. Dr. Dietrich sold his 23,232 shares of Applied Therapeutics common stock retained at the end of the Class Period on December 9, 2024 for $1.24 per share and total proceeds of $28,808.

Applying the Lax/Olsten factors, Dr. Dietrich (1) purchased 76,759 shares of Applied Therapeutics common stock during the Class Period and held those shares through the November 27, 2024 curative disclosure, (2) purchased 23,384 net shares during the Class Period because he sold 53,475 shares, after the first major curative disclosure, on December 2, 2024, the last day of the Class Period, (3) expended net funds of $385,970 during the Class Period ($496,044 total Class Period cost minus $110,074 total Class Period sales proceeds), and (4) suffered a trading loss related to his purchases of Applied Therapeutics common stock during the Class Period of $357,163, calculated by subtracting his sales proceeds ($110,074 plus $28,808 in proceeds from a post-class period sale on December 9, 2024) from his total purchase price ($496,044).[4]

In addition, Dr. Dietrich purchased an additional 62,875 shares on December 3, 2024 (while new curative information was continuing to enter the market) at $1.74 per share and sold those shares on December 9, 2024, at $1.24 per share, incurring an additional $31,429 in losses after additional curative information was revealed to the market from December 3 to 4, 2024. That curative information will undoubtedly be included in an amended complaint. Accordingly, Dr. Dietrich's total financial interest with respect to the allegations in this action total, then he suffered total losses of $388,591.

Dr. Dietrich financial interest in the relief sought by the Class under the four Lax/Olsten factors greatly exceeds the financial interest of the plaintiffs in *Alexandru* and *Ikram*.

---

[4] The PSLRA provides that damages "shall not exceed the difference between the purchase [price paid] by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market," or if the security is sold during that 90-day "look back" or "bounce back" period, the average trading price through the date of sale. 15 U.S.C. § 78u-4(e). Here, the price of Applied Therapeutics common stock continued to decline following the end of the Class Period. As Judge Rakoff stated in *Gruber v. Gilbertson*, 647 F. Supp. 3d 100, 122 (S.D.N.Y. Dec. 21, 2022), "the PSLRA's bounce back provision has no relevance here for the simple reason that Dakota Plains' stock never bounced back."

Accordingly, Dr. Dietrich satisfies the second requirement of the PSLRA's "presumptively most adequate plaintiff" analysis. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).

### 4.    Dr. Dietrich Satisfies the Typicality and Adequacy Requirements of Rule 23

A prospective lead plaintiff must satisfy the requirements of Rule 23. At the lead plaintiff stage, "courts need only consider whether the prospective lead plaintiff satisfies the typicality and adequacy prongs of Rule 23." *Oddity Tech*, 2024 U.S. Dist. LEXIS 220596, at *7-8.

"Movants can demonstrate typicality by showing that their claims arise from the same conduct from which the other class members' claims and injuries arise[.]" *Id.* at *8 (citation and quotations omitted). Dr. Dietrich's claims are typical of those of the purported Class. Dr. Dietrich purchased Applied Therapeutics common stock during the Class Period, at prices alleged to be artificially inflated as a result of the defendants' alleged materially false and misleading statements. Dr. Dietrich suffered damages when the truth was revealed, and possesses claims against the defendants under the federal securities laws. Because Dr. Dietrich's claims arise from the same events and course of conduct as the Class's claims, he satisfies the typicality requirement of Rule 23(a)(3).

"A presumptive lead plaintiff is adequate if they (1) have no conflict of interest with the other members of the class, (2) have sufficient interest in the outcome of the case, and (3) have selected counsel that is qualified, experienced, and generally able to conduct the litigation in question." *Id.* at *9. Dr. Dietrich is an adequate representative. Dr. Dietrich's claims are not antagonistic or in conflict with those of the Class. Dr. Dietrich is not subject to any unique defenses. Further, Dr. Dietrich's loss of $388,591 means he has sufficient interest in the outcome of this litigation to ensure vigorous advocacy on behalf of the Class, whose interests align directly

13

with his own. Also, as a board-certified oncologist, Dr. Dietrich will provide invaluable assistance to the litigation of this action.

