**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE APPLIED THERAPEUTICS
SECURITIES LITIGATION

Case No. 1:24-CV-09715 (DLC) (VF)

**ECF Case**

---

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANT SHOSHANA SHENDELMAN'S MOTION TO DISMISS
### THE SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Rachel M. Fritzler
Bella F. Gianani
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
Rachel.Fritzler@kirkland.com
Bella.Gianani@kirkland.com

Mark Filip, P.C.
Jules H. Cantor
KIRKLAND & ELLIS LLP
333 W. Wolf Point Plaza
Chicago, Illinois 60654
(312) 862-2000
Mark.Filip@kirkland.com
Jules.Cantor@kirkland.com

*Attorneys for Shoshana Shendelman*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 3

     A.    The Development of Govorestat ................................................................. 3

     B.    Clinical Trials and NDA Submission for the Treatment of Galactosemia ............. 3

     C.    FDA Inspection and the Form 483 ............................................................. 4

     D.    Advancement Through FDA Review ......................................................... 5

     E.    Dr. Shendelman's Stock Sales .................................................................. 7

ARGUMENT ....................................................................................................................... 7

     I.    THE COMPLAINT FAILS TO PLEAD SCIENTER. ............................... 8

         a.    Plaintiff's Motive Allegations Fail as a Matter of Law. ................ 8

         b.    Plaintiff Fails to Allege Circumstantial Evidence of
             Conscious Misbehavior or Recklessness. .................................... 12

     II.    THE COMPLAINT ALLEGES NUMEROUS INACTIONABLE
         MISSTATEMENTS ................................................................................. 23

         a.    Statements Expressing Optimism for NDA Approval Were
             Immaterial. ................................................................................. 23

         b.    Statements Related to the Late Stage of the FDA's Review
             and the PDUFA Date Are Not False. ......................................... 26

     III.    THE SECTION 20(A) CLAIMS SHOULD BE DISMISSED. ................. 27

CONCLUSION ................................................................................................................... 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995) ............................................................................................10, 12

*In re Adient PLC Sec. Litig.*,
   2020 WL 1644018 (S.D.N.Y. April 2, 2020) ...........................................................................21

*In re Alkermes Pub. Ltd. Co. Sec. Litig.*,
   523 F. Supp. 3d 283 (E.D.N.Y. 2021) ..............................................................................15, 16

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
   823 F.3d 51 (2d Cir. 2016)..................................................................................................4

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................................................3

*In re AstraZeneca Sec. Litig.*,
   559 F. Supp. 2d 453 (S.D.N.Y. 2008)....................................................................................8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)..............................................................................................4, 27

*In re Axis Cap. Holdings Ltd., Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006)...................................................................................10

*Bazzelle v. Novocure Ltd.*,
   2025 WL 843668 (S.D.N.Y. Mar. 18, 2025) ...................................................................18, 27

*In re Bristol-Myers Squibb Co. CVR Sec. Litig.*,
   2024 WL 873436 (S.D.N.Y. Feb. 29, 2024)............................................................................20

*In re Bristol-Myers Squibb Co. CVR Sec. Litig.*,
   658 F. Supp. 3d 220 (S.D.N.Y. 2023)....................................................................................20

*In re Bristol-Myers Squibb Sec. Litig.*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004)...............................................................................24, 26

*Buhrke Fam. Revocable Tr. v. U.S. Bancorp*,
   726 F. Supp. 3d 315 (S.D.N.Y. 2024).....................................................................................9

*In re Checkpoint Therapeutics Sec. Litig.*,
   2025 WL 1434400 (S.D.N.Y. May. 19, 2025) ..................................................................16, 17

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*,
    655 F. Supp. 2d 262 (S.D.N.Y. 2009)................................................................................17

*Das v. Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018)................................................................................21

*Denny v. Canaan Inc.*,
    2023 WL 2647855 (S.D.N.Y. Mar. 27, 2023) ...................................................................20

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..........................................................................7, 8, 9, 12

*In re EDAP TMS S.A. Sec. Litig.*,
    2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015)...........................................................24, 25

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)................................................................................10

*Foley v. Transocean Ltd.*,
    861 F. Supp. 2d 197 (S.D.N.Y. 2012)................................................................................19

*Fort Worth Emps.' Ret. Fund v. Biovail Corp.*,
    615 F. Supp. 2d 218 (S.D.N.Y. 2009)..........................................................................24, 26

*Francisco v. Abengoa, S.A.*,
    559 F. Supp. 3d 286 (S.D.N.Y. 2021)................................................................................21

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
    336 F. Supp. 3d 196 (S.D.N.Y. 2018)................................................................................11

*Frederick v. Mechel OAO*,
    475 F. App'x 353 (2d Cir. 2012) ................................................................................19, 20

*In re Garrett Motion Inc. Sec. Litig.*,
    2022 WL 976269 (S.D.N.Y Mar. 31, 2022) ......................................................................21

*In re Garrett Motion Inc. Sec. Litig.*,
    2023 WL 2744029 (S.D.N.Y. Mar. 31, 2023) ...................................................................22

*In re Genzyme Corp. Sec. Litig.*,
    754 F.3d 31 (1st Cir. 2014)..................................................................................................4

*In re GeoPharma, Inc. Sec. Litig.*,
    411 F. Supp. 2d 434 (S.D.N.Y. 2006)..........................................................................21, 22

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009)..................................................................................9

*Gillis v. QRX Pharma Ltd.*,
   197 F. Supp. 3d 557 (S.D.N.Y. 2016)..................................................................13, 23, 25, 26

*Gissin v. Endres*,
   739 F. Supp. 2d 488 (S.D.N.Y. 2010)..................................................................................17

*Glantz v. James River Group Holdings, Ltd.*,
   2025 WL 278440 (S.D.N.Y. Jan. 23, 2025) .........................................................................20

*Gordon v. Target Corp.*,
   2022 WL 836773 (S.D.N.Y. Mar. 18, 2022) ..........................................................................4

*In re HEXO Corp. Sec. Litig.*,
   524 F. Supp. 3d 283 (S.D.N.Y. 2021)...................................................................................18

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)............................................................................................8, 12

*In re Keryx Biopharmaceuticals, Inc. Sec. Litig.*,
   2014 WL 585658 (S.D.N.Y. Feb. 14, 2014)........................................................................4, 9

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..................................................................................11

*In re Lululemon Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014)....................................................................................18

*In re MELA Sciences, Inc. Sec. Litig.*,
   2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012)..........................................................18, 23, 26

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*,
   2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016).........................................................................9

*In re Paysafe Sec. Litig.*,
   2025 WL 1003322 (S.D.N.Y. Mar. 31, 2025) .......................................................................19

*In re PXRE Grp., Ltd., Sec. Litig.*,
   600 F. Supp. 2d 510 (S.D.N.Y. 2009).....................................................................................9

*Reilly v. U.S. Physical Therapy, Inc.*,
   2018 WL 3559089 (S.D.N.Y. Jul. 23, 2018) ........................................................................11

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
   573 F.3d 98 (2d Cir. 2009)...................................................................................................12

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015).........................................................................14, 16, 17

*Saraf v. Ebix, Inc.*,
  2024 WL 1298246 (2d Cir. Mar. 27, 2024)................................................................10

*Schaeffer v. Nabriva Therapeutics PLC*,
  2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020).........................................................25

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994).............................................................................18, 27

*Sinay v. CNOOC Ltd.*,
  2013 WL 1890291 (S.D.N.Y. May 6, 2013) ............................................................22

*In re Skechers USA, Inc. Sec. Litig*,
  444 F. Supp. 3d 498 (S.D.N.Y. 2020)......................................................................11

