**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE APPLIED THERAPEUTICS SECURITIES LITIGATION | Case No. 1:24-cv-09715 (DLC) (VF) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANT RICCARDO PERFETTI'S MOTION TO DISMISS THE**
**<u>SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

**WOLF POPPER LLP**
Robert C. Finkel
rfinkel@wolfpopper.com
Joshua W. Ruthizer
jruthizer@wolfpopper.com
Emer Burke
eburke@wolfpopper.com
Samuel Coffin
scoffin@wolfpopper.com
845 Third Avenue, 12th Floor
New York, New York 10022
Telephone: (212) 759-4600

*Attorneys for Court-Appointed Lead Plaintiff Dr.*
*Martin Dietrich and Court-Appointed Lead*
*Counsel to the Proposed Class*

**TABLE OF CONTENTS**

I.  Preliminary Statement.................................................................................................... 1

II.  Statement of Relevant Facts........................................................................................ 3

    A.  Applied's Clinical Trials for Govorestat to Treat Galactosemia ........................... 3

    B.  The Materially Deficient NDA ............................................................................ 4

    C.  The FDA Discovers and Defendant Learns that Clinical Data Was Deleted in Violation of FDA Regulations and that the FDA Could Not Verify the Clinical Data in the NDA ...................................................................................................... 5

    D.  The Truth is Disclosed Through a Series of Partial Corrective Disclosures .......... 6

III.  Argument ..................................................................................................................... 8

    A.  The Complaint Adequately Alleges That Perfetti Made Materially False and Misleading Statements in Violation of Section 10(b) and Rule 10b-5 ................... 8

    B.  Perfetti Is a "Maker" of Statements 1-4 ............................................................... 8

        1.  Perfetti Is a "Maker" of Statements 1 and 3 ............................................... 9

        2.  Statement 2 is Attributable to Perfetti......................................................... 11

        3.  Statements 1, 3, and 4 Were Materially False and Misleading................. 13

        4.  Statement 2 Was Materially False and Misleading.................................. 15

    C.  The Complaint Adequately Alleges a Strong Inference of Perfetti's Scienter ..... 17

        1.  Plaintiff's Motive Allegations Support a Strong Inference of Scienter.... 17

        2.  Plaintiff Adequately Pleads a Strong Inference of Scienter Based on Perfetti's Deliberate Recklessness ............................................................. 19

        3.  The Complaint Alleges Perfetti's Involvement and Scienter with Particularity................................................................................................. 22

    D.  Plaintiff Has Adequately Pled Loss Causation .................................................... 23

    E.  Plaintiff Adequately Pleads a Section 20(a) Claim Against Perfetti .................... 24

IV.  Conclusion ................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Allergan PLC Sec. Litig.*,
Case No. 18 Civ. 12089 (CM), 2019 WL 4686445 (S.D.N.Y. Sept. 20, 2019) ........................ 8

*Anderson v. Abbott Labs*,
140 F. Supp. 2d 894 (N.D. Ill. 2001) ................................................................................ 16

*Busic v. Orphazyme A/S*,
Case No. 21 Civ. 3640, 2022 WL 3299843 (N.D. Ill. Aug. 11, 2022) .................................... 19

*Caiola v. Citibank, N.A.*,
295 F.3d 312 (2d Cir. 2002) ............................................................................................ 16

*Christiansen v. Spectrum Pharms., Inc.*,
Case No. 22 Civ. 10292 (VEC), 2024 WL 246020  (S.D.N.Y. Jan. 23, 2024) ........................ 19

*In re CIT Grp. Inc. Sec. Litig.*,
Case No. 08 Civ. 6613(BSJ), 2010 WL 2365846  (S.D.N.Y. Sept. 29, 2010) ........................ 25

*City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011) ............................................................................. 9, 11

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022) ................................................................................ 24

*Cruz v. TD Bank, N.A.*,
742 F.3d 520 (2d Cir. 2013) ............................................................................................ 26

*In re Delcath Sys. Sec. Litig.*,
36 F. Supp. 3d at 320 (S.D.N.Y. 2014) ......................................................................... *passim*

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ........................................................................................................ 23

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015) ............................................................................................ 17

*In re Eventbrite, Inc. Sec. Litig.*,
Case No. 18 Civ. 02019 (EJD), 2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ...................... 15

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ............................................................................... 23

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) ....................................................................................... 17

*Gauquie v. Albany Molec. Rsch., Inc.*,
Case No. 14 Civ. 6637 (FB) (SMG), 2016 WL 4007591 (E.D.N.Y. July 26, 2016) .............. 19

*In re Genzyme Corp. Sec. Litig.*,
Case No. 09 Civ. 11299 (GAO), 2012 WL 1076124 (D. Mass. Mar. 30, 2012)...................... 16

*Janus Cap. Grp. v. First Deriv. Traders*,
564 U.S. 135 (2011)....................................................................................................... 8

*Kendall v. Odonate Therapeutics, Inc.*,
Case No. 20 Civ. 01828-H-LL, 2021 WL 3406271 (S.D. Cal. Aug. 4, 2021) ........................ 14

*Kleinman v. Elan Corp., plc*,
706 F.3d 145 (2d Cir. 2013) ...................................................................................... 15

*Liu v. Intercept Pharms., Inc.*,
Case No. 17 Civ. 7371 (LAK), 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020)...................... 12

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011).................................................................................................... 15

*Monroe Cnty. Emples. Ret. Sys. v. YPF Sociedad Anonima*,
15 F. Supp. 3d 336 (S.D.N.Y. 2014) ......................................................................... 24

*In re Norfolk S. Corp. Bond/Note Sec. Litig.*,
Case No. 23 Civ. 4068 (LAK), 2025 WL 641089  (S.D.N.Y. Feb. 27, 2025) ........................ 15

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) .......................................................................... 17, 18, 20

*Odeh v. Immunomedics, Inc.*,
Case No. 18 Civ. 17645, 2020 WL 4381924 (D.N.J. July 31, 2020) ..................................... 14

*In re Omega Healthcare Invs., Inc.*,
563 F. Supp. 3d 259 (S.D.N.Y. 2021) ...................................................................... 15

*In re Omnicom Group Sec. Litig.*,
597 F.3d 501 (2nd Cir. 2010)....................................................................................... 24

*In re Oxford Health Plans, Inc. Sec. Litig.*,
187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................................... 19

*In re Pfizer Inc. Sec. Litig.*,
936 F. Supp. 2d 252 (S.D.N.Y. 2013) .............................................................. 10, 11

*In re Pfizer Inc. Securities Litig.*,
  584 F. Supp. 2d 621 (S.D.N.Y. 2008) ................................................................. 21

*Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*,
  792 F. Supp. 2d 328(D. Conn. 2011)................................................................... 25

*Puddu v. 6D Global Techs., Inc.*,
  Case No. 15 Civ. 0861 (AJN), 2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021)......................... 11

*Rihn v. Acadia Pharms. Inc.*,
  Case No. 15 Civ. 575 (BTM) (DHB), 2016 WL 5076147 (S.D. Cal. Sep. 19, 2016) .............. 14

*Rosi v. Aclaris Therapeutics, Inc.*,
  Case No. 19 Civ. 7118 (LJL), 2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) ........................ 24