Further, as described below, Dr. Dietrich has retained Wolf Popper LLP to act as Lead Counsel, and Wolf Popper is experienced in securities litigation. Dr. Dietrich has submitted a sworn certification, as required by the PSLRA, attesting to his willingness to serve as Lead Plaintiff for the Class and to provide testimony at deposition and trial, if necessary. Burke Decl., Ex. 2. Dr. Dietrich has also submitted a declaration attesting to, among other things, his understanding of the obligations of a lead plaintiff and commitment to zealously prosecute this litigation. *Id.* Ex. 3.

Because Dr. Dietrich's claims are typical of those of the Class and because he will adequately represent the Class, he satisfy the third requirement of the PSLRA's "presumptively most adequate plaintiff" analysis. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc).

C.      **Dr. Dietrich's Selection of Wolf Popper to Serve as Lead Counsel Should Be Approved**

Under the PSLRA framework, the "most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). "There is a strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection." *Oddity Tech.*, 2024 U.S. Dist. LEXIS 220596, at *11.

Dr. Dietrich has selected Wolf Popper to act as Lead Counsel, and respectfully request that the Court approve its selection. Wolf Popper is highly experienced in the area of securities litigation and class actions, and has successfully prosecuted numerous securities litigations and securities fraud class actions on behalf of investors as detailed in its attached resume. *See* Burke Decl., Ex. 5. For example, in *Martinek v. AmTrust Financial Services, Inc.*, No. 19-cv-08030-KPF (S.D.N.Y.), Judge Katherine Polk Failla of this Court appointed Wolf Popper to serve as lead counsel on behalf of a class of investors in AmTrust Financial Services preferred stock. On

14

November 16, 2022, this Court entered an order finally approving a $13 million cash settlement for the Martinek class. *Martinek*, ECF No. 111 (Final Judgment). The Court also stated that Wolf Popper "conducted the Litigation and achieved the Settlement with skill, perseverance and diligent advocacy; [and] Lead Counsel are highly experienced in class action litigation and securities class action litigation…." *Martinek*, 2022 U.S. Dist. LEXIS 209097, at *4 (S.D.N.Y. Nov. 16, 2022).

Also, in *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 2:09-cv-01713 (E.D.N.Y.), Wolf Popper represented the Public Employees' Retirement System of Mississippi as lead plaintiff and recovered $280 million for investors in residential mortgage-backed securities issued by JPMorgan Acceptance Corp. On July 24, 2014, Judge Pamela K. Chen of the Eastern District of New York entered an order approving the settlement. The Court found that "the representation of both sides was obviously very vigorous. The plaintiffs expended efforts in terms of pursuing the investigation, the theories, the research and the advocacy." *J.P. Morgan Acceptance Corp. I*, ECF No. 230 (Transcript) at 19:14-17. "Certainly in the beginning, at the time when some of the legal principles that are applied in this case, in any cases related to mortgage-backed securities, was not well established. They did yeomen's work in trying to establish some of those principles.... [T]his is a good result in this particular case." *Id.* at 22:5-18.

As a result of Wolf Popper's extensive experience in litigation involving issues similar to those raised in this action, it has the skill and knowledge to prosecute this action effectively and expeditiously. The Court may be assured that by approving the Dr. Dietrich's selection of Lead Counsel, the members of the Class will receive the best legal representation available.

15

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Dr. Dietrich respectfully requests that this Court issue an Order appointing him as Lead Plaintiff and approving Wolf Popper as Lead Counsel.

Dated: February 18, 2025
       New York, NY

Respectfully submitted,

**WOLF POPPER LLP**

*/s/ Joshua W. Ruthizer*
Robert C. Finkel
rfinkel@wolfpopper.com
Joshua W. Ruthizer
jruthizer@wolfpopper.com
Adam Savett
asavett@wolfpopper.com
Emer Burke
eburke@wolfpopper.com
845 Third Avenue, 12th Floor
New York, New York 10022
Telephone: (212) 759-4600

*Attorneys for Movant Dr. Martin Dietrich and*
*Proposed Lead Counsel for the Class*

## <u>WORD COUNT CERTIFICATION</u>

Pursuant to Southern District of New York Local Civil Rule 7.1(c), the undersigned hereby certifies that this memorandum of law contains 5,012 words, excluding the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates. I utilized the word count of the word-processing program used to prepare the document in order to obtain that word count.

*/s/ Joshua W. Ruthizer*
Joshua W. Ruthizer

16