*In re Spero Therapeutics, Inc., Sec. Litig.*,
  2024 WL 4593422 (E.D.N.Y. Oct. 28, 2024)..........................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...........................................................................................7, 8, 23

*In re Travelzoo Inc. Sec. Litig.*,
  2013 WL 1287342 (S.D.N.Y. Mar. 29, 2013) ....................................................10, 11

*In re UBS AG Sec. Litig.*,
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd*, 752 F.3d 173 (2d Cir. 2014) ................21

**Statutes**

PSLRA ............................................................................................................ *passim*

Securities Exchange Act Section 10(b)....................................................................... *passim*

**Rules**

Fed. R. Civ. P. 12(b)(6)...............................................................................................3

**Other Authorities**

21 CFR § 314.110 (2024) ............................................................................................17

*Priority Review*, U.S. FOOD & DRUG ADMIN. (Jan. 4, 2018),
  https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-
  priority-review/priority-review ..............................................................................4

*Step 4 FDA Drug Review*, U.S. FOOD & DRUG ADMIN. (Jan. 4, 2018),
  https://www.fda.gov/patients/drug-development-process/step-4-fda-drug-review ..................6

v

**TABLE OF DEFINED TERMS**

| Abbreviation | Definition |
| --- | --- |
| Adult Study | The ACTION-Galactosemia Phase 1/2 Study, Applied's first clinical trial targeting galactosemia, initiated in June 2019. Compl. ¶48. |
| Applied | Applied Therapeutics, Inc. |
| Class Period | The putative Class Period between January 3, 2024 and December 2, 2024, inclusive. *Id.* ¶1. |
| Complaint | The Second Consolidated Amended Class Action Complaint filed on June 13, 2025. ECF No. 99. |
| Data Deletion | A vendor's deletion, on March 27, 2024, of electronic data for subjects in the Pediatric Study. *Id.* ¶10. |
| Dosing Errors | Labeling error causing 19 subjects enrolled in the Pediatric Study to receive approximately 80% of the intended dose of govorestat between March and June 2021. *Id.* ¶3. |
| FDA | The U.S. Food and Drug Administration. |
| Form 483 | The Form 483 given to Dr. Shendelman on May 3, 2024. *Id.* ¶12. |
| Inspection | The FDA's inspection, between April 29, 2024 and May 3, 2024 conducted as part of the FDA's Bioresearch Monitoring Program. *Id.* ¶143 |
| Late-Cycle Meeting | Applied's late-cycle review meeting with the FDA completed by September 18, 2024. *Id.* ¶261. |
| Mid-Cycle Meeting | Applied's mid-cycle review meeting with the FDA completed late Spring 2024. *Id.* ¶254. |
| NDA | The New Drug Application for govorestat to treat galactosemia submitted by Applied in December 2023 and accepted by the FDA in February 2024. *Id.* ¶¶2, 66, 96. |
| PDUFA | The Prescription Drug User Fee Act. |
| Pediatric Study | The ACTION-Galactosemia Kids Study for govorestat initiated June 2020, also referred to as ACTION-Kids or AT-007-1002. *Id.* ¶¶3, 54. |
| Pediatric Study Results | Results of the Pediatric Study. *See* Evan Bailey et. al., *Results of the ACTION-Galactosemia Kids Study to Evaluate the Effects of Govorestat in Pediatric Patients with* |

|  | *Classic Galactosemia*, JOURNAL OF CLINICAL PHARMACOLOGY (2024). |
|---|---|
| Plaintiff | Martin Dietrich, Lead Plaintiff. |
| PSLRA | Private Securities Litigation Reform Act of 1995. |
| Separation Agreement | The letter detailing the terms of Dr. Shendelman's separation from Applied attached to the 12/20/2024 Form 8-K. *Id*. ¶330. |
| Q-Global | A Web-based administration system used by Applied to capture certain electronic clinical outcome assessments. *Id*. ¶141. |

**PRELIMINARY STATEMENT**

The law does not require executives to be clairvoyant, nor does it require them to assume the worst.  In the context of the development of a new drug, courts recognize the complexity and unpredictability of the regulatory process and decline to impose securities liability except where executives ***know***, and fail to disclose, that existing issues will ***necessarily prevent*** FDA approval. The Complaint fails to allege such particularized facts and should be dismissed.

Shoshana Shendelman is a Ph.D. scientist whose life's work led her to found Applied,[1] a clinical-stage biopharmaceutical company focused on combatting untreated rare diseases. Specifically, Dr. Shendelman led the development of govorestat, a first-of-its-kind drug to treat galactosemia, a rare and debilitating neurological disorder primarily affecting children.

In December 2023, after years of clinical research, Applied submitted a New Drug Application for govorestat, which the FDA accepted and granted Priority Review in February 2024.  Dr. Shendelman and her colleagues communicated regularly with the FDA as Applied moved through important milestones, completing an FDA inspection in May 2024, and holding Mid- and Late-Cycle Meetings with the FDA.  At each step, the FDA could have issued a Complete Response Letter ("CRL"), its mechanism for rejecting an NDA.  Each time the FDA did not issue a CRL, but instead set the date for the next milestone, Applied moved closer to possible approval and commercialization of govorestat.  And while the FDA identified issues with the application, including a dosing error during the clinical phase and a vendor's deletion of source data prior to an FDA inspection, the FDA never indicated that these issues warranted a CRL.  So as Applied

---

[1]    Capitalized terms not defined in the Table of Defined Terms shall have the same meanings ascribed to them in the Complaint.

moved closer to possible approval, Dr. Shendelman shared that progress with the investing public—while noting, of course, that there were still risks govorestat would not be approved.

In late November 2024, however, the FDA issued a CRL and a Warning Letter, which pointed to the Dosing Errors and Data Deletion. In the days that followed, Applied stockholders—including Dr. Shendelman, who owned more than seven million shares—saw Applied's stock price plummet.

Plaintiff's claim amounts to an argument that Dr. Shendelman should have known govorestat would not be approved but misrepresented the NDA review and failed to disclose issues the FDA identified. Plaintiff further alleges that Dr. Shendelman was motivated to commit fraud, because she wanted to increase Applied's stock price, including so she could sell Applied stock during the Class Period. This theory fails because (i) courts recognize that all executives want to see their companies succeed, so that is an insufficient basis to suspect fraud, and (ii) the modest size of Dr. Shendelman's trades—two of which were non-discretionary trades made for tax purposes, and none representing more than 10% of her then-current holdings—cannot support an inference of scienter. Alternatively, Plaintiff attempts to allege that circumstantial evidence shows that Dr. Shendelman knew or should have known that the FDA would not approve govorestat. But this theory relies on conjecture, hindsight, and allegations that Dr. Shendelman was unduly optimistic about the chances of approval, none of which satisfies the rigorous PSLRA pleading requirements for scienter. Taken together, the allegations are far more consistent with an inference that Dr. Shendelman honestly believed govorestat *could* be approved.

Moreover, numerous alleged misstatements in the Complaint are legally inactionable. Statements regarding the outlook of drug approval and interactions with the FDA are quintessential

puffery and immaterial expressions of corporate optimism under settled precedent.    Nor can Plaintiff base a Section 10(b) claim on accurate statements of fact regarding the FDA's review.

At bottom, a failure to accurately predict the future is not fraud, and the Court should dismiss the Complaint.

<h3 align="center">FACTUAL BACKGROUND[2]</h3>

### A.  The Development of Govorestat

Dr. Shendelman founded Applied to develop cutting-edge treatments for rare diseases. Compl. ¶¶36–37.  One such treatment, govorestat, was developed to treat galactosemia, a rare, degenerative, and life-threatening disease predominantly affecting children. *Id.* ¶41.  Patients with galactosemia cannot metabolize galactose, which can result in severe neurological complications. *Id.* ¶¶42–43.