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016) ................................................................. 15

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
  351 F. Supp. 3d 874 (E.D. Pa. 2018) ................................................................. 20

*SEC v. Place*,
  Case No. 16 Civ. 4291, 2019 WL 634638 (E.D. Pa. Feb. 14, 2019).................................. 10, 11

*SEC v. Rosenberger*,
  Case No. 21 Civ. 10665 (DLC), 2023 WL 1928093 (S.D.N.Y. July 25, 2023)........................ 8

*SEC v. Sourlis*,
  851 F.3d 139 (2d Cir. 2016) ............................................................................. 8

*Setzer v. Omega Healthcare Invs. Inc.*,
  968 F.3d 204 (2d Cir. 2020) ............................................................................. 14

*In re Signet Jewelers Ltd. Sec. Litig.*,
  Case No. 16 Civ. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ........................ 20

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
  Case No. 22 Civ. 6978 (AS), 2024 WL 456745  (S.D.N.Y. Feb. 5, 2024) ............................ 14

*Tellabs Inc. v. Makor Issues & Rts.*, Ltd.,
  551 U.S. 308 (2007)....................................................................................... 17, 21

*Tomaszewski v. Trevena, Inc.*,
  482 F. Supp. 3d 317 (E.D. Pa. 2020) ................................................................. 10, 11

*In re UBS Auction Rate Sec. Litig.*,
  Case No. 08 Civ. 2967(LMM), 2009 WL 860812  (S.D.N.Y. Mar. 30, 2009) ........................ 25

iv

*United Indus. Workers' Pension Plan v. Waste Mgmt., Inc.*,
  Case No. 22 Civ. 4838 (LGS), 2024 WL 1312593 (S.D.N.Y. Mar. 27, 2024) ........................ 20

*Van Dongen v. CNinsure Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013) ................................................................................. 18

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y) ...................................................................................... 10, 12

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ......................................................................................... 23, 24

*In re Xerox Corp. Sec. Litig.*,
  165 F. Supp. 2d, 208 (D. Conn. 2001) .................................................................................. 19

*In re Y-mAbs Therapeutics, Inc. Sec. Litig.*,
  Case No. 23 Civ. 431 (AS), 2024 WL 451691  (S.D.N.Y. Feb. 5, 2024) ................................ 20

## Statutes

Securities Exchange Act §10(b).................................................................................................. 3, 8

Securities Exchange Act §20(a).................................................................................................. 3, 25

## Regulations

21 C.F.R. §312.58(a)..................................................................................................................... 5

21 C.F.R. §314.50(d) .................................................................................................................... 4

## I.    PRELIMINARY STATEMENT

Defendant Dr. Ricardo Perfetti, the Chief Medical Officer ("CMO") of Defendant Applied Therapeutics Inc. ("Applied" or the "Company") during the January 3, 2024 to December 2, 2024 "Class Period," designed Applied's ACTION-Galactosemia Kids Study (the "Pediatric Study"), a clinical trial for govorestat to treat Classic Galactosemia ("Galactosemia") in children. Perfetti also reviewed and interpreted the data from the Pediatric Study, and was the lead author of the Pediatric Studies published results. ¶¶ 55-64.[1] In addition, Perfetti was responsible to oversee Applied's clinical development activities, and was involved in the oversight of regulatory affairs and strategy at Applied. ¶¶ 38, 82; Ans. ¶ 82.

The Pediatric Study results were submitted as part of Applied's New Drug Application ("NDA") to the U.S. Food & Drug Administration ("FDA") for the approval of govorestat to treat Galactosemia. ¶ 65-68, 89, 358. Between March and June 2021, as part of the Pediatric Study, 19 of the 47 subjects enrolled at a clinical site—over 40% of the study population—received only approximately 80% of the intended dose of govorestat due to a labeling error (the "Dosing Errors"), violating the trial protocol. FDA regulations and guidelines required information about the Dosing Errors and the related clinical data (the "Dosing Errors Clinical Data") to be included in the NDA. However, Defendants, including Perfetti, omitted this information from the NDA, and instead reported clinical data as if the patients received the full, correct dose. ¶¶ 67-79.

Further, on March 27, 2024, one of Applied's vendors for the Pediatric Study deleted clinical source data for all 47 patients (the "Study Data Deletion"). ¶ 142. Between April 29 and

---

[1] Unless otherwise stated, references to "¶_" are to Plaintiff's Second Consolidated Amended Class Action Complaint ("Complaint," ECF No. 99), and "PBr." are to the Memorandum of Law in Support of Perfetti's Motion to Dismiss the Complaint (ECF No. 101). On June 27, 2025, Applied answered the Complaint ("Answer" or "Ans.," ECF No. 106).

May 3, 2024, the FDA conducted an inspection of a clinical test site and discovered the Study Data Deletion, and informed Applied of these findings in an FDA Form 483 delivered to Applied and its CEO Defendant Dr. Shoshana Shendelman, Ph.D., on May 9, 2024 (the "Form 483"). ¶¶ 143-152. FDA Regulations state that Form 483s are also discussed with company management (i.e. Perfetti). ¶¶ 153-155. The Study Data Deletion was a violation of the clinical trial protocol for the Pediatric Study. Applied was unable to recover the source data for 11 of the patients, which it told the FDA on May 9, 2024, and as a result, the FDA was not able to verify this clinical data that was submitted with the NDA. ¶¶ 47, 70-79, 147, 159-160.

Throughout the Class Period, Applied told investors that (1) the NDA included "clinical outcomes data" from the Pediatric Study (¶¶ 88-89, 100, 108, 128, 168, 208, 283), (2) in order to obtain FDA approval, Applied had to "demonstrate with substantial evidence from well-controlled clinical trials, and to the satisfaction of the FDA …that such product candidate is safe and effective for its intended uses" (¶¶ 114, 179, 219, 285), (3) Applied had made "significant regulatory and clinical progress" (¶¶ 110, 172, 286), and (4) Applied was preparing to commercialize govorestat (¶¶ 109, 135, 172, 195, 254-255, 261, 263, 294). These statements informed investors that the Pediatric Study supporting the NDA was well controlled and would support approval of the NDA. Against the backdrop, Perfetti made four materially false and misleading statements during the Class Period:

- Slides 14-18 of a March 11, 2024 Investor Presentation published by Applied ("FS11" or "Statement 1" or the "3/11/2024 Investor Presentation") that presented the results of the Pediatric Study without any disclosure of the Dosing Errors or Dosing Errors Clinical Data. ¶¶ 121-125.

- The August 7, 2024 RBC Capital Markets report ("FS40" or "Statement 2" or the "RBC Report"), which reported a statement from Applied's management falsely stating that a "careful audit" of the NDA revealed no discrepancies, despite the fact that there were material deficiencies in the NDA and the Study Data Deletion had occurred. ¶¶ 222-225.

2

- Slides 40 and 42-55 of the September 4, 2024 presentation by Perfetti and Applied at the Annual Symposium of the Society for the Study of Inborn Errors of Metabolism ("FS41" or "Statement 3" or the "SSIEM Slides"), that again presented the Pediatric Study results, while omitting the Dosing Errors, the Dosing Errors Clinical Data, the Study Data Deletion, and that certain clinical data could not be verified. ¶¶ 240-249.