There are no FDA-approved treatments for galactosemia.  *Id*. ¶43.  Govorestat was developed to address this unmet medical need by reducing levels of galactitol in both the blood and the brain, which would improve cognitive performance, motor skills, and behavioral outcomes.  *Id*. ¶44.

### B.  Clinical Trials and NDA Submission for the Treatment of Galactosemia

Applied began its first clinical trial for govorestat, the Adult Study, in June 2019.  *Id.* ¶48. A Pediatric Study commenced in June 2020.  *Id.* ¶54.  Between March and June 2021, 19 test subjects in the Pediatric Study received 80% of the intended dose.  *Id.* ¶69.  On June 17, 2021, Applied notified affected clinical sites of the Dosing Errors and distributed corrected doses by June

---

[2]    This factual background is derived from the allegations in the Complaint and documents incorporated therein by reference, as required on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The description of Plaintiff's allegations is not an admission of the truth or completeness of any allegation nor a concession of the actionability or materiality of any such allegation.

29, 2021. *Id.* ¶3. The Pediatric Study Results were published on November 6, 2024. *Id.* ¶55–56; Ex. A.[3]

In December 2023, Applied submitted the NDA for govorestat for the treatment of galactosemia. Compl. ¶66. In February 2024, the FDA accepted the NDA and granted Priority Review status. *Id.* ¶96. A Priority Review designation "direct[s] overall attention and resources to the evaluation of applications for drugs that, if approved, would be significant improvements in the safety or effectiveness of the treatment … of serious conditions." *Priority Review*, U.S. FOOD & DRUG ADMIN. (Jan. 4, 2018), https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/priority-review.[4] The FDA also established a timeline for review, assigning a PDUFA target action date[5] of August 28, 2024, and noting its plan to hold an advisory committee meeting for the NDA. *Id.* ¶96. In March 2024, the FDA extended the PDUFA date to November 28, 2024. *Id.* ¶126.

## C. FDA Inspection and the Form 483

On March 25, 2024, the FDA announced an inspection of a clinical testing site involved in the Pediatric Study. *Id.* ¶140.

---

[3] This Motion relies on sources attached as exhibits, which the Court may consider because they are "incorporated into the complaint by reference," are "legally required public disclosure documents filed with the SEC," or were "possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also In Re Keryx Biopharmaceuticals, Inc. Sec. Litig.*, 2014 WL 585658, at *13 & n.9 (S.D.N.Y. Feb. 14, 2014) (finding "[t]he [c]ourt may take judicial notice of disclosures made in publicly available SEC documents" and considering "tax withholding" language in a Form 4). These exhibits, attached to the accompanying Declaration of Jules H. Cantor, include copies of the Pediatric Study Results (Exhibit A), the November 27, 2024 Warning Letter (Exhibit B), and Dr. Shendelman's Form 4 filings dated March 18, 2024 (Exhibit C), June 10, 2024 (Exhibit D), and August 14, 2024 (Exhibit E).

[4] This Court may take judicial notice of the FDA's public statements. *See, e.g.*, *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016) (taking judicial notice of FDA guidance "because the Guidance is publicly available and its accuracy cannot reasonably be questioned"); *Gordon v. Target Corp.*, 2022 WL 836773, at *2 (S.D.N.Y. Mar. 18, 2022) (taking judicial notice of two FDA webpages and observing that "[c]ourts may take judicial notice of public documents or … records of administrative bodies … like the FDA").

[5] *See In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 35 n.2 (1st Cir. 2014) ("The PDUFA … requires the FDA to set a target date for approval of the application. This target date, however, is not a guarantee of approval nor is it binding on the FDA.").

4

On March 27, 2024, Applied's third-party vendor deleted certain electronic data collected and maintained in Q-Global for subjects in the Pediatric Study. *Id.* ¶142.  The FDA identified the Data Deletion and the Dosing Errors during the Inspection, which occurred between April 29 and May 3, 2024. *Id.* ¶¶11, 143.  Shortly thereafter, the FDA issued a Form 483[6] detailing findings from the Inspection. *Id.* ¶149.  The Form 483 did not identify the Dosing Errors. *See id.* ¶318; Ex. B at 5 ("We acknowledge that [the Dosing Errors] finding was not included on the [Form 483] you received, and therefore your written response does not address this finding.").  It did, however, include the Data Deletion.  Compl. ¶152.

On May 9, 2024, Applied responded to the Form 483 and informed the FDA that data for 11 test subjects, captured directly into Q-Global, could not be recovered in electronic format. *Id.* ¶156; Ex. B at 3.  Applied's May 9, 2024 written response also included steps taken to "ensure the integrity of the remaining data" and listed a series of planned preventative actions.  Compl. ¶157; Ex. B at 3.

**D. Advancement Through FDA Review**

Notwithstanding its observations in the Form 483, the FDA continued to advance the NDA. The FDA held the Mid-Cycle Meeting in late Spring 2024, Compl. ¶254, and the Late-Cycle Meeting by September 18, 2024, *id.* ¶261.  Additionally, throughout summer and fall 2024, the FDA and Applied corresponded about the NDA, including regarding the Data Deletion. *Id.* ¶318; Ex. B at 4.

---

[6]     A Form 483 is issued to "management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the [FD&C] Act and related Acts."  Compl. ¶140. According to the FDA, a Form 483 "does not include observations of questionable or unknown significance at the time of the inspection." *Id.*

On August 27, 2024, in response to an FDA Information Request, Applied explained that "an export of the [redacted] data from the backup Q-Global[] system is maintained with a third-party statistical consulting vendor; however, the data is no longer available in Q-Global[]." Compl. ¶234; Ex. B at 4.   On September 11, in response to the FDA's September 5, 2024 correspondence providing the Late-Cycle Meeting Background Package, Applied wrote that the third-party vendor deleted the data from the Q-Global system without consulting Applied and that it was able to recover data from the Q-Global system's backup, except for the 11 tests.  Compl. ¶236.  Applied also noted that before the electronic data's deletion, item-level responses were captured in PDF and in paper copies of all score reports.  *Id.*¶236; Ex. B at 4.

During the Late-Cycle Meeting, Applied learned the FDA was cancelling the Advisory Committee meeting tentatively scheduled for October 9, 2024.  Compl. ¶261.  Advisory Committee meetings are typically held where the agency requires additional information.  *Step 4 FDA Drug Review*, U.S. FOOD & DRUG ADMIN. (Jan. 4, 2018), https://www.fda.gov/patients/drug-development-process/step-4-fda-drug-review (While "[o]ften, the NDA contains sufficient data for [the] FDA to determine the safety and effectiveness of a drug," "[s]ometimes … questions arise that require additional consideration.").  In these cases, the FDA may organize an Advisory Committee "to get independent, expert advice and to permit the public to make comments."  *Id.*

On November 27, 2024, Applied received a CRL.  Compl. ¶300.  That same day, Applied filed a Form 8-K stating that "[t]he CRL indicates that the FDA completed its review of the application and determined that it is unable to approve the NDA in its current form, citing deficiencies in the clinical application."  *Id.* ¶303.  Applied also received the Warning Letter on November 27, which it disclosed on Form 8-K on December 2, 2024.  *Id.* ¶¶304, 316.  The next day, the FDA published the Warning Letter.  *Id.* ¶318.

### E. Dr. Shendelman's Stock Sales

During the Class Period, on March 14, June 10, and August 12–14, 2024, Dr. Shendelman sold 1,157,382 of her shares of Applied common stock (the "March Sale," the "June Sale," and the "August Sale," and collectively, the "Sales"). *Id.* ¶335. The March Sale represented 3.8% of Dr. Shendelman's then-owned holdings, *id.* ¶118, the June Sale represented 0.76%, *id.* ¶196, and the August Sale represented 9.06%, *id.* ¶¶232. The March and June Sales were made to "cover tax withholding obligations in connection with the vesting and settlement of compensatory Restricted Stock Units." Exs. C–D. After the Sales, Dr. Shendelman retained 7,803,355 shares of Applied common stock. *Id.* ¶227.