- The November 6, 2024 article published in *The Journal of Clinical Pharmacology* (the "*JCP*") titled "*Results of the ACTION-Galactosemia Kids Study to Evaluate the Effects of Govorestat in Pediatric Patients with Classic Galactosemia*" ("FS59" or "Statement 4" or the "11/6/2024 Pediatric Study Results") that presented the full Pediatric Study results, while omitting the Dosing Errors, the Dosing Errors Clinical Data, the Study Data Deletion, and that certain clinical data could not be verified. ¶¶ 273-280

The Complaint properly pleads that Perfetti violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5. Perfetti's motion should be denied.

## II.    STATEMENT OF RELEVANT FACTS

### A.    Applied's Clinical Trials for Govorestat to Treat Galactosemia

Applied is a clinical-stage biopharmaceutical company focused on developing drugs to treat rare diseases. During the Class Period, Applied had no approved drugs for sale, and its sole drug candidate under FDA review was govorestat, for the treatment of Galactosemia. ¶¶ 2, 45, 361. Galactosemia is a rare, inherited, genetic metabolic disorder that primarily affects children and can be fatal if left untreated. ¶¶ 41-45.

Applied conducted two clinical studies of govorestat to treat Galactosemia. In advance of these clinical trials, Applied was required to, and did, agree to clinical trial protocols with the FDA. ¶¶ 47, 72-78, 84. The first, the "Adult Study," was initiated in June 2019, and its results were published on July 10, 2024 in the *JCP*. ¶¶ 48-53. The second, the Pediatric Study, launched in or around June 2020 and its results were published as the 11/6/2024 Pediatric Study Results. ¶¶ 54-60. Perfetti was a lead author of both studies and is credited for each with designing the study, interpreting the data and approving the final manuscript. ¶¶ 51–53, 58–59.

3

### B.       The Materially Deficient NDA

On January 3, 2024, the first day of the Class Period, Applied issued a press release announcing that it had submitted the NDA to the FDA, stating that the NDA included "clinical outcomes data" from the Adult Study and the Pediatric Study. ¶¶ 88-89. However, unknown to investors, but known to Perfetti, the NDA was materially deficient and omitted information that FDA regulations and guidance required to be included.

Between March and June 2021, Applied supplied clinical sites for the Pediatric Study with mislabeled doses of govorestat. As a result, the Dosing Errors, which were violations of the clinical study protocol for the Pediatric Study, occurred. ¶¶ 69-70. FDA regulations required Applied to include in the NDA "[a] description and analysis of any other data or information relevant to an evaluation of the safety and effectiveness of the drug product obtained or otherwise received by the applicant from any source, foreign or domestic, including information derived from clinical investigations, including controlled and uncontrolled studies of uses of the drug other than those proposed in the NDA." 21 C.F.R. § 314.50(d)(5)(iv). ¶ 68. The Dosing Errors and the Dosing Errors Clinical Data were such "other data and information" required to be included in the NDA because they were "relevant to an evaluation of the safety and effectiveness of" govorestat. ¶¶ 67, 72. Further, published guidance from the FDA instructed that "important protocol deviations," including "those who received the wrong treatment or incorrect dose," i.e. the Dosing Errors, should be included and listed in an NDA. ¶¶ 73-74.

However, in violation of these FDA regulations and guidance, Applied did not include any description of the Dosing Errors or Dosing Errors Clinical Data in the NDA, and instead "reported dose levels for subjects as stated in the protocol…rather than the actual dose levels administered" (collectively, the "NDA Clinical Data Errors"). ¶ 71.

4

Perfetti was aware of the Dosing Errors and Dosing Errors Clinical Data, the FDA regulations and guidance that required this information to be included in the NDA, and that the NDA omitted this information and instead reported the NDA Clinical Data Errors, because, among other reasons, he designed the Pediatric Study, authored the Pediatric Study Results, evaluated the data that resulted from the Pediatric Study, and was a senior officer "involved with the oversight of regulatory affairs and strategy at Applied." ¶¶ 81-82; Ans. ¶ 82.

### C. The FDA Discovers and Defendant Learns that Clinical Data Was Deleted in Violation of FDA Regulations and that the FDA Could Not Verify the Clinical Data in the NDA

FDA regulations also require a new drug applicant to allow the FDA "to have access to and copy and verify any records and reports relating to a clinical investigation." 21 C.F.R. § 312.58(a), ¶¶ 144-146. Applied, however, failed to adhere to these requirements as a result of the Study Data Deletion.

In the Pediatric Study, Applied "used Pearson's Q-global®, a Web-based administration system for capturing data for certain electronic clinical outcome assessments [eCOAs] performed for measuring primary and secondary efficacy endpoints." ¶ 141. On March 25, 2024, the FDA pre-announced an inspection of one of Applied's clinical sites involved in the Pediatric Study. ¶ 140. Such inspections are part of the NDA process, and are conducted to ensure the integrity of data supporting a new drug application and verify that clinical trials comply with FDA regulations. ¶ 144. On March 27, 2024, two days after the inspection was pre-announced, the Study Data Deletion occurred. ¶ 142. Between April 29, 2024 and May 3, 2024, the FDA conducted its inspection and discovered the Study Data Deletion. The FDA asked to review the records in Q-global, and was unable to review and copy deleted records for 11 patients. ¶ 147. The Study Data Deletion was a violation of the clinical trial protocol for the Pediatric Study. ¶¶ 148, 152.

5

At the conclusion of the inspection, on May 3, 2024, the FDA gave a Form FDA 483 to Shendelman that detailed the Study Data Deletion for 11 patients (the "Form 483"), and also discussed the Form 483 with Shendelman. ¶¶ 150-152. On May 9, 2023, Applied responded and informed the FDA that deleted source data for 11 subjects could not be recovered. ¶ 156.

Given his role as CMO, and lead architect of the Pediatric Study, Perfetti would have been informed of the inspection findings and protocol violations identified in the Form 483. ¶¶ 153-154. Further, according to information from the FDA website, a Form 483 is also discussed with company management (i.e. Perfetti) "so that there is a full understanding of what the observations are and what they mean." ¶ 155. Therefore, by May 9, Perfetti was aware, or at a minimum, was severely reckless in not knowing, that the Study Data Deletion had occurred, that Applied had violated FDA regulations and the clinical trial protocol, that the FDA knew of these issues, and that the FDA could not verify clinical results of the Pediatric Study as part of its NDA review. ¶ 158.

### D.    **The Truth is Disclosed Through a Series of Partial Corrective Disclosures**

On November 27, 2024, during post-market hours, Applied announced that it had received a Complete Response Letter ("CRL") from the FDA stating that the FDA was "unable to approve the NDA in its current form, citing deficiencies in the clinical application." ¶¶ 302-303. This announcement was a surprise to the market, as evidenced by analyst reports discussing the CRL. ¶¶ 306-310, 313-314. In response to the announcement of the CRL, on November 29, 2024, the next trading day and a half trading day following the Thanksgiving Holiday, the price of Applied common stock declined 76.3%, or $6.54 per share, and closed at $2.03 per share, on trading volume of more than 23 times average trading volume. ¶¶ 311-312. Applied common stock continued its decline on December 2, 2024, falling another $0.28 per share. ¶ 315.