### ARGUMENT

To state a claim under Section 10(b) of the Securities Exchange Act, a "plaintiff must establish that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).[7] Under the PSLRA's "[e]xacting pleading requirements," Plaintiff must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Because Plaintiff fails to adequately allege scienter, the Complaint should be dismissed entirely. Moreover, and independently, certain alleged misstatements are inactionable.

---

[7]    Unless otherwise noted, internal citations, quotations, and alterations are omitted and emphases are added.

## I.    THE COMPLAINT FAILS TO PLEAD SCIENTER.

Under the PSLRA, Plaintiff must allege, with particularity, facts giving rise to a strong inference of scienter.  The requisite state of mind is one "embracing intent to deceive, manipulate, or defraud."  *Id.* at 319.  To satisfy this requirement, Plaintiff must either demonstrate "that defendants had the motive and opportunity to commit fraud," or allege facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA & Local,* 553 F.3d at 198.  To plead recklessness, the alleged conduct must be "highly unreasonable and … an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).  The scienter standard is "inherently comparative," and requires "more than [a] merely plausible or reasonable" inference.  *Tellabs*, 551 U.S. at 314, 323.  "A complaint will survive … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.  If the inference of non-fraudulent intent is more compelling, Plaintiff's claim fails.  *See In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 471–72 (S.D.N.Y. 2008).

Plaintiff's allegations of both motive and recklessness fail to carry his burden.  Under controlling law, the trades identified by Plaintiff and the generic motive alleged are insufficient.  And the facts alleged, including the progress of the FDA's review, do not support an inference of recklessness—instead, the more compelling inference is that Dr. Shendelman reasonably believed govorestat was moving toward approval.  Having failed to adequately allege scienter, the Section 10(b) claim should be dismissed.

### a.    Plaintiff's Motive Allegations Fail as a Matter of Law.

Dr. Shendelman's alleged motive—to have the NDA approved and increase Applied's stock price, Compl. ¶¶342–54, and therefore profit by selling her stock, *id.* ¶¶334–41—cannot

8

support a strong inference of scienter.  To "raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiff[] must allege that [the defendant] benefitted in some concrete and personal way from the purported fraud." *ECA & Local*, 553 F.3d at 198.  The "bare invocation of magic words such as motive and opportunity" will not suffice.  *In re PXRE Grp., Ltd.*, *Sec. Litig.,* 600 F. Supp. 2d 510, 531 (S.D.N.Y. 2009).

Plaintiff theory of motive fails as a matter of law because the combined purpose and proportionate size of her trades cannot support a strong inference of scienter, and the generic, ubiquitous objectives of corporate success alleged do not evince fraudulent intent.

### i. *Dr. Shendelman's Stock Sales Do Not Support an Inference of Fraudulent Intent.*

"[T]he mere fact that insider stock sales occurred does not suffice to establish scienter." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009).  Rather, Plaintiff must establish that the alleged sales were "unusual" or "suspicious."  *See Buhrke Fam. Revocable Tr. v. U.S. Bancorp*, 726 F. Supp. 3d 315, 358 (S.D.N.Y. 2024).  Here, Plaintiff identifies three sales during the Class Period, none of which, taken individually or viewed collectively, are sufficiently unusual or suspicious to give rise to a strong inference of scienter.

*First*, the March and June Sales allow no inference of scienter, as both were nondiscretionary sales to "cover tax withholding obligations in connection with the vesting and settlement of compensatory Restricted Stock Units." Exs. C–D.  Courts have repeatedly held that disposing of shares "to cover the tax withholding obligations due upon the vesting of shares of restricted stock … [is] not indicative of fraud." *In re Keryx*, 2014 WL 585658, at *13; *see also N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016) (same) (collecting cases).  Indeed, the "disclosed

9

nature" of such trades "suggests [an] *absence* of fraudulent motive." *MDC Partners*, 2016 WL 5794774, at *20.

*Second*, the Sales represent only a small percentage of Dr. Shendelman's holdings, and it is settled law that "the inference of scienter is weakened" where sales are "only a small fraction of (the seller's) shares[.]" *In re Travelzoo Inc. Sec. Litig.*, 2013 WL 1287342, at *10 (S.D.N.Y. Mar. 29, 2013).

The March and June Sales—again, made for tax purposes—represented less than 5% of Dr. Shendelman's total holdings on the date of each sale (3.8% and 0.76% respectively), Compl. ¶¶118, 196,[8] while the August Sale represented only 9.06% of her holdings.[9]  *Id.* ¶232.  These Sales do not constitute a suspicious benefit necessary for a strong inference of scienter.  *See Acito v IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (holding that sale of 11% of defendant's holdings was not sufficiently unusual to plead scienter);[10] *see also In re Axis Cap. Holdings Ltd., Sec. Litig.*, 456 F. Supp. 2d 576, 595 (S.D.N.Y. 2006) ("[C]ourts of this district have held that 'insider sales that represent less than ten percent of that insider's holdings are insufficiently "unusual" to permit an inference of scienter.'").

Plaintiff alleges that, collectively, the Sales constituted 13.8% of Dr. Shendelman's total holdings prior to her first sale during the Class Period, Compl. ¶336, but even if the March and June Sales were relevant to scienter, this percentage is still too low to establish a *strong* inference. *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006) (under Second Circuit guidance, sales of 17.4% and 10.9% of defendants' holdings "are *de minimis*") (citing *Acito*, 47

---

[8]    *See also* Exs. C–D.

[9]    *See also* Ex. E.

[10]    Though decided prior to the enactment of the PSLRA, *Acito* continues to be relied on by this Circuit.  *See, e.g.*, *Saraf v. Ebix, Inc.*, 2024 WL 1298246, at *3 (2d Cir. Mar. 27, 2024) (citing *Acito* for proposition that motive to maintain a high stock price to increase executive compensation does not give rise to a strong inference of scienter).

F.3d at 54); *see also Travelzoo*, 2013 WL 1287342, at *10 (an individual defendant's sale of 22% of his stockholdings for $186 million was not unusual because he still retained 78% of his total stockholdings); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 382–83 (E.D.N.Y. 2003) (no inference of scienter where "the individual defendants sold less than 20% of their available holdings").

Further, the size of Dr. Shendelman's post-Sales holdings is entirely inconsistent with fraudulent intent. As Plaintiff acknowledges, Dr. Shendelman owned or controlled **7,803,355** shares of Applied common stock following the Sales. Compl. ¶227. It is implausible that Dr. Shendelman allegedly knew that govorestat would not be approved yet continued to hold 90% of her stock after the August Sale. *See Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 218 (S.D.N.Y. 2018) (finding no motive where defendant "still retained millions worth of stock options after his sale").[11] Plaintiff's allegations do not support an inference of scienter.