Also on November 27, 2024, Applied received a Warning Letter from the FDA ¶ 304. A Warning Letter is issued by the FDA when the agency has determined that a company has committed "significant violations" of regulatory requirements.[2] The Warning Letter identified the Study Data Deletion, the inability of the FDA to verify clinical data submitted with the NDA, the Dosing Errors, the failure of Applied to include any information about the Dosing Errors and Dosing Errors Clinical Data in the NDA, and the reporting of the NDA Clinical Data Errors. The Warning Letter also described these issues as violations of the clinical trial protocol for the Pediatric Trial and violations of FDA regulations. ¶¶ 70-72, 318. The Warning Letter also stated, among other things, that failure to include information about the Dosing Errors or report the Dosing Errors Clinical Data "raises significant concerns about the validity, reliability, and integrity of the data for" the NDA and "significant concerns about [Applied's] oversight and conduct of clinical investigations, including its compliance with the reporting requirements for human drug products," and that these issues, combined with the Study Data Deletion, "raise significant concerns about the validity and reliability of data collected for this clinical investigation." ¶¶ 72, 160, 318.

Five days later, on December 2, 2024, during post-market hours, Applied disclosed that it had received the Warning Letter. ¶ 316. Then, on December 3, 2024, the FDA published the Warning Letter to its website. In response to the disclosure, the price of Applied common stock fell $0.06 per share, or 3.4%, on December 3, 2024. ¶ 319. News coverage on December 4 and 5, 2024 discussed the CRL and the Warning Letter. The price of Applied common stock continued to decline $0.31 per share, or 18.3%, on December 4, 2024 and $0.09 per share, or 6.5%, on December 5, 2024, closing at $1.29 per share on December 5, 2024. ¶¶ 321, 323.

---

[2] See FDA, *About Warning and Close-Out Letters*, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/about-warning-and-close-out-letters (last accessed 7/11/2025).

On December 20, 2024, during pre-market hours, Applied announced that Shendelman had stepped down as President, CEO, Secretary, and Board Chair. ¶¶ 326-327. In response, the price of Applied common stock fell $0.88 per share, or 13.7%, on December 20, 2024. ¶ 328. After the Complaint was filed, on June 17, 2025, Applied announced that Perfetti had also separated from the Company.

In total, from November 27, 2024 through December 20, 2024, the price of Applied's common stock plummeted $7.69 per share, or 89.7%, and closed at $0.88 per share on December 20, 2024, causing significant damages to Lead Plaintiff and the Class. ¶ 31.

## III.    ARGUMENT

### A.    The Complaint Adequately Alleges That Perfetti Made Materially False and Misleading Statements in Violation of Section 10(b) and Rule 10b-5

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege that the defendant "(1) made a material misrepresentation or omission as to which he had a duty to speak; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Rosenberger*, 2023 WL 1928093, at *5 (S.D.N.Y. July 25, 2023) (quoting *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016)). A statement may be actionable even if it literally true when read in isolation if it is misleading in context or "leaves investors with a false impression." *In re Allergan PLC Sec. Litig.*, 2019 WL 4686445, at *23 (S.D.N.Y. Sept. 20, 2019).

### B.    Perfetti Is a "Maker" of Statements 1-4

Perfetti's argument that he is not the "maker" of Statements 1–3 under *Janus Cap. Grp. v. First Deriv. Traders*, 564 U.S. 135 (2011), is unavailing in light of the Complaint's detailed allegations of his direct involvement in authoring, approving, and disseminating each of those statements. *Janus* held that the "maker" of a statement is the person or entity with "ultimate authority over the statement, including its content and whether and how to communicate it." In the

ordinary case, the Supreme Court explained, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Id* at 142-43. But in singling out "ordinary case[s]," the Court implicitly recognized that the analysis extends beyond the narrower grounds of attribution. *Id*. Furthermore, nothing in *Janus* implies that "there can be only one 'maker' of a statement in the case of express or implicit attribution." *City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417 n.9 (S.D.N.Y. 2011).

### 1.    Perfetti Is a "Maker" of Statements 1 and 3

Perfetti argues that he was not the "maker" of Statement 1, Slides 14-18 of the 3/11/2024 Investor Presentation, and Statement 3, Slides 42 and 44-55 of the September 4, 2024 SSIEM Slides. Defendant's arguments fail.[3]

The Complaint pleads specific facts to evidence that he had ultimate authority over the content of Statement 1, which are results of the Pediatric Study. Applied's CMO and senior-most clinical executive, Perfetti led govorestat's development, was responsible for regulatory compliance, designed and analyzed the Pediatric Study and was publicly credited as an author of the Pediatric Study results. ¶¶ 5, 38-39, 58-63, 80-82, 123, 153-154, 240-245, 273-275. The Complaint also alleges that the 3/11/2024 Investor Presentation was "to be used by members of management from time to time in a series of meetings with analysts, investors and other third parties." ¶ 121. Further, as the second most senior executive at the Company and one of only two individuals who spoke publicly about govorestat during the Class Period, Perfetti's involvement in preparing and reviewing Statement 1 can be strongly inferred.

---

[3] Perfetti does not contest that he is the "maker" of Statement 4, the 11/6/2024 Pediatric Study Results.

For the same reason, the Complaint pleads facts to evidence that Perfetti had ultimate authority over Statement 3, which was another public statement of the Pediatric Study Results. Further, the Complaint alleges additional facts establishing that Perfetti exercised ultimate authority over Statement 3. The presentation includes detailed biographies identifying Perfetti as an employee of Applied presenting on the Company's behalf. ¶ 240. Publicly available photographs confirm that Perfetti stood at the podium delivering a portion of the presentation with Slide 16 projected behind him. ¶ 241. The September 4, 2024 SSIEM Slides also list Perfetti as a presenter of slides other than those slides that make up Statement 3. Perfetti was therefore an active participant, designated to present a portion of the 66-slide deck. ¶¶ 242–243.

While Perfetti did not sign Statement 1 or 3, and was not listed to present the slides that make up Statement 3, courts applying *Janus* have consistently held that an individual need not have signed or been explicitly attributed in a statement to be its "maker" so long as they had control over its content and dissemination, which is exactly what the Complaint pleads. *See In re Pfizer Inc. Sec. Litig.*, 936 F. Supp. 2d 252, 269 (S.D.N.Y. 2013), vacated in part on other grounds, 819 F.3d at 657 (testimony that "top management . . . reviewed all Pfizer press releases" was "evidence from which a jury could conclude that [defendants] made [these] statements"); *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 335 (E.D. Pa. 2020) (executive liable for unattributed statements because subject matter within his responsibility); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 545-46 (S.D.N.Y) ("The jury could have concluded that [Defendants] made, approved or authorized the challenged statements in Vivendi's press releases even if the statements were not publicly attributed to them in the form of a quotation, thereby supplying Vivendi's scienter for those statements."); *SEC v. Place*, 2019 WL 634638, at *7–8 (E.D. Pa. Feb. 14, 2019) (evidence that defendants "controlled, authorized, and often scripted" statements created

10

"genuine disputes about whether [defendants] exercised actual control over communications that were not expressly or impliedly attributed to them"); *EnergySolutions*, 814 F. Supp. 2d at 418 ("explicit attributions" in SEC filing "d[id] not preclude attribution" to defendant whose ultimate authority was "implicit from surrounding circumstances").[4]

It is simply not credible to believe that given his integral role in the Pediatric Study and reviewing and analyzing its results, he did not review and approve Applied's public statements concerning the results of the study before they were published.