### ii.   *The Motivation of Corporate Actors to Keep the Stock Price High is Not Indicative of Scienter.*

Similarly misplaced are Plaintiff's allegations that Dr. Shendelman wanted to see the NDA approved and increase the stock price to reach incentive compensation goals. Compl. ¶¶342–54. Because it is reasonable—indeed, expected—that executives want their companies to succeed, such generic allegations do not give rise to the strong inference of scienter required to carry Plaintiff's burden under the PSLRA. Accordingly, courts have declined to infer scienter from

---

[11]   Plaintiff's allegations that the Sales were suspicious in timing, Compl. ¶341, do not support a strong inference of scienter. Indeed, Dr. Shendelman's last sale during the Class Period occurred over ***three months*** before the first alleged corrective disclosure, which caselaw teaches is sufficiently attenuated to undercut any inference of scienter. *See, e.g.*, *In re Skechers USA, Inc. Sec. Litig*, 444 F. Supp. 3d 498, 524 (S.D.N.Y. 2020) (defendant's sale that preceded the alleged corrective disclosure by at least a month and a half insufficient to create a strong inference of scienter); *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *14 (S.D.N.Y. Jul. 23, 2018) ("[C]ourts in this Circuit are frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a negative disclosure.").

motives including "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation." *Kalnit*, 264 F.3d at 139; *accord*, *e.g.*, *Acito*, 47 F.3d at 54 ("Plaintiff's allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is without merit.").[12]    Because Dr. Shendelman's desire for the NDA to be approved—that is, for Applied to succeed—is a "[m]otive[] that [is] common to most corporate officers," it likewise cannot establish scienter. *ECA & Local*, 553 F.3d at 198.

### b. Plaintiff Fails to Allege Circumstantial Evidence of Conscious Misbehavior or Recklessness.

Failing to allege motive, Plaintiff's Section 10(b) claim survives only if it alleges specific facts constituting "strong circumstantial evidence" of "conscious misbehavior or recklessness." *Kalnit*, 264 F.3d at 142.  Recklessness is conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it[.]" *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis omitted).  Without any well-pleaded allegations of motive, "the strength of [Plaintiff's] circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142.  Plaintiff has not met this high burden.

Plaintiff alleges that Dr. Shendelman was aware, or severely reckless in not knowing, that the Data Deletion and the Dosing Errors constituted "material risks" to approval of the NDA. Compl. ¶¶163–223.  But this is not the standard.  Instead, precedent instructs that, to infer scienter, a plaintiff must allege the executive ***knew*** an issue would ***necessarily prevent*** approval, or such

---

[12]      Plaintiff's allegations that Dr. Shendelman was motivated to inflate Applied's stock price to reach incentive compensation goals, Compl. ¶¶342–354, are undercut by the longstanding principle that "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated." *Acito*, 47 F. 3d at 54; *Kalnit*, 264 F.3d at 139–141 (collecting examples of insufficient alleged motive related to compensation and corporate performance).

executive did not honestly believe their statements regarding approval to be true.  *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 579 (S.D.N.Y. 2016).  But even if Plaintiff's "material risk" standard were supported by precedent—it is not—the Complaint fails to adequately allege that Dr. Shendelman knew the Data Deletion and Dosing Errors constituted material risks to approval.  Plaintiff's own allegations, *e.g.*, Compl. ¶235, show that, despite the FDA's awareness of the Data Deletion and Dosing Errors, it did not immediately issue a CRL or inform Applied that approval was unlikely, much less impossible.  Instead, the FDA continued to advance govorestat through the review process.    Plaintiff's remaining allegations—that Dr. Shendelman was a "key employee," govorestat was Applied's "core operation," Dr. Shendelman put her knowledge on the subject "at issue," Dr. Shendelman was "terminated," and Dr. Shendelman made misleading statements after the Class Period, *id.* ¶¶355–83—endeavor to circumstantially show scienter in ways that have been rejected by Second Circuit courts and cannot carry Plaintiff's heightened burden under the PSLRA.  *See infra* Sections II(b)(ii)-(iv).

### i.   *Dr. Shendelman's Awareness of the Data Deletion and the Dosing Errors Does Not Support Scienter.*

Plaintiff alleges that Dr. Shendelman's optimistic statements about the NDA's approval prospects were reckless considering her knowledge of the Data Deletion and Dosing Errors. Compl. ¶¶163–224.  This hindsight theory fails.

*First*, Dr. Shendelman's awareness of potential regulatory hurdles alone does not support an inference of scienter.  "In the context of the development and approval process for a new drug," there is scienter only "if the management ***knows that certain facts will necessarily prevent the regulatory approval***[.]"  *Gillis*, 197 F. Supp. 3d at 579.  "If, on the other hand, the management of the company releases positive reports about the drug to the public along the way ***which the management honestly believes to be true***, and where there is no reckless disregard for the truth,

13

then that is not securities fraud." *Id.* Plaintiff fails to allege any particularized facts indicating that Dr. Shendelman **knew** the Data Deletion or Dosing Errors would **necessarily prevent** approval, or that she did not honestly believe her statements to be true.

*In re Sanofi Securities Litigation* is instructive. 87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016). There, Sanofi sought approval of a drug utilizing a single-blind study. *Id.* at 519. The FDA repeatedly "expressed concerns" about the study design and even advised Sanofi that the clinical trials would "'not provide substantial support' for a license application," but nevertheless continued to advance the drug through its review stages. *Id.* Sanofi did not disclose the FDA's concerns about the study and "continued to make optimistic statements about [the drug's] prospects." *Id.* at 522. Thereafter, the FDA rejected the drug application. *Id.* at 523. The ensuing Section 10(b) claim argued that "defendants knew about the design shortcomings in the [company's] clinical trials … yet failed to disclose that interim feedback, and were aware or recklessly failed to appreciate that the absence of such a disclosure made their optimistic projections about FDA approval false and misleading." *Id.* at 534. The court declined to draw an inference of scienter and dismissed, because, "in expressing misgivings about a single-blind methodology, the FDA did not state that it would **refuse** to approve [the drug] were this methodology used." *Id.* at 533. Rather, "a series of actions by the FDA … communicated that timely agency approval **was** possible." *Id.* (emphasis in original).

Here, Plaintiff fails to allege that Dr. Shendelman did not genuinely believe the NDA could be approved, let alone that she knew Applied would receive a CRL. And the FDA's statements and actions allegedly known to Dr. Shendelman "were by no means inconsistent with [her] stated optimism." *Id.* at 534.

14

To the contrary, Applied's interactions with the FDA supported Dr. Shendelman's reasonable belief that approval was possible.  Despite its awareness of the Data Deletion and Dosing Errors, Compl. ¶87, the FDA advanced govorestat through its review stages, proceeding with the Mid-Cycle and Late-Cycle Meetings, *id.* ¶¶254, 261, and maintained correspondence with Applied regarding the Data Deletion through summer and fall of 2024, *id.* ¶ 318; Ex. B at 4.

And the Warning Letter acknowledges that the Form 483 *did not even mention the Dosing Errors*.  Compl. ¶318; Ex. B at 5.  As Plaintiff notes, the purpose of a Form 483 is to "notif[y] the company's management of objectionable conditions."  *Id.* ¶155.  A Form 483 does not include observations "of questionable or unknown significance at the time of the inspection."  *Id.*  If anything, the fact that the Dosing Errors were not identified in the Form 483 suggested that the FDA considered them to be "of questionable or unknown significance," *not* fatal flaws that would doom approval.  Moreover, the Pediatric Study Results indicate that "several of the key secondary endpoints were statistically significant and demonstrated substantial clinical benefit of govorestat at 18 months," Ex. A at 7, despite some participants receiving a lower dose than intended.  It is unreasonable to believe that if patients had received the intended higher dose, the results would be *less* statistically significant.  These facts weigh against Plaintiff's assertion that Dr. Shendelman should have known that the Dosing Errors would prevent approval; they certainly do not support an inference of recklessness or fraud.