### 2.    Statement 2 is Attributable to Perfetti

Defendant contends that Plaintiff has not sufficiently alleged that Perfetti was the "maker" of Statement 2, the RBC Report publishing a statement attributable to Applied's "mgmt. team." But courts have repeatedly held that unattributed statements may be actionable under *Janus* where the complaint plausibly alleges that a particular executive exercised authority over the content or communication of the statements. *See Place*, 2019 WL 634638, at *7–8; *In re Pfizer*, 936 F. Supp. 2d at 269; *Trevena, Inc.*, 482 F. Supp. 3d at 335.

The RBC Report relayed reassurances from Applied's management team that a "careful audit of the rest of the [NDA] package" had "not revealed any other discrepancies," and that there were "no additional mistakes or discrepancies." ¶ 222. While the statement is attributed only to Applied management, the Complaint alleges that only two executives, Shendelman and Perfetti, spoke publicly about govorestat on Applied's behalf during the Class Period. ¶ 224. That inference

---

[4] Perfetti's reliance on *Puddu v. 6D Global Techs., Inc.*, 2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) is misplaced. *Puddu* supports the conclusion that Plaintiff has alleged Perfetti was the maker of Statements 1 and 3: he exercised extensive day-to-day control (he oversaw clinical development), directed content (was integrally involved in the Pediatric Study and the author of the Pediatric Study Results), and participated in the review of public filings (he was the author of the Adult Study and the Pediatric Study). *Id.* at *8.

is supported by Perfetti's public-facing role as Applied's CMO, his design of the Pediatric Study and authorship of the Pediatric Study Results. ¶¶ 5, 38-39, 58-63, 80-82, 123, 153-154, 240-245, 273-275.[5]

Further, his integral involvement in clinical development and the Pediatric Study support a conclusion that he was, at a minimum, involved in the "audit" and a source of the information conveyed in Statement 2. As in *Vivendi*, 765 F. Supp. 2d at 545–46, attribution is satisfied where factual allegations tie an executive to the statement's content, even absent formal authorship. Similarly here, Perfetti had ultimate authority over the Pediatric Study, publicly presented and promoted the results, and repeatedly spoke about the study's safety and efficacy, statements that were based on data he knew to be incomplete or misleading. His repeated involvement and oversight give rise to a strong inference that he "made" the challenged statements under *Janus* and its progeny.

Defendant's reliance on *Liu v. Intercept Pharms., Inc.*, 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020), is misplaced. There, the court rejected vague assertions about unidentified "management" where the complaint lacked facts tying specific individuals to the statements. *Id*. at *6. Here, by contrast, the Complaint alleges that only Shendelman and Perfetti spoke publicly on the topic. ¶ 224. These allegations, taken as a whole, raise a strong inference that Perfetti either made or had ultimate authority over the content of Statement 2.

---

[5] Although not alleged in the Complaint, Perfetti also conducted investor conference calls concerning the results of Applied's clinical trials, including an April 24, 2023 call discussing the Company's plans to meet with the FDA regarding the NDA submission, and a February 15, 2024 call highlighting "positive results" from a study of govorestat to treat SORD deficiency.

### 3.    Statements 1, 3, and 4 Were Materially False and Misleading

Statements 1, 3, and 4 were materially false and misleading publications the Pediatric Study results. ¶¶ 122, 245, 274-276. Throughout the Class Period, Applied repeatedly stated that the NDA contained "clinical outcomes data" from the Pediatric Study, touted the results of the Pediatric Study, that Applied need to pass FDA review of a "well-controlled" clinical study, and spoke positively about the NDA's progress toward approval and Applied's plans to commercialize govorestat. *See, e.g.,* ¶¶ 16, 49, 55, 60, 122, 125, 222, 247, 275, 277. As alleged in the Complaint, reasonable investors would conclude that the Pediatric Study results that Applied was publicly disclosing, and touting, were reliable and accurate, and that Applied was not withholding any required clinical data. ¶¶ 125, 247-249, 277-279. However, at the time Statements 1, 3, and 4 were made, Perfetti knew that the Dosing Errors Clinical Data were not included in the NDA, and at the time Statements 3 and 4 were made, Perfetti knew about the Study Data Deletion and that certain clinical data for the Pediatric Study was not verifiable. By failing to disclose this information, Perfetti and Applied misled investors into believing that the Pediatric Study results published in these statements were accurate, verifiable, and supported FDA approval of the NDA. ¶¶ 55-64, 80-87, 122-125, 240-249, 273-280.

Initially, Perfetti does not contest Plaintiff's allegations that Statements 3 and 4 were materially false and misleading for failure to disclose the Study Data Deletion and that the FDA could not verify clinical data related to the Pediatric Study. *See* PBr. at 5-8. His only argument concerning failure to disclose the Study Data Deletion is directed towards Statement 2. *See* PBr. at 8-9. The Complaint also alleges that the Pediatric Study Results' (Statement 4) claim of "uniform exposure" is materially misleading because it "suggested that all participants achieved consistent pharmacokinetic outcomes under the dosing scheme[, when, in] truth, a substantial portion of the study population had received incorrect dosages for a prolonged period." ¶ 280.

13

Perfetti again does not challenge this alleged reason for falsity. By failing to challenge these allegations of falsity, Perfetti has conceded for purposes of this motion that they are properly alleged.

Perfetti's argument that he had no duty to disclose the Dosing Errors or the Dosing Errors Clinical Data misstates both the substance of his statements and the governing law. Once he chose to speak on the Pediatric Study results, he was required to avoid giving an "inaccurate, incomplete, or misleading" impression about those results and the NDA. *Setzer v. Omega Healthcare Invs. Inc.*, 968 F.3d 204, 213-14 (2d Cir. 2020). *See also Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *2 (S.D.N.Y. Feb. 5, 2024) (denying dismissal where defendants "put[] the topic 'in play'" by listing factors that one "would expect to prop up sales" without disclosing "sales ha[d] already cratered"). Courts have held that "when a pharmaceutical company makes statements about its product, the company is required to disclose information that would render those statements not misleading." *In re Delcath Sys. Sec. Litig.*, 36 F. Supp. 3d at 320, 332-33 (S.D.N.Y. 2014) (holding that statements about clinical trial results were actionable where defendants omitted adverse facts that cast those results "in a more negative light"). *See also Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147, at *6 (S.D. Cal. Sep. 19, 2016) (denying dismissal, finding omissions about manufacturing concerns rendered NDA statements misleading); *Odeh v. Immunomedics, Inc.,* 2020 WL 4381924, at *6 (D.N.J. July 31, 2020) (positive statements about "manufacturing validation runs" were actionable in light of data integrity breach that "could seriously jeopardize" FDA approval); *Kendall v. Odonate Therapeutics, Inc.*, 2021 WL 3406271, at *5 (S.D. Cal. Aug. 4, 2021) (omitted information made statements misleading because "undisclosed reality was materially different").