Further, the mere fact that Applied received interim feedback during the review process does not support a strong inference of scienter.  In *In re Alkermes Public. Ltd. Co. Securities Litigation*, the court found no scienter where the defendant was similarly aware of FDA concerns but "the FDA nonetheless permitted the drug to proceed through various stages of approval prior to its ultimate denial of the application."  523 F. Supp. 3d 283, 295 (E.D.N.Y. 2021).  The court

15

found that the FDA's communications expressing concerns did not reveal information conveying that "FDA approval of the [drug] was not possible or even unlikely." *Id.* at 295; *see also In re Sanofi*, 87 F. Supp. 3d at 545 ("[T]he significance of [the FDA's interim] feedback became apparent only after the FDA had released … its decision not to approve [the drug]."). Here, too, there was no indication that approval was unlikely. To the contrary, "implicit in the ongoing dialogue between the FDA and [Applied] was a collective expectation that the process was an iterative one and that [Applied] would continue to respond to feedback in its continued effort to seek approval of [govorestat]." *In re Alkermes*, 523 F. Supp. 3d at 294.

The Form 483 also does not support a strong inference of scienter. In *In re Checkpoint Therapeutics Sec. Litig.*, 2025 WL 1434400, at *23 (S.D.N.Y. May. 19, 2025), the court rejected the theory that defendants—by allegedly concealing a manufacturing third-party's receipt of Forms 483—"knowingly misled the market about [the company's] prospects for receiving FDA approval[.]" The court found that the alleged "fraud[ulent] scheme … to conceal the fact that the Form 483 presented an insurmountable obstacle, as opposed to a readily clearable regulatory hurdle—is not coherent." *Id.* at *24. While the plaintiff failed to allege defendants knew of the Forms 483, the court observed that "even assuming … it were well-pled that defendants knew," the Forms 483 were "merely observational in nature, and did not represent the FDA's final word." *Id.* at *17. After all, a Form 483 "presents as a formidable problem" only "in hindsight[,] with awareness that the FDA ultimately did not approve [a drug] by its [] PDUFA goal date." *Id.*

Like the defendant in *In re Checkpoint*, Dr. Shendelman "had sound reasons not to treat the Form 483 as more than a navigable speed bump." *Id.* at *27. That the Form 483 was "observational in nature" similarly undermines an inference of scienter. *Id.* Plaintiff's "speculative competing inference" is far less compelling than the inference that Dr. Shendelman,

16

"who did not have an affirmative duty to mention the Form 483, did not do so because [she] believed that [govorestat] remained on track for timely FDA approval." *Id.*

Govorestat's advancement through the review process also undermines any inference of recklessness. The FDA could have issued a CRL at any time, including after the Inspection, the Mid-Cycle Meeting, or the Late-Cycle Meeting.[13] As the review proceeded without a CRL, Dr. Shendelman had good reason to believe that the NDA might be approved. Put differently, the "FDA's negative feedback was muted by a series of encouraging regulatory decisions" that allowed the NDA to proceed through the approval process prior to ultimate disapproval. *In re Sanofi*, 87 F. Supp. 3d at 545. There is no allegation that the FDA ever communicated that approval of the NDA was impossible, or even unlikely. These facts cannot support an inference of recklessness.

*Second*, Plaintiff's theory relies on the premise that, because govorestat was ultimately not approved, earlier optimistic statements must have been at least reckless. But this is exactly the type of impermissible hindsight pleading that has been repeatedly rejected in this Circuit.

"Mere allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Gissin v. Endres*, 739 F. Supp. 2d 488, 501 (S.D.N.Y. 2010). That the NDA was later denied does not imply that Dr. Shendelman's statements during the regulatory process were knowingly false or reckless. After all, "[c]orporate officials need not be clairvoyant[.]" *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*, 655 F. Supp. 2d 262, 268 (S.D.N.Y. 2009).

---

13      *See*, *e.g.*, 21 CFR § 314.110 (2024) (if the FDA determines that the submitted data is "inadequate to support approval," the FDA may "issue a [CRL] without first conducting required inspections and/or reviewing proposed product labeling").

17

Dr. Shendelman's alleged "optimism," *e.g.*, Compl. ¶322, also does not support an inference of recklessness.  A corporate officer's "misguided optimism is not a cause of action, and does not support an inference of fraud."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994).[14]  And even when "optimism about a prosperous future turn[s] out to be unwarranted," that "is not circumstantial evidence of conscious fraudulent behavior or recklessness," *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 314 (S.D.N.Y. 2021), because management is "not required to take a gloomy, fearful or defeatist view of the future," *Shields*, 25 F.3d at 1129.  In other words, optimism is not recklessness, because the law does not require executives to expect and foresee the worst.

*Finally*, Plaintiff's allegation that Dr. Shendelman was reckless in not knowing that "omissions and errors in the NDA were a significant and material negative factor for approval of the NDA, and [posed] a serious risk that the FDA would reject [the] NDA" is simply a repackaged argument that Dr. Shendelman "ought to have known" better.  Compl. ¶359.  "An allegation that a defendant merely ought to have known is not sufficient to allege recklessness."  *In re Lululemon Litig.*, 14 F. Supp. 3d 553, 574 (S.D.N.Y. 2014); *see also In re MELA Sciences, Inc. Sec. Litig.*, 2012 WL 4466604, at *9 (S.D.N.Y. Sept. 19, 2012) (finding plaintiffs' claim that defendants "should have known approval would be delayed" to be "insufficient to adequately plead strong circumstantial evidence showing recklessness").  Taken together, Plaintiff's allegations cannot support an inference of scienter.

---

[14]     Though decided prior to the enactment of the PSLRA, *Shields* continues to be relied on by courts in this Circuit.  *See, e.g.*, *Bazzelle v. Novocure Ltd.*, 2025 WL 843668, at *10 (S.D.N.Y. Mar. 18, 2025) (citing *Shields* for proposition that misguided optimism is not a cause of action and does not support an inference of fraud).

####    ii.    *Allegations That Dr. Shendelman Was a Key Employee and an Author of the Clinical Studies Are Insufficient.*

Plaintiff's allegations concerning Dr. Shendelman's role as a "key employee" of Applied and her involvement in the Pediatric and Adult Studies also do not raise any inference of scienter. Compl. ¶¶355–60. Alleging that Dr. Shendelman must have known that the alleged misstatements were false or misleading because she was a "key employee" is conclusory and courts have repeatedly rejected similar attempts to establish scienter. *See, e.g.*, *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 212 (S.D.N.Y. 2012) ("Scienter cannot be inferred solely from the fact that, due to the defendants' … executive managerial position, they had access to … adverse information."). The only other allegation Plaintiff makes in support of this "key-employee" theory is that, because Dr. Shendelman was "critically involved in the Pediatric Study," she was aware, or severely reckless in not being aware, that the Data Deletion and Dosing Errors constituted a material risk that the NDA would be rejected. Compl. ¶359. This is merely another version of Plaintiff's fraud-by-hindsight argument, *id.* ¶¶163–223, and fails for the same reasons discussed above. *See supra* Section I(b)(i).

####    iii.    *The Core Operations Doctrine Cannot Independently Establish Scienter.*

Next, Plaintiff attempts to establish an inference of scienter by invoking the core operations doctrine. Compl. ¶¶361–68. The core operations doctrine allows a court to "infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *In re Spero Therapeutics, Inc., Sec. Litig.*, 2024 WL 4593422, at \*8 (E.D.N.Y. Oct. 28, 2024). The Second Circuit, however, "has not expressly determined if the core operations doctrine remains applicable to proving scienter after the enactment of the PSLRA." *In re Paysafe Sec. Litig.*, 2025 WL 1003322, at \*30 (S.D.N.Y. Mar. 31, 2025); *see also Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012) ("[W]e

19

have not yet expressly addressed whether, and in what form, the 'core operations' doctrine survives as a viable theory of scienter."). Regardless, recent decisions indicate that a "core operations" theory provides—at most—"supplementary but not independently sufficient means to plead scienter." *Denny v. Canaan Inc.*, 2023 WL 2647855, at \*14 (S.D.N.Y. Mar. 27, 2023); *see also Glantz v. James River Group Holdings, Ltd.*, 2025 WL 278440, at \*8 (S.D.N.Y. Jan. 23, 2025). Because Plaintiff's other allegations of scienter are insufficient, there is nothing for the core operations theory to "supplement," so it cannot save Plaintiff's deficient claims.