Perfetti's reliance on *Omega* and *Sanofi* is misplaced. In *Omega*, the court found no duty to disclose missed rent payments because the challenged statements did not address financial

14

health in a way that made the omissions misleading. *In re Omega Healthcare Invs., Inc.*, 563 F. Supp. 3d 259, 272 (S.D.N.Y. 2021). Likewise, in *Sanofi*, the court merely reported historical sales without implying anything about propriety. *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016). Here, by contrast, Perfetti presented and authored the Pediatric Trial Results, which were the basis for the NDA. Contrary to Perfetti's assertion otherwise (PBr. at 7), the omitted information bore a "meaningful connection to the substance of" Statement 1, 3, and 4, which, combined with Applied other public statements, presented the Pediatric Study as a reliable basis for regulatory review. [6]

### 4.    Statement 2 Was Materially False and Misleading

In Statement 2, RBC Capital Markets reported on an August 7, 2024 press release issued by Applied titled "*Applied Therapeutics Reports Second Quarter 2024 Financial Results,*" which was filed with the SEC as an exhibit to a Form 8-K the same day.  The press release disclosed that Applied had corrected a clinical data calculation error in the NDA. The correction "result[ed] in significantly improved data for cognition as compared to the prior data." ¶¶ 210-211, 222. RBC Capital Markets reported, based on conversations with Applied management, that

> While this delayed error identification may lead to questions about whether there may be additional mistakes in the rest of the data package (recall data integrity and presentation had been a concern for some), the company emphasized that this is isolated to a single toolbox of tests done by a third party and that their careful audit of the rest of the package did not reveal any other discrepancies. [¶ 222.]

---

[6] Perfetti's other case citations are inapposite because they involved omissions unrelated to the specific subject matter of the challenged statements or lacked contemporaneous facts contradicting them. (*See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (addressing omission of inconclusive adverse events, not known flaws directly contradicting disclosed claims); *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (no liability where core study results were disclosed); *In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at *13 (N.D. Cal. Apr. 28, 2020) (no actionable omission where plaintiffs failed to allege facts showing contemporaneous falsity); *In re Norfolk S. Corp. Bond/Note Sec. Litig.*, 2025 WL 641089, at *5 (S.D.N.Y. Feb. 27, 2025) (omitted information did not contradict the challenged disclosures).

Perfetti's argument that Statement 2 is not false and misleading because he had no duty to disclose the Study Data Deletion or related Form 483 misrepresents both the content of Statement 2, the context in which it was made, and the allegations of the Complaint. At the time the statement was made, Applied and Perfetti were aware that the NDA failed to include information about the Dosing Errors and Dosing Errors Clinical Data, that the NDA contained the NDA Clinical Data Errors, and that electronic source data for 11 test subjects had been deleted and could not be recovered, and as such the FDA could not verify this test data. ¶ 223. The assertion that a "careful audit" had revealed no additional discrepancies was therefore materially false and misleading. Having chosen to publicly vouch for the completeness and accuracy of the NDA, Applied and Perfetti had a duty to disclose material facts that directly contradicted that message. *See Jinkosolar*, 761 F.3d at 250 ("Once a company speaks on an issue or topic, there is a duty to tell the whole truth.") (citation omitted); *see also Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("Once [Defendant] chose to discuss its hedging strategy, it had a duty to be both accurate and complete.") (citations omitted).

Perfetti's reliance on *Anderson v. Abbott Labs*, 140 F. Supp. 2d 894 (N.D. Ill. 2001), and *In re Genzyme Corp. Sec. Litig.*, 2012 WL 1076124 (D. Mass. Mar. 30, 2012), is misplaced. In *Anderson*, the court dismissed the claims because plaintiffs failed to identify statements that were rendered misleading by the omission of regulatory issues, and the challenged statements did not address, imply, or depend on regulatory compliance. In *Genzyme*, the court dismissed claims where the company repeatedly and promptly disclosed adverse regulatory developments, including multiple FDA letters and a Form 483, and reasonably believed approval remained likely based on external signals like an FDA advisory vote and European regulatory approvals. These facts are not present here.

16

C.    **The Complaint Adequately Alleges a Strong Inference of Perfetti's Scienter**

Under the PSLRA, scienter may be pled by alleging facts showing either (1) motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168–69 (2d Cir. 2000). Courts have consistently held that scienter may be inferred where a defendant had "access to information suggesting that their public statements were not accurate," particularly where the subject matter was squarely within the executive's core responsibilities. *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). A strong inference of scienter also arises where a defendant "failed to check information they had a duty to monitor," or deliberately ignored red flags. *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).

No "smoking gun" is required. The inference "need not be irrefutable . . . or even the most plausible of competing inferences," but merely "cogent and at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rts.*, Ltd., 551 U.S. 308, 324 (2007). Moreover, the analysis must be holistic and courts ask "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter," not whether "any individual allegation, scrutinized in isolation," suffices. *Id.* at 322–23. "[A] tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emp' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

1.    **Plaintiff's Motive Allegations Support a Strong Inference of Scienter**

Initially, where a plaintiff adequately alleges conscious misbehavior or recklessness, there is no requirement to assess the defendant's motive at this time. *See Ganino*, 228 F.3d at 170; *In re Delcath*, 36 F. Supp. 3d at 334 n.4 (motive unnecessary where allegations of knowing misconduct are sufficiently particularized). Thus, Defendant's attempt to rebut scienter based on a lack of motive is misplaced.

17

In any event, the Complaint adequately alleges motive through Perfetti's Class Period sales of stock. Insider sales can support a strong inference of scienter where "when corporate insiders were alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." *Novak*, 216 F.3d at 308. That is exactly what Plaintiff alleges here.

During the Class Period, Perfetti sold over $800,000 in Applied stock in three stock sales, representing 13.61% of his holdings during the Class Period. ¶ 339. These sales were suspicious in both timing and context, occurring while the market was misled by statements that Perfetti drafted, approved and promoted. On March 14, 2024, just three days after Statement 1 was published, Perfetti sold 155,488 shares while knowing of the Dosing Errors, and that the NDA omitted the Dosing Errors and Dosing Errors Clinical Data and falsely presented data as if study participants received the full dose. On June 6, 2024, one month after Applied confirmed on May 9, 2024 that data for 11 patients was permanently lost (and hence unverifiable by the FDA), he sold 22,003 shares. *Id*. On August 23, 2024, Perfetti sold 22,681 shares. *Id*. This stock sale took place shortly after the August 7, 2024 announcement by Applied that it the correction of a data calculation error had "significantly improved" certain data submitted with the NDA and the reporting of Statement 2. ¶¶ 210-211, 222. At the time of each sale, Perfetti knew of material negative issues with the NDA that had not been disclosed to investors and continued to pose a risk to the Company's regulatory approval prospects. The sales, therefore, are suspicious in context. Courts have found scienter, where insider sales are suspicious in timing or context, even when the amount sold was relatively small. *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 475 (S.D.N.Y. 2013) (sales "comparatively small in amount" but "unusual because of their timing");

*In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (11% and 17% sales sufficient when "suspiciously timed").