### iv. *The Fact That Dr. Shendelman Spoke Regularly About the NDA Does Not Establish Scienter.*

Plaintiff's allegation that Dr. Shendelman put her knowledge at issue by speaking regularly and in detail about the NDA, Compl. ¶¶370–71, is conclusory and insufficient. In *In re Bristol-Myers Squibb Co. CVR Securities Litigation*, plaintiffs argued that the fact that the company's "'top management repeatedly made false or misleading statements' is … probative of scienter." 658 F. Supp. 3d 220, 233 n.6 (S.D.N.Y. 2023). The court rejected this argument, finding it was "circular" and "without merit." *Id.* ("[A]lleging that [statements] were incomplete or that they omitted material information[] is not enough to plead scienter based on conscious misbehavior or recklessness."); *see also In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 2024 WL 873436, at \*4 n.2 (S.D.N.Y. Feb. 29, 2024) (no inference of scienter where "executives regularly spoke in detail about the state of the … approval process").

### v. *Dr. Shendelman's Separation Agreement Does Not Support an Inference of Scienter.*

Plaintiff also alleges that Dr. Shendelman's Separation Agreement "supports a strong inference … that [her] resignation was not voluntary and was instead either forced or was actually a termination." Compl. ¶332. The Complaint does not support that logical leap, but even accepting this conclusory allegation as true, "[t]erminations or resignations of corporate executives are

insufficient alone to establish an inference of scienter." *In re Adient PLC Sec. Litig.*, 2020 WL 1644018, at \*29 (S.D.N.Y. April 2, 2020). Courts routinely recognize that there are many reasons an executive might resign or be terminated, "most of which are not related to fraud." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 815 (S.D.N.Y. 2018) (rejecting inference of scienter where key executives were terminated for failing to adhere to a code of conduct). Accordingly, "terminations do not support a strong inference of scienter" absent "additional factual allegations" "linking [those terminations] … to the alleged fraud." *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at \*18 (S.D.N.Y. Sept. 28, 2012), *aff'd*, 752 F.3d 173 (2d Cir. 2014). Plaintiff has not alleged a single particularized fact tying Dr. Shendelman's departure to the supposed fraud. Without "independent evidence corroborating that the employee" whose employment circumstances changed "held a culpable state of mind," the Court need not credit Plaintiff's conclusory allegation. *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 321 (S.D.N.Y. 2021).

### vi. *Dr. Shendelman's Post-Class Period Statements Do Not Support an Inference of Scienter.*

Finally, Plaintiff alleges that Dr. Shendelman's statements on a podcast, made well after the Class Period, "support[] a strong inference that Dr. Shendelman [] made misleading statements about the NDA and communications with the FDA about the NDA … during the Class Period." Compl. ¶¶376–83. As an initial matter, these statements are inactionable, because "a defendant is liable only for those statements made ***during the class period***." *In re Garrett Motion Inc. Sec. Litig.*, 2022 WL 976269, at \*15 (S.D.N.Y Mar. 31, 2022). Nor can Plaintiff's allegation support an inference of ***scienter*** by asking the Court to infer that Shendelman made misleading statements. *See In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 448 n.92 (S.D.N.Y. 2006) ("[S]cienter

is a distinct element of securities fraud and ought not to be confused or combined with the requirement that a statement be false or misleading.").

Post-class period statements have relevance to scienter only where they "confirm what defendant **knew or should have known** during the class period." *Sinay v. CNOOC Ltd.*, 2013 WL 1890291, at *8 (S.D.N.Y. May 6, 2013). But the alleged podcast statements reveal nothing, because they are entirely consistent with Applied's disclosures and Dr. Shendelman's statements during the class period. Even if they were not, "a post-class period statement about a belief or knowledge a party has at the time that post-class period statement was made does not necessarily impute that belief or knowledge to the class period." *In re Garrett Motion Inc. Sec. Litig.*, 2023 WL 2744029, at *11 n.8 (S.D.N.Y. Mar. 31, 2023).

Plaintiff points to Dr. Shendelman's comment that the CRL was "based on … data processing and handling procedures." Compl. ¶379. But this statement is not inconsistent with Applied's disclosure that the CRL "cit[ed] deficiencies in the clinical application," *id.* ¶303, and says nothing about Dr. Shendelman's knowledge or state of mind at the time the alleged misstatements were made. Similarly, Dr. Shendelman's statement that there was "data to back up [the NDA]," *id.* ¶379, is consistent with the FDA's acknowledgement in the Warning Letter that the Data Deletion did not result in a wholesale loss of data, because "before the electronic data's deletion, item-level responses were captured in PDF and in paper copies of the score reports," *id.* ¶318.[15]

In sum, none of the podcast statements reveal information that Dr. Shendelman allegedly knew, but did not disclose, or any conflict between the alleged Class Period statements and the

---

[15] Plaintiff's attempt to use Dr. Shendelman's general awareness that there are "hundreds of pages" of FDA regulations to suggest she knew that any particular regulation—unspecified by Plaintiff—would lead to the NDA's rejection, Compl. ¶386, is simply another flavor of impermissible fraud by hindsight. *See* Section I(b)(i), *supra*.

alleged corrective disclosures.  If anything, the fact that Dr. Shendelman's alleged statements were consistent before and after the alleged corrective disclosures supports the reasonable inference that there was no intent to mislead, and she honestly believed the statements at the time they were made.  This undercuts Plaintiff's allegations of scienter.  *Tellabs*, 551 U.S. at 314 ("[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non fraudulent intent.").  At bottom, Plaintiff must allege a **strong** inference of scienter, and these innocuous sound bites are no substitution for the particularized allegations required under the PSLRA.

## II.    THE COMPLAINT ALLEGES NUMEROUS INACTIONABLE MISSTATEMENTS

Moreover, many of Plaintiff's alleged misstatements are independently inactionable.[16] First, Dr. Shendelman's expressions of optimism about the NDA's approval prospects are statements of opinion and inactionable puffery.  *See Gillis*, 197 F. Supp. 3d at 585 n.15 (statements regarding FDA approval were "inactionable 'expression[s] of puffery and corporate optimism'").  Second, Plaintiff fails to allege that Dr. Shendelman's statements about the progress of the FDA's review were anything but truthful statements of fact.  *See In re MELA Sciences*, 2012 WL 4466604, at *12 (holding that defendant's statements that the FDA granted expedited review were "accurate statements of fact" and therefore inactionable).

### a.    Statements Expressing Optimism for NDA Approval Were Immaterial.

#### i.    *Expressions of Confidence in NDA Approval*

Plaintiff's alleged misstatements include various positive statements about the approval of the NDA, such as "we remain confident in the potential for govorestat approval," "things are going

---

[16]    Attached as Appendix A is a compilation of the alleged misstatements relevant to this Section. Dr. Shendelman's focus on these alleged misstatements should not be construed as a concession as to the alleged misstatement's actionability, and Dr. Shendelman reserves all rights to challenge the actionability of any alleged misstatement should this matter proceed past the pleadings stage.

very well," and FDA interactions are "on track."  *See* App'x A FS12, FS21, FS23.  But such statements are nothing more than the "ordinary expressions of corporate optimism" that courts hold cannot support a Section 10(b) claim.  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004); *see also In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at \*12 (S.D.N.Y. Sept. 14, 2015) (dismissing Section 10(b) claims based on statements that FDA review process was "on track" because, "insofar as these statements place a positive spin on developments in the … process, they constitute inactionable puffery and corporate optimism").