Defendant's attempt to characterize these as "sell-to-cover" transactions for tax purposes. But that is a factual dispute inappropriate for resolution at the pleading stage. Moreover, even if characterized as "sell-to-cover," Perfetti could have chosen to pay the associated tax obligation in cash. Courts have rejected the "sell-to-cover" defense where other circumstantial evidence, including timing and context, suggests insider knowledge. *See In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d, 208, 222 (D. Conn. 2001) ("Insider sales of stock may be evidence of scienter if the trades are unusual or suspicious in timing or amount.").

### 2. <u>Plaintiff Adequately Pleads a Strong Inference of Scienter Based on Perfetti's Deliberate Recklessness</u>

The Complaint contains numerous specific allegations to show that, at the time Statements 1-4 were made, Perfetti was aware of the Dosing Errors, the Dosing Errors Clinical Data, that the NDA did not include any disclosure of the Dosing Errors Clinical Data, that the NDA included the NDA Clinical Errors Data, that the Study Data Deletion occurred, and that clinical data for 11 patients that was included in the NDA was permanently lost and could not be verified by the FDA. Perfetti then made the four alleged false statements that omitted this information and gave the false impression that the Pediatric Study supported Applied's NDA submission. Those omissions rendered his statements materially misleading. That is textbook recklessness. *See Christiansen v. Spectrum Pharms., Inc.*, 2024 WL 246020, at *16 (S.D.N.Y. Jan. 23, 2024) (scienter supported where executive omitted serious issues affecting drug's approvability); *Busic v. Orphazyme A/S*, 2022 WL 3299843, at *23 (N.D. Ill. Aug. 11, 2022) (similar); *Gauquie v. Albany Molec. Rsch., Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) (scienter inferred where defendant "had access to" omitted data).

19

Courts have found similar conduct sufficient to establish scienter. *See SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018) (scienter adequately pled where executives, speaking authoritatively about a core company product, knowingly or recklessly failed to disclose adverse data that contradicted their public statements about the product's safety); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018) (scienter adequately pled where executives made repeated assurances about close monitoring of a core business segment but failed to disclose known or obvious negative trends, rendering those assurances misleading).

Perfetti's argument that Plaintiff's reliance on positional scienter (PBr. at 20) fails. The Complaint does not merely rely on his position as CMO. Rather, it alleges specific facts evidencing he would have learned or been presented with the undisclosed information due to his disclosed roles in the Pediatric Study: Perfetti oversaw and designed the Pediatric Study, and authored and analyzed the results of the Pediatric Study. That is more than sufficient under Second Circuit law. *See Novaks*, 216 F.3d at 311 (2d Cir. 2000) (holding that a strong inference of scienter arises where a complaint alleges that defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor").

Courts have sustained scienter allegations against corporate officers who are directly involved in the clinical programs at issue. *See In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, 2024 WL 451691, at *13 (S.D.N.Y. Feb. 5, 2024) (scienter adequately pled where defendants were responsible for regulatory strategy and made "detailed statements" about FDA progress); *United Indus. Workers' Pension Plan v. Waste Mgmt., Inc.*, 2024 WL 1312593, at *7 (S.D.N.Y. Mar. 27, 2024) (scienter supported where defendants "received information regarding the deficiencies" yet made contrary public statements).

20

Perfetti argues that "interim FDA feedback" is insufficient to plead scienter, and that the Complaint must plead knowledge that the undisclosed issues would "necessarily" preclude approval. But the Complaint alleges far more than "interim feedback," namely that Applied and Perfetti **knew** that clinical data for the NDA could not be verified by the FDA. Courts have sustained recklessness claims on comparable facts. *See In re Delcath*, 36 F. Supp. 3d at 335 (scienter adequately pled where CEO promoted positive trial data while omitting serious adverse events and substituted new device in NDA, signaling awareness that actual trial results undermined approval); *In re Pfizer Inc. Securities Litig.*, 584 F. Supp. 2d 621, 639-640 (S.D.N.Y. 2008) (scienter sufficiently alleged where defendants knew of and concealed negative clinical study results).[7] The fact that the FDA did not reject the NDA until November 27, 2024 does not negate the inference of scienter. It does nothing to negate the facts that Perfetti knew of the material deficiencies and problems with the NDA and made statements otherwise.

Under *Tellabs*, courts must assess whether "all of the facts alleged, taken collectively," give rise to a strong inference of scienter. 551 U.S. at 322–24. Perfetti had knowledge of the undisclosed facts that rendered his statements materially false and misleading. Perfetti sold $800,000 worth of Applied stock during the Class Period. Perfetti was a key-employee at a company with no more than 35 employees, and govorestat was the sole drug with a change of approval and commercialization, rendering it a core operation of Applied (¶¶ 355-369), allegations that are not challenged by Perfetti. Taken together, these allegations support a cogent and compelling inference that he acted with at least severe recklessness.

---

[7] Perfetti's argument that the 2023 notice from the FDA to Perfetti misses the mark. PBr. at 20. This communication evidences that Perfetti was informed of FDA communications, and supports that he was informed of the findings of the Form 483 and Applied's following investigation.

Perfetti also attempts to create an opposing inference, claiming that the alleged fraudulent conduct is not plausible because the scheme would have inevitably been discovered and the NDA rejected. PBr. at 18. However, it is clearly coherent and plausible that the Defendant submitted the NDA purposely without information about the Dosing Errors and Dosing Errors Clinical Data, and with the NDA Clinical Data Errors. The Dosing Errors Clinical Data either supported or did not support approval of the NDA. If they did not support approval, Defendant had ample motive to omit them. If they did support approval, then the only reason not to include them was because Defendant believed that a serious violation of the clinical trial protocol would lead to rejection of the NDA. The stronger inference is that they intentionally omitted them and hoped the FDA would never find out. Further, what is not plausible is that someone who designed the Pediatric Study, analyzed its data, and authored its results would not be aware of the Dosing Errors, the Dosing Errors Clinical Data, the Study Data Deletion, or the material deficiencies in the data submitted with the NDA.

### 3. The Complaint Alleges Perfetti's Involvement and Scienter with Particularity

Perfetti's contention that Plaintiff relies on improper group pleading to infer scienter as to Perfetti is wrong. The Complaint does not invoke the group pleading doctrine to establish Perfetti's liability. Rather, it pleads with particularity his ultimate authority over Statements 1-4, the information he possessed that rendered those statements false or misleading, and why he knew or was reckless in not knowing they were misleading at the time.

Defendant cites cases dismissing claims where plaintiffs failed to tie defendants to specific statements or relied solely on their titles. That is not the case here. Plaintiff does not allege that Perfetti "must have known" the truth merely because he was CMO. The Complaint instead alleges that he was personally involved in designing and presenting the Pediatric Study, he authored and

22

approved specific statements about the Pediatric Study. These allegations are far stronger than the generic "access to information" assertions rejected in *Levy* or *Health Mgmt.*, and meet the Second Circuit's standard for pleading scienter.

### D.        Plaintiff Has Adequately Pled Loss Causation

Perfetti wrongly contends that the Complaint fails to plead loss causation. But "[t]his is a factual argument for a later day." *In re Delcath*, 36 F. Supp. 3d at 336. At the pleading stage, a plaintiff need only provide "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

Further, To be a corrective disclosure, the statement must reveal that "the subject of the fraudulent statement" caused plaintiff's loss. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d, 202 (S.D.N.Y. 2010) (holding mirror disclosure not necessary). Rule 8(a)'s notice pleading standard applies. *Id*.