Indeed, the majority of the alleged misstatements are substantially similar to the categories of statements rejected in *In re Bristol-Myers*—specifically, regarding (i) the opportunity to bring the drug to, and potential to help, patients,[17] (ii) the potential commercial launch of the drug,[18] and (iii) "confidence" in FDA approval.[19]  312 F. Supp. 2d at 557–558.  Analyzing each category, the *In re Bristol-Myers* court concluded such statements to be "plainly opinions, not guarantees" of FDA approval, and therefore inactionable.  *Id.*  These statements are inherently subjective, made in the context of a regulatory process known to be lengthy and uncertain,[20] and incapable of being proven true or false at the time they were made.  *Id.* at 562 (noting there is an "inherent" amount of "uncertainty … in any application for FDA approval").  Other courts have held that similar statements expressing confidence in FDA approval are insufficient to form the basis for a Section 10(b) claim.  *See, e.g.*, *Fort Worth Emps.' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 230 (S.D.N.Y. 2009) ("mere[] expressions of 'hope' that the FDA would approve [the drug]" were

---

[17]    *See, e.g.*, App'x A FS33 ("[W]e look forward to ***potentially making this drug available to patients*** later this year in the U.S. …"); FS61 ("…We look forward to the ***opportunity to bring govorestat to patients*** in 2025.").

[18]    *See, e.g.*, App'x A FS32 ("With potential approvals on the horizon, we are ***continuing to prepare for commercial launch of govorestat*** ….").

[19]    *See, e.g.*, App'x A FS28 ("… ***[W]e're very confident in the process*** and we're very hopeful that this will be the first drug approved for Galactosemia later this year.").

[20]    The timeline for the PDUFA process alone takes "generally ten months for most [NDAs] and six months for those with priority review."  Compl. ¶97.

24

"soft" and "immaterial on their face as a matter of law"); *Gillis*, 197 F. Supp. 3d at 589 (defendant's statements that it was "encouraged" by the FDA's feedback and "confident" that a drug would receive FDA approval were each inactionable opinions).  The Court should likewise find here.

The fact that the Form 483 was not disclosed does not change the analysis, because, as discussed *supra* Section I(b)(i), Plaintiff does not articulate why Dr. Shendelman should have reasonably expected a denial of govorestat based on receipt of the Form 483.

### ii.   *Statements Referencing Applied's Regulatory Progress*

Dr. Shendelman's statements referencing Applied's regulatory progress are likewise inactionable.  In *Gillis*, the court found an officer's characterization of a company's "initiation and filing of [an] NDA as 'milestones' that reflected the 'significant progress' the company was making toward FDA approval" to be an "inactionable expression of puffery and corporate optimism."  197 F. Supp. 3d at 585 n.15.  *Gillis* reasoned that similar statements are "too 'broad and nebulous as to not provide any specific or concrete guarantee on which a reasonable investor could have relied.'"  *Id.*  This Court should apply the same reasoning here to conclude that statements about making "significant clinical and regulatory progress" and achieving "key milestones for [its] rare disease pipeline," App'x A FS7, are likewise inactionable and cannot form the basis for Plaintiff's Section 10(b) claim.  *See Schaeffer v. Nabriva Therapeutics PLC*, 2020 WL 7701463, at *9 (S.D.N.Y. Apr. 28, 2020) (statements "[d]escribing the NDA submission as 'another major milestone' … are classic examples of puffery"); *In re EDAP*, 2015 WL 5326166, at *4, 10 (statement that FDA's acceptance of an application was a "major milestone" was puffery).

25

**b. Statements Related to the Late Stage of the FDA's Review and the PDUFA Date Are Not False.**

Plaintiff identifies as misstatements certain statements describing the status of the FDA's review. But the Complaint does not allege that these statements were false, and the statements are therefore inactionable. *See In re Bristol-Myers*, 312 F. Supp. 2d at 557 (a securities claim cannot be based on true statements).

In *Biovail*, the court found alleged misstatements that "the FDA accepted [an NDA] … for review" and that "the FDA is expected to respond to [the] NDA" by a certain date inactionable because they "merely recite[] … historical fact[s] … not alleged to be false." 615 F. Supp. 2d at 230. Just like *Biovail*, certain alleged misstatements identified in the Complaint "are in no way misleading" and are therefore inactionable. *In re MELA Sciences,* 2012 WL 4466604, at *12; *see also Gillis*, 197 F. Supp. 3d at 586 (finding certain alleged misstatements to be "accurate statements of objective historical facts" and "not at all misleading").

For example, statements that the PDUFA date was rescheduled for November 28, 2024,[21] and that the NDA was in "late stage" review,[22] are simply recitations of fact. Nowhere does the Complaint allege that the PDUFA date was not, in fact, rescheduled, or that it was rescheduled for a different date than November 28, 2024. And it was true that the NDA was in the late stage of FDA review. Compl. ¶219 ("On September 5, 2024, the FDA sent Applied … the ***Late Cycle Meeting*** Background Package ….").

Plaintiff alleges that the omission of the Data Deletion and Dosing Errors made these statements misleading, because "these undisclosed facts were negative material factors and a significant risk that the FDA would not approve the NDA." Compl. ¶296. This is the same

---

[21]    *See, e.g.,* App'x A FS64 ("For Galactosemia, we're under review at the FDA with a ***PDUFA date of November 28th*** this month ….").
[22]    *See, e.g.*, App'x A FS67 ("So to sum up, ***govorestat is in late stage review*** ….").

fraud-by-hindsight approach that has been firmly rejected by this Circuit and can no more render the statements false than it can create an inference of scienter.  *See Shields*, 25 F.3d at 1129 (rejecting "the legitimacy of alleging fraud by hindsight").  It is simply not enough to allege that a statement was "not borne out by subsequent events."  *Bazzelle*, 2025 WL 843668, at *9.

Plaintiff has failed to allege that the statements related to the stage of the review process and the PDUFA date are false.  Therefore, these statements are inactionable, and should be dismissed.

## III.    THE SECTION 20(A) CLAIMS SHOULD BE DISMISSED.

Because Plaintiff fails to state a violation of Section 10(b), the Section 20(a) claim against Dr. Shendelman likewise fails.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (where plaintiff "fail[ed] to allege any primary violation" under Section 10(b), it could not "establish control person liability" under Section 20(a)).

<strong>CONCLUSION</strong>

For the foregoing adequate and independent reasons, the Complaint should be dismissed in its entirety.

Dated: June 27, 2025                            Respectfully submitted,

                                               */s/ Rachel M. Fritzler*

                                               Rachel M. Fritzler
                                               Bella F. Gianani
                                               KIRKLAND & ELLIS LLP
                                               601 Lexington Avenue
                                               New York, New York 10022
                                               (212) 446-4800
                                               Rachel.Fritzler@kirkland.com
                                               Bella.Gianani@kirkland.com

                                               Mark Filip, P.C.
                                               Jules H. Cantor
                                               KIRKLAND & ELLIS LLP
                                               333 W. Wolf Point Plaza
                                               Chicago, Illinois 60654
                                               (312) 862-2000
                                               Mark.Filip@kirkland.com
                                               Jules.Cantor@kirkland.com

                                               *Attorneys for Shoshana Shendelman*

## **LOCAL RULE 7.1(c) CERTIFICATION**

I hereby certify that the foregoing Memorandum of Law complies with the word-count limitations as set forth in Local Rule 7.1(c).  The foregoing Memorandum contains 8,697 words, exclusive of the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, but does include material contained in footnotes, according to the word processing software used to prepare it.

Dated: New York, New York
   June 27, 2025        Respectfully submitted,

                  */s/ Rachel M. Fritzler*

                  Rachel M. Fritzler