Here, the Complaint alleges a series of partial corrective disclosures beginning on November 27, 2024 and continuing through December 20, 2024 that revealed, for the first time, the facts Defendant had concealed. Among other things, the CRL and Warning Letter revealed that the Pediatric Study Data that was submitted with the NDA, which Applied referenced throughout the Class Period as supportive of NDA approval along with significant regulatory progress and plans for commercialization, and the results of which Perfetti publicly disclosed, was not complete or reliable (the falsity of Statements 1, 3, and 4). The CRL and the Warning Letter also disclosed that, despite Statement 2's assurance otherwise of no additional errors in the NDA after an audit, there were errors – failure to include the Dosing Errors and the Dosing Errors Clinical Data, and reporting instead the NDA Clinical Errors Data (the falsity of Statement 2).

Perfetti's contention that the CRL merely reflected the materialization of a "known regulatory risk" (PBr. at 23) is contradicted by the facts alleged. Courts consistently reject the

23

argument that general risk disclosures defeat loss causation when, as here, the risk that materialized had been affirmatively concealed. See *Vivendi*, 838 F.3d at 262; *In re Delcath*, 36 F. Supp. 3d at 336; *Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *26 (S.D.N.Y. Mar. 29, 2021) (materialization of concealed risk adequately pleads loss causation). Further, the fact that the price of Applied common stock declined so heavily in response to the CRL, and that analysts were surprised by the CRL, negates any claim that the CRL was the revelation of a known regulatory risk. In addition, such a truth on the market defense is not appropriate for determination on a motion to dismiss. *See City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC,* 587 F. Supp. 3d 56, 82 (S.D.N.Y. 2022) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality.") (quoting *Ganino*, 228 F.3d at 167).

Defendant's remaining cases are inapposite. In *In re Omnicom Group Inc. Sec. Litig.*, the alleged "disclosure" merely repeated already-public information. 597 F.3d 501, 512 (2nd Cir. 2010). In *Monroe Cnty. Emples. Ret. Sys. v. YPF Sociedad Anonima*, loss causation was not pled where a stock drop reflected the materialization of a risk widely reported in the media, not the revelation of previously concealed facts. 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014). Here, by contrast, Plaintiff pleads a sequence of disclosures that introduced new, previously withheld facts and resulted in statistically significant price declines.[8]

### E.    Plaintiff Adequately Pleads a Section 20(a) Claim Against Perfetti

Perfetti argues that Plaintiff's Section 20(a) claim must fail because the Complaint does not sufficiently plead that Perfetti (1) controlled the Company or (2) exercised control over the

---

[8] Plaintiff respectfully withdraws his claims for scheme liability and a duty to correct FS15 against Perfetti.

alleged primary violator. Both arguments misstate the law and ignore well-pleaded facts in the Complaint. To withstand a motion to dismiss, a Section 20(a) claim need only allege "some level of culpable participation at least approximating recklessness". *In re CIT Grp. Inc. Sec. Litig.*, 2010 WL 2365846, at *5 (S.D.N.Y. Sept. 29, 2010) (quoting *In re UBS Auction Rate Sec. Litig.*, 2009 WL 860812, at *3 (S.D.N.Y. Mar. 30, 2009)*..

First, the Complaint sufficiently alleges that Perfetti had control over Applied and the challenged conduct. ¶¶ 5, 38-39, 58-63, 80-82, 123, 153-154, 240-245, 273-275. Second, Plaintiff is not required to show that Perfetti controlled co-defendant Shendelman or any particular individual. Section 20(a) requires control over "the primary violator," which may be the corporate entity itself (which answered the Complaint). Finally, Defendant's argument that Perfetti cannot be a control person because he was outranked by the CEO is meritless. Section 20(a) imposes joint and several liability on any person who exercised control over the company's fraudulent conduct, not just the most senior executive. *See Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*, 792 F. Supp. 2d 328, 336–39 (D. Conn. 2011) (denying motion to dismiss Section 20(a) claim where the defendant was not the highest-ranking officer, but allegations showed he had control over operations and contributed to misleading investor communications).

IV.   **CONCLUSION**

For the reasons stated above, the Court should deny Defendant's Motion to Dismiss in its entirety. While Plaintiff recognizes that he has already been given one chance to amend, the Court has not yet issued an opinion concerning the sufficient of Plaintiff's allegations. If the Court grants Defendant's motion in whole or in part, Plaintiff respectfully requests leave to amend. *See Cruz v.*

*TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) ("[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead.").[9]

Dated: July 11, 2025
New York, NY

Respectfully submitted,

**WOLF POPPER LLP**

*/s/ Joshua W. Ruthizer*
Robert C. Finkel
rfinkel@wolfpopper.com
Joshua W. Ruthizer
jruthizer@wolfpopper.com
Emer Burke
eburke@wolfpopper.com
Samuel Coffin
scoffin@wolfpopper.com
845 Third Avenue, 12th Floor
New York, New York 10022
Telephone: (212) 759-4600

*Attorneys for Court-Appointed Lead Plaintiff*
*Dr. Martin Dietrich and Court-Appointed*
*Lead Counsel to the Proposed Class*

---

[9] Perfetti refers to the Complaint as Plaintiff's "third chance" to plead a claim. PBr. at 1. Perfetti is mistaken. The two initial complaints in this case were filed before Plaintiff was appointed Lead Plaintiff. Plaintiff has filed only two complaints.

26

## LOCAL RULE 7.1(c) CERTIFICATION

I hereby certify that the foregoing Memorandum of Law complies with the word-count limitations set forth in Local Rule 7.1(c). The foregoing Memorandum contains 8,302 words, exclusive of the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, but does include material contained in footnotes, according to the word processing software used to prepare it.

Dated: New York, New York
      July 11, 2025

Respectfully submitted,

**WOLF POPPER LLP**

*/s/ Joshua W. Ruthizer*
Robert C. Finkel
rfinkel@wolfpopper.com
Joshua W. Ruthizer
jruthizer@wolfpopper.com
Emer Burke
eburke@wolfpopper.com
Samuel Coffin
scoffin@wolfpopper.com
845 Third Avenue, 12th Floor
New York, New York 10022
Telephone: (212) 759-4600

*Attorneys for Court-Appointed Lead Plaintiff Dr. Martin Dietrich and Court-Appointed Lead Counsel to the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July, 2025, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will automatically send an email notification of such filing to all attorneys of record in the above-referenced case.

**WOLF POPPER LLP**

*/s/ Joshua W. Ruthizer*
Robert C. Finkel
rfinkel@wolfpopper.com
Joshua W. Ruthizer
jruthizer@wolfpopper.com
Emer Burke
eburke@wolfpopper.com
Samuel Coffin
scoffin@wolfpopper.com
845 Third Avenue, 12th Floor
New York, New York 10022
Telephone: (212) 759-4600

*Attorneys for Court-Appointed Lead Plaintiff Dr. Martin Dietrich and Court-Appointed Lead Counsel to the Proposed Class*