**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE APPLIED THERAPEUTICS SECURITIES LITIGATION | Case No. 1:24-cv-09715 (DLC) (VF) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANT DR. SHOSHANA SHENDELMAN'S MOTION TO DISMISS THE**
**<u>SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

**WOLF POPPER LLP**
Robert C. Finkel
rfinkel@wolfpopper.com
Joshua W. Ruthizer
jruthizer@wolfpopper.com
Emer Burke
eburke@wolfpopper.com
Samuel Coffin
scoffin@wolfpopper.com
845 Third Avenue, 12th Floor
New York, New York 10022
Telephone: (212) 759-4600

*Attorneys for Court-Appointed Lead Plaintiff Dr.*
*Martin Dietrich and Court-Appointed Lead*
*Counsel to the Proposed Class*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF FACTS .................................................................................... 4

        A.      Applied's Clinical Trials for Govorestat to Treat Galactosemia ............ 4

        B.      The Materially Deficient NDA ................................................................ 5

        C.      The FDA Discovers and Defendant Learns that Clinical Data Was Deleted in
                Violation of FDA Regulations and that the FDA Could Not Verify the
                Clinical Data in the NDA ........................................................................ 6

        D.      The Truth is Disclosed Through a Series of Partial Corrective Disclosures .......... 7

III.    ARGUMENT ........................................................................................................ 9

        A.      The Complaint Alleges Shendelman Made Materially False or Misleading
                Statements .............................................................................................. 9

                1.      Shendelman's Statements Related to the NDA Approval and
                        Regulatory Process Are Actionable ........................................... 10

                2.      The Complaint Adequately Alleges that Statements Related to the
                        FDA's Review and the PDUFA Date Were Materially Misleading ......... 14

        B.      The Complaint Adequately Alleges A Strong Inference of Shendelman's
                Scienter. ............................................................................................... 16

                1.      The Complaint Alleges Motive to Commit Fraud ...................... 16

                2.      The Complaint Alleges Strong Circumstantial Evidence of Conscious
                        Misbehavior or Recklessness ..................................................... 20

                3.      Taken Together, Plaintiff's Allegations Support a Strong Inference of
                        Scienter ...................................................................................... 26

        C.      The Complaint Properly Alleges Shendelman's Violation of Section 20(a) ........ 27

IV.     CONCLUSION ................................................................................................... 27

i

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995) ................................................................................................... 18

*Bazzelle v. NovoCure Ltd.*,
   No. 1:23-cv-5146-GHW, 2025 WL 843668 (S.D.N.Y. Mar. 18, 2025).................................. 15

*Christiansen v. Spectrum Pharms., Inc.*,
   No. 22-CV-10292 (VEC), 2024 WL 246020 (S.D.N.Y. Jan. 23, 2024)................................. 25

*City of Austin Police v. Kinross Gold Corp.*,
   957 F. Supp. 2d 277 (S.D.N.Y. 2013) ................................................................................ 27

*City of Pontiac Gen. Emps'. Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012) ................................................................................ 16

*Cruz v. TD Bank, N.A.*,
   742 F.3d 520 (2d Cir. 2013) ............................................................................................... 27

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ............................................................................................... 19

*Fort Worth Emps.' Ret. Fund v. Biovail Corp.*,
   615 F. Supp. 2d 218 (S.D.N.Y. 2009) ........................................................................... 14, 15

*Frater v. Hemispherx Biopharma, Inc.*,
   996 F. Supp. 2d 335 (E.D. Pa. 2014)................................................................................. 24

*Fresno Cty. Emps. Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017) ................................................................................ 25

*Freudenberg v. E*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................................................ 10

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) ............................................................................................... 16

*Gauquie v. Albany Molec. Rsch., Inc.*,
   No. 14 CV 6637 (FB) (SMG), 2016 WL 4007591 (E.D.N.Y. July 26, 2016) ........................ 25

*Gillis v. QRX Pharma Ltd.*,
   197 F. Supp. 3d 557 (S.D.N.Y. 2016) ........................................................................... 14, 22

*Gorlamari v. Verrica Pharms.*,
   No. 22-cv-2226, 2024 WL 150341 (E.D. Pa. Jan. 11, 2024).................................................. 21

*In re Alkermes Public. Ltd. Co. Securities Litigation*,
   523 F. Supp. 3d 283 (E.D.N.Y. 2021) ................................................................. 22

*In re Allergan PLC Sec. Litig.*,
   No. 18 Civ. 12089 (CM), 2019 WL 4686445 (S.D.N.Y. Sept. 20, 2019) ............................... 15

*In re Arqit Quantum Inc. Sec. Litig.*,
   No. 22-cv-2604 (PKC) (MMH), 2025 WL 977995 (E.D.N.Y. Mar. 28, 2025) ....................... 10

*In re Avon Sec. Litig.*,
   No. 19 Civ. 01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ............................... 24

*In re Axsome Therapeutics, Inc. Sec. Litig.*,
   No. 22 Civ. 3925 (LGS), 2025 WL 965265 (S.D.N.Y. Mar. 31, 2025) ...................... 11, 12, 13

*In re Bristol-Myers Squibb Sec. Litig.*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004) ................................................................. 13

*In re Checkpoint Therapeutics Sec. Litig.*,
   No. 24 Civ. 2613 (PAE), 2025 WL 1434400 (S.D.N.Y. May. 19, 2025) ............................... 22

*In re Delcath Sys. Sec. Litig.*,
   36 F. Supp. 3d 320 (S.D.N.Y. 2014) ................................................................. 16

*In re Didi Global Inc. Sec. Litig.*,
   Master Docket 21-cv-05807 (LAK), 2024 WL 1119483 (S.D.N.Y. Mar. 14, 2024) ............... 19

*In re EDAP TMS S.A. Sec. Litig.*,
   No. 14 Civ. 6069(LGS), 2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015) ............................... 14

*In re eSpeed, Inc. Sec. Litig.*,
   457 F. Supp. 2d 266 (S.D.N.Y. 2006) ................................................................. 18

*In re MELA Sciences, Inc. Secs. Litig.*,
   No. 10 CV 8774(VB), 2012 U.S. Dist. LEXIS 144150 (S.D.N.Y. Sept. 19, 2012) .......... 15, 23

*In re Oxford Health Plans*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ................................................................. 17, 18

*In re Sanofi Securities Litigation*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir.
   2016) ................................................................. 22, 23

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ................................................................. 25

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
   124 F. Supp. 2d 527 (S.D. Ohio 2000) ................................................................. 18

*In re Travelzoo Inc. Sec. Litig.*,
  Nos. 11 Civ. 5531 GBD, 2013 WL 128734 (S.D.N.Y. Mar. 29, 2013) ................................... 18

*In re UBS AG Sec. Litig.*,
  Master File No. 07 Civ. 11225(RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd, City of Pontiac Policeman's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ....... 25

*In re Vivendi Universal, S.A. Sec. Litig.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) ...................................................................................... 9

*In re Y-mAbs Theraps., Inc. Sec. Litig.*,
  23-cv-431 (AS), 2024 WL 451691 (S.D.N.Y. Feb. 5, 2024) .................................................... 24

*Irvine v. ImClone Sys., Inc.*,
  No. 02 Civ.109 RO, 2003 WL 212972851 (S.D.N.Y. June 4, 2003) ....................................... 12

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ..................................................................................................... 19

*Kendall v. Odonate Therapeutics, Inc.*,
  No.: 3:20-cv-01828-H-LL, 2021 WL 3406271 (S.D. Cal. Aug. 4, 2021) ............................... 12

*Marksman Partners LP v. Chantal Pharm. Corp.*,
  927 F. Supp. 1297 (C.D. Cal. 1996) ........................................................................................ 18

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ............................................................................................... 11, 20

*Odeh v. Immunomedics*,
  No. 18-17645, 2020 WL 4381924 (D.N.J. July 31, 2020) ....................................................... 12

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark*,
  367 F. Supp. 3d 16 (S.D.N.Y. Mar. 19, 2019).......................................................................... 24

*Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
  No. 19 Civ 3354 (VM), 2020 WL 3268531 (S.D.N.Y. June 17, 2020)............................... 11, 20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015).................................................................................................................. 13

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
  348 F. Supp. 3d 313 (S.D.N.Y. 2018) ...................................................................................... 24

*Shields v. Citytrust Bancorp*,
  25 F.3d 1124 (2nd Cir. 1994) .............................................................................................. 15, 23

*Sinay v. CNOOC Ltd.*,
  No. 12 Civ. 1513(KBF), 2013 WL 1890291 (S.D.N.Y. May 6, 2013) .................................... 26

*Sinnathurai v. Novavax*,
   645 F. Supp. 3d 495 (D. Md. 2022) .................................................................................. 12, 14

*Skiadas v. Acer Therapeutics Inc.*,
   No. 1:19-cv-6137-GHW, 2020 WL 3268495 (S.D.N.Y. June 16, 2020) ........................... 16, 19

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
   551 U.S. 308 (2007) ................................................................................................ 16, 26, 27

*Van Dongen v. CNinsure Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013) ................................................................................. 17

## Regulations

21 C.F.R. § 312.58(a).................................................................................................................. 6

21 C.F.R. § 314.50(d)(5)(iv)....................................................................................................... 5

## I.    **INTRODUCTION**

Plaintiff's Second Consolidated Amended Class Action Complaint ("Complaint," ECF No. 99) alleges with specificity how Defendant Shoshana Shendelman, Ph.D, the founder and former Chief Executive Officer ("CEO"), President, Secretary, and Board Chairman of Applied Therapeutics Inc. ("Applied"), and the senior most officer involved in regulatory compliance, made materially false and misleading statements with scienter, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5, concerning, among other things, the new drug application submitted to the U.S. Food & Drug Administration ("FDA") by Defendant Applied Therapeutics Inc. ("Applied") for the approval of govorestat to treat Classic Galactosemia ("Galactosemia"), the progress toward approval of the NDA, Applied's communications and dealings with the FDA concerning the NDA, and Applied's preparations for commercialization of govorestat.

Applied had to conduct clinical trials to support the NDA, and was required to agree to clinical trial protocols for those trials with the FDA. Between March and June 2021, as part of Applied's ACTION-Galactosemia Kids Study (the "Pediatric Study"), 19 of the 47 subjects enrolled at a clinical site—over 40% of the study population—received only approximately 80% of the intended dose of govorestat due to a labeling error (the "Dosing Errors"). This was a violation of the agreed to clinical trial protocol. The Complaint alleges with specificity how Shendelman knew (a) about the Dosing Errors and that they constituted a violation of the clinical trial protocol for the Pediatric Study, and (b) that information about the Dosing Errors and the clinical data recorded for patients who received the Dosing Errors (the "Dosing Errors Clinical Data") was required by FDA regulation and guidance to be included in the NDA, (c) that the NDA failed to include this information, and instead reported clinical data as if the patients received the full, correct dose, and (d) as a result, the NDA was materially deficient and failed to comply with

1

FDA regulations. Nevertheless, throughout the January 3, 2024 to December 2, 2024 "Class Period," Shendelman stated, among other things, that (1) the NDA included "clinical outcomes data" from the Pediatric Study (FS1, FS3, ¶¶ 88-89, 100, 108, 128, 168, 208, 283), (2) in order to obtain FDA approval, Applied had to "demonstrate with substantial evidence from well-controlled clinical trials, and to the satisfaction of the FDA …that such product candidate is safe and effective for its intended uses" (FS9, FS19 ¶¶ 114, 179, 219, 285), (3) Applied had made "significant regulatory and clinical progress" (FS7, FS18, FS60, ¶¶ 110, 172, 286), and (4) Applied was preparing to commercialize govorestat (FS6, FS14, FS18, FS32, FS46-50, FS51, FSFS 53, FS56, FS58, ¶¶ 109, 135, 172, 195, 254-255, 261, 263).[1] These statements were materially misleading due to Shendelman's failure to disclose the known material deficiencies with the NDA.

The Complaint also alleges with particularity and specificity how Shendelman knew no later than May 9, 2024 that (a) on March 27, 2024, one of Applied's vendors for the Pediatric Study deleted clinical source data for all 47 patients enrolled in the study (the "Study Data Deletion"), (b) between April 23 and May 3, 2024, the FDA conducted an inspection of a clinical test site and discovered the Study Data Deletion, (c) the Study Data Deletion was a violation of the clinical trial protocol for the Pediatric Study, and (d) Applied could not recover the source data for 11 of the patients, and as a result, the FDA was not able to verify this clinical data that was submitted with the NDA. However, from May 9, 2024 through the end of the Class Period, Shendelman told the investing public that "no additional data or studies have been requested by the FDA" (FS16, ¶ 166), that interactions and communications with the FDA were "going very well," were "on track," and had been "very positive and sort of normal course" (FS21, 23, 29, ¶

---

[1] For ease of refence, the Complaint identifies each alleged false statement by a false statement number (FS#).

185), and that she saw "an approval in galactosemia in the near term" (FS45, ¶ 252). Shendelman also gave the public positive regulatory updates, including a re-calculation of submitted clinical data that improved the clinical trial results for govorestat (FS35, 36, 40, ¶¶ 210-211, 222) and the cancellation of an FDA advisory committee meeting for the NDA, the announcement of which on September 18, 2024 caused the price of Applied common stock to increase 68.9%, or $3.20 per share (¶¶ 261-263, 271, FS51-58).

These and other statements alleged in the Complaint were materially false and misleading because, among other reasons, once Shendelman chose to speak about these topics, she had an obligation to disclose all material facts, including that that NDA was materially deficient and that the FDA was not able to verify the clinical data submitted with the NDA, both of which she was well aware. When the truth of her false and misleading statements was disclosed through a series of corrective disclosures, including the rejection of the NDA due to "deficiencies," the FDA issuing a Warning Letter detailing those deficiencies (including the failure to include the Dosing Errors and Dosing Errors Clinical Data in the NDA and the inability to verify clinical data due to the Study Data Deletion), and news reports discussing the Warning Letter and claiming Shendelman misled investors, Applied Therapeutics stock plummeted by $7.28 per share, or approximately 85%, wiping out hundreds of millions in shareholder value.

Shendelman's motion to dismiss should be denied in its entirety. Shendelman's unsuccessful arguments for dismissal challenges only the falsity and scienter elements of Plaintiff's claims. Concerning falsity, Shendelman does not challenge 24 statements alleged to be false and misleading, conceding for purposes of this motion that those statements are properly pled. Shendelman argues that the remaining alleged false statements are inactionable puffery, opinion or truthful recitations of fact. These arguments fail, because, among other reasons, these

statements were based on facts, omitted to disclose material information important to the reasonable investor, rendering them at a minimum half-truths, and a reasonable investor would have been materially misled by Shendelman's optimistic statements about the NDA's approval prospects.

Concerning scienter, Shendelman ignores the standard to view all allegations together and holistically, and instead evaluates each set of allegations by itself. When all of the Complaint's scienter allegations are evaluated together, including suspiciously timed stock sales that netted her over $6.7 million, her clear knowledge of the undisclosed facts, her key role in the Pediatric Study and the NDA, and her suspicious resignation, it is clear that the Complaint alleges a strong inference that Shendelman acted with scienter.

## II.    STATEMENT OF FACTS

### A.    Applied's Clinical Trials for Govorestat to Treat Galactosemia

Applied is a clinical stage biopharmaceutical company focused on developing drugs to treat rare diseases. During the Class Period, Applied had no approved drugs for sale, and its only drug candidate being considered for approval for sale was govorestat to treat Galactosemia. ¶¶ 2, 45, 361.[2] Galactosemia is a rare, inherited, genetic metabolic disorder that primarily affects children and can be fatal if left untreated. The disease is caused by a genetic defect that makes patients unable to metabolize galactose, a simple sugar. ¶¶ 41-45.

Applied conducted two clinical studies on govorestat to treat Galactosemia. In advance of these clinical trials, Applied was required to, and did, agree to clinical trial protocols with the FDA. ¶¶ 47, 72-78, 84. The first clinical trial was the "Adult Study," which was initiated in June 2019,

---

[2] Unless otherwise stated, references to "¶_" are to the Complaint, and "SBr." are to the Memorandum of Law in Support of Shendelman's Motion to Dismiss (ECF No. 105). On June 27, 2025, Applied answered the Complaint ("Answer" or "Ans.," ECF No. 106).

and its results were published on July 10, 2024 in *The Journal of Clinical Pharmacology* ("*JCP*"). ¶¶ 48-53. The second clinical trial was the Pediatric Study, which was launched in or around June 2020 with 47 study participants, and its results were published in *JCP* on November 6, 2024 (the "Pediatric Study Results"). ¶¶ 54-60. Shendelman was an author of both studies, "analyzed and interpreted" their data, and had final approval over the published version. ¶¶ 50-64.

### B.    The Materially Deficient NDA

On January 3, 2024, the first day of the Class Period, Applied announced that it had submitted the NDA to the FDA. ¶ 88. However, unknown to investors, but known to Shendelman, the NDA was materially deficient and omitted information that FDA regulations and guidance required and instructed to be included in the NDA.

Between March and June 2021, Applied supplied clinical sites for the Pediatric Study with mislabeled doses of govorestat. As a result, the Dosing Errors, which were violations of the clinical study protocol for the Pediatric Study, occurred. ¶¶ 69-70. FDA regulations required Applied to include in the NDA "[a] description and analysis of any other data or information relevant to an evaluation of the safety and effectiveness of the drug product obtained or otherwise received by the applicant from any source, foreign or domestic, including information derived from clinical investigations, including controlled and uncontrolled studies of uses of the drug other than those proposed in the NDA." 21 C.F.R. § 314.50(d)(5)(iv). ¶ 68. The Dosing Errors and the Dosing Errors Clinical Data were such "other data and information" required to be included in the NDA because they are relevant to an evaluation of the safety and effectiveness of govorestat. ¶¶ 67, 72. Further, published guidance from the FDA instructed that "important protocol deviations," including "those who received the wrong treatment or incorrect dose," i.e. the Dosing Errors, should be included and listed in a new drug application. ¶¶ 73-74.

5

However, in violation of these FDA regulations and guidance, Applied did not include any description of the Dosing Errors or Dosing Errors Clinical Data in the NDA, and instead "reported dose levels for subjects as stated in the protocol…rather than the actual dose levels administered" (the "NDA Clinical Data Errors"). ¶ 71. Shendelman designed the Pediatric Study, authored the Pediatric Study Results, evaluated the data that resulted from the Pediatric Study, and was involved with the oversight of regulatory affairs strategy at Applied. ¶¶ 81-82; Ans. ¶ 82. SEC filings signed by Shendelman discussed the FDA regulatory requirements for the NDA (¶¶ 84, 114), and Shendelman met with the FDA before its submission to discuss whether data from the trials was acceptable for the NDA. ¶ 85. She was therefore aware of the Dosing Errors and the Dosing Errors Clinical Results, that FDA regulations and guidance required this information to be included in the NDA, and that the NDA omitted this information and instead reported the NDA Clinical Data Errors.

C.    **The FDA Discovers and Defendant Learns that Clinical Data Was Deleted in Violation of FDA Regulations and that the FDA Could Not Verify the Clinical Data in the NDA**

FDA regulations also require a new drug applicant to allow the FDA "to have access to and copy and verify any records and reports relating to a clinical investigation." 21 C.F.R. § 312.58(a), ¶¶ 144-146. Applied, however, failed to adhere to these requirements as a result of the Study Data Deletion.

In the Pediatric Study, Applied "used Pearson's Q-global®, a Web-based administration system for capturing data for certain electronic clinical outcome assessments [eCOAs] performed for measuring primary and secondary efficacy endpoints." ¶ 141. On March 25, 2024, the FDA pre-announced an inspection of one of Applied's clinical testing sites involved in the Pediatric Study. ¶ 140. Such inspections are part of the NDA process, and are conducted to ensure the integrity of data supporting a new drug application and verify that clinical trials comply with FDA

6

regulations. ¶ 144. On March 27, 2024, two days after the inspection was pre-announced, the Study Data Deletion occurred. ¶ 142. Between April 29, 2024 and May 3, 2024, the FDA conducted its inspection, asked to, and was unable to, review the records in Q-global for 11 patients, and discovered the Study Data Deletion. ¶ 147. The Study Data Deletion was a violation of the clinical trial protocol for the Pediatric Study. ¶ 152.

At the conclusion of the inspection, on May 3, 2024, the FDA gave a Form FDA 483 to Shendelman that detailed the Study Data Deletion and two other objectionable conditions (the "Form 483"), and also discussed the Form 483 with Shendelman. ¶¶ 150-152. These forms are designed to inform company management of objectionable conditions observed during an FDA inspection. ¶ 155. On May 9, 2023, Applied responded to the Form 483 and informed the FDA that deleted source data for 11 subjects could not be recovered. ¶ 156. Therefore, by May 9, Shendelman knew about the Study Data Deletion, that the FDA knew Applied had violated FDA regulations and the clinical trial protocol for the Pediatric Study, and that the FDA could not verify clinical results of the Pediatric Study as part of its NDA review. ¶¶ 158-159.

### D.        The Truth is Disclosed Through a Series of Partial Corrective Disclosures

On November 27, 2024, during post-market hours, Applied issued a press release announcing that it had received a Complete Response Letter from the FDA ("CRL") indicating that the FDA was "unable to approve the NDA in its current form, citing deficiencies in the clinical application [the NDA]." ¶¶ 302-303. This announcement was a surprise to the market, as evidenced by analyst reports discussing the CRL. ¶¶ 306-310, 313-314. In response to the announcement of the CRL, on November 29, 2024, the next trading day and a half trading day following Thanksgiving, the price of Applied common stock declined 76.3%, or $6.54 per share, and closed at $2.03 per share, on trading volume of more than 23 times average trading volume. Applied

7

common stock continued its decline on December 2, 2024, falling another $0.28 per share. ¶¶ 311-312, 315.

Also on November 27, 2024, Applied and Shendelman received a Warning Letter from the FDA. ¶ 304. A Warning Letter is issued by the FDA when the agency has determined that a company has committed "significant violations" of regulatory requirements.[3] The Warning Letter identified deficiencies in the NDA: the Study Data Deletion, the inability of the FDA to verify clinical data submitted with the NDA, the Dosing Errors, the failure of Applied to include any information about the Dosing Errors and Dosing Errors Clinical Data in the NDA, and the reporting of the NDA Clinical Data Errors. The Warning Letter also described these issues as violations of the clinical trial protocol for the Pediatric Trial and violations of FDA regulations. ¶¶ 70-72, 318. The Warning Letter also stated, among other things, that failure to include information about the Dosing Errors or report the Dosing Errors Clinical Data "raises significant concerns about the validity, reliability, and integrity of the data for" the NDA and "significant concerns about [Applied's] oversight and conduct of clinical investigations, including its compliance with the reporting requirements for human drug products," and that the failure to provide this information, combined with the Study Data Deletion, "raise significant concerns about the validity and reliability of data collected for this clinical investigation." ¶¶ 72, 160, 318.

Five days later, on December 2, 2024, during post-market hours, Applied first disclosed that it had received the Warning Letter. ¶ 316. Then, on December 3, 2024, the FDA published the Warning Letter to its website. ¶ 318. In response, the price of Applied common stock fell $0.06 per share, or 3.4%, on December 3, 2024. ¶ 323. News reports were published on December 4 and

---

[3] *See* FDA, *About Warning and Close-Out Letters*, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/about-warning-and-close-out-letters (last accessed 7/11/2025).

5, 2024 discussing the CRL and the Warning Letter. ¶¶ 320-322. Stat News published an article

on December 5, 2024, stating that Shendelman had misled investors concerning the NDA:

> Applied Therapeutics' CEO Shoshana Shendelman has a debilitating credibility problem: She repeatedly misled investors prior to the Food and Drug Administration's rejection of the company's rare-disease drug.
>
> Throughout 2024, Shendelman assured investors that Applied's drug, called govorestat, was sailing through the FDA review process without major hitches. We now know she was lying by omission. The company was aware of significant problems with the govorestat application identified by the FDA, but Shendelman said nothing publicly. [¶ 322.]

The price of Applied common stock continued to decline $0.31 per share, or 18.3%, on December

4, 2024 and $0.09 per share, or 6.5%, on December 5, 2024, closing at $1.29 per share on

December 5, 2024. ¶¶ 321, 323.

On December 20, 2024, Applied announced that Shendelman had stepped down from her

positions as President, CEO, Secretary, and Board Chair. ¶¶ 326-327. In response, the price of

Applied common stock fell $0.14 per share, or 13.7%, on December 20, 2024, and closed at $0.88

per share. ¶ 328. In total, from November 27, 2024 through December 20, 2024, the price of

Applied's common stock plummeted $7.69 per share, or 89.7%, causing significant damages to

Plaintiff and the Class. ¶ 31.

## III.    ARGUMENT

### A.    The Complaint Alleges Shendelman Made Materially False or Misleading Statements

To establish falsity under the PSLRA and Rule 9(b), a complaint must "identify the

speaker, state where and when the statements were made, and explain why the statements were

fraudulent" by pleading facts "sufficient to support a reasonable belief as to the misleading nature

of the statement or omission." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 184

(S.D.N.Y. 2003). A statement is actionably misleading if "a reasonable investor would have

received a false impression from that statement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010).

Initially, Shendelman does not challenge the falsity of 24 false statement made by her.[4]  As such, if the Court finds that scienter has been properly pled as to these Unchallenged FS, the Court can deny Shendelman's motion and defer consideration of her arguments concerning the Challenged FS[5] until summary judgment. As Judge Pamela Chen of the Eastern District of New York concluded earlier this year:

> Defendants make three other arguments in support of dismissal of Plaintiffs' Section 11 claims, namely, that some of the [false statements] are (1) puffery, which cannot support a securities violation; (2) inactionable opinion statement; or (3) inactionable forward-looking statements. The Court finds it unnecessary to address these arguments and therefore declines to do so. The resolution of these arguments will not affect the outcome of this motion or the course of the litigation because Defendants are not challenging many of the [false statements] on these grounds. Therefore, even if the Court were to dismiss some or all of the [false statements] that Defendants challenge on these three grounds, Plaintiffs' claims would still survive the motion to dismiss. Furthermore, Defendants will have the opportunity to raise these arguments at a later stage in this proceeding after discovery has concluded.

*In re Arqit Quantum Inc. Sec. Litig.*, 2025 WL 977995, at \*17 n.27 (E.D.N.Y. Mar. 28, 2025); *see also id.* at 48-52 (finding same false statements false under Section 10(b)).

### 1.    Shendelman's Statements Related to the NDA Approval and Regulatory Process Are Actionable

Knowing that the likelihood of the FDA's approval of govorestat was of paramount importance to investors, Shendelman repeatedly spoke in misleadingly optimistic terms about the

---

[4] FS1, FS3, FS6, FS9-10, FS15-17, FS19-20, FS24-27, FS30-31, FS35-36, FS39-40, FS54, FS62, and FS70-71 (collectively, the "Unchallenged FS").

[5] Shendelman's motion mentions 10 false statements in the body of her motion: FS7, FS12, FS21, FS23, FS28, FS32, FS33, FS61, FS64, and FS67. She lists these ten and the remaining 34 challenged false statements (FS2, FS4-5, FS7-8, FS12-14, FS18, FS21-23, FS28-29, FS32-FS34, FS37-FS38, FS42-FS53, FS55-FS58, FS60-61, FS63-FS69, collectively with the 10 false statements identified in the motion, the "Challenged FS") in "Appendix A."

10

progress of the NDA, when at the time she made those statements, she knew that the NDA was materially deficient and that the FDA had discovered the Study Data Deletion. Shendelman claims that statements she characterizes as "referencing Applied's regulatory progress"[6] or "expressing confidence in and potential of NDA approval"[7] are inactionable as puffery, opinion, or statements of fact. She is mistaken. Once Shendelman chose to speak on these topics, she had an obligation to disclose the negative materially relevant facts in her possession. *Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at *19 (S.D.N.Y. June 17, 2020) (holding statements regarding positive interactions with the FDA were materially misleading when they omitted that the company had received a negative Form 483).

Shendelman first claims incorrectly that FS12 (March 28, 2024: "…we remain confident in the potential for govorestat approval for Galactosemia…"), FS21 (May 14, 2024: interactions with the FDA "have been very positive and sort of normal course") and FS23 (May 14, 2024: "There's a lot of interactions with FDA in the interim and that's all going very well and on track and we feel very encouraged") are statements of puffery and corporate optimism. SBr. at 23-24. However, "statements are not puffery where they constitute 'misrepresentations of existing facts' and the speaker 'knew the contrary was true.'" *In re Axsome Therapeutics, Inc. Sec. Litig.*, 2025 WL 965265, at *7 (S.D.N.Y. Mar. 31, 2025) (quoting *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)). That is exactly what the Complaint alleges here. *See* ¶¶ 130-132, 187-192.

Courts have held that it is materially misleading under the securities laws to portray the prospects for FDA approval in a positive light while omitting negative information that is likely to cause delays or rejection of the NDA. *See Sinnathurai v. Novavax*, 645 F. Supp. 3d 495, at 520 (D.

---

[6] FS4, FS7, FS18, FS37, FS60.

[7] FS2, FS5, FS8, FS12-FS14, FS18, FS21- FS23, FS28-FS29, FS32- FS34, FS38, FS42-FS53, FS55-FS58, FS60-FS61, FS63, FS66, FS69.

Md. 2022) (sustaining statements under the reasoning that by choosing to speak positively "about the timeline for regulatory approval and the manufacturing progress," omitting "contamination and purity issues" misrepresented the "ability to obtain regulatory approval and produce" at scale); *Kendall v. Odonate Therapeutics, Inc.*, 2021 WL 3406271, at *5 (S.D. Cal. Aug. 4, 2021) (sustaining statements that gave a misleading "impression that [the Phase 3 study] was proceeding as expected, with no significant setbacks"); *Odeh v. Immunomedics*, 2020 WL 4381924, at *6 (D.N.J. July 31, 2020) (positive statements about FDA review were actionable based on awareness of data breach that "could seriously jeopardize" approval); *See In re Axsome*, 2025 WL 965265, at *7 (sustaining statement that defendants' drug was in a "position to potentially launch" as an NDA because it "misrepresented material facts… which prevented it from conducting necessary studies for the NDA"); *Irvine v. ImClone Sys., Inc.*, 2003 WL 21297285, at *1 (S.D.N.Y. June 4, 2003) (statement that FDA approval was expected "in early 2002" was actionable where defendants knew but concealed that "it was not reasonably foreseeable").

Shendelman next claims, incorrectly, that FS33 (June 6, 2024: "[W]e look forward to potentially making this drug available to patients later this year in the U.S. …"); FS61 (November 7, 2024: "…We look forward to the opportunity to bring govorestat to patients in 2025."), FS32 (June 6, 2024: "With potential approvals on the horizon, we are continuing to prepare for commercial launch of govorestat …."), and FS28 (May 14, 2024: "… [W]e're very confident in the process and we're very hopeful that this will be the first drug approved for Galactosemia later this year."), as well as "the majority" (i.e. not all) of other alleged FS listed on Appendix A, but not discussed specifically in her motion, are statements of opinion and inactionable. SBr. at 24-25. Even assuming that these statements are pure opinions, "[s]tatements of opinion may be actionable misstatements if (1) 'the speaker did not hold the belief she professed,' (2) 'the supporting fact[s]

12

she supplied were untrue' or (3) the stated opinion 'omits material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself.'" *In re Axsome*, 2025 WL 965265, at *7 (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186-189 (2015). The Complaint here meets this standard. *See* ¶¶ 187-192, 198-202, 287-291. The Complaint contains particularized allegations concerning Shendelman's knowledge of the Dosing Errors, the material deficiencies in the NDA, and the Study Data Deletion and the FDA's inability to verify clinical data for the NDA, that support that she did not hold the alleged opinions made or omitted facts that conflict with what a reasonable investor would take from the statements – that there were no problems or issues with the FDA review and approval was more than likely.

Shendelman is also wrong to compare the Challenged FS to the statements found to be inactionable puffery, corporate optimism, or statements of opinion in *In re Bristol-Myers Squibb*. *See* SBr. at 23-24 (*citing In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004). In *Bristol-Myers Squibb*, the Bristol-Myers Squibb ("BMS") affiliated defendants made statements that the court found to be inactionable. However, those statements were about the potential regulatory approval of a drug that was developed by another company, ImClone, that BMS has partnered with. *Id.* at 554. Further, the BMS defendants spoke about what BMS would do if the drug application was not approved, which the Court found would lead a reasonable investor to recognize the chances that the application could be denied. *Id.* at 558. Here, Shendelman has not pointed to any disclosure of what Applied would do if the NDA was denied. Further, Shendelman was integrally involved in Applied's (not a third party's) NDA and clinical trials, and knew the undisclosed facts. These undisclosed facts rendered her positive statements to be at odds with factual reality, and therefore misleading to the reasonable investor. Shendelman's

13

other cited authority is similarly distinguishable. *See, e.g., In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *10 (S.D.N.Y. Sept. 14, 2015) (finding statements that an NDA was "on track" inactionable when the risk of non-approval was disclosed, whereas here the Dosing Errors, NDA deficiencies, and Study Data Deletion were concealed); *Fort Worth Emps.' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 230 (S.D.N.Y. 2009) (finding statements that were "merely expressions of 'hope' that the FDA would approve" the drug inactionable because the speaker was "conservative and cautious in advising the audience" on the subject of FDA approval, whereas here, Shendelman only gave positive updates about the NDA's progress); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 589-90 (S.D.N.Y. 2016) (finding statements expressing confidence in FDA were inactionable when, unlike here, there were no allegations that "defendants' statements, as reasonably interpreted, were in conflict with facts not volunteered").

**2.    The Complaint Adequately Alleges that Statements Related to the FDA's Review and the PDUFA Date Were Materially Misleading**

Shendelman further argues that four statements from November 12, 2024 regarding the status of the FDA's review of the NDA and the PDUFA (FS64-65 and FS67-68) are inactionable as statements of truth or alleged fraud-by-hindsight. SBr. at 26-27. She is mistaken. These FS were materially false and misleading to a reasonable investor because they concealed the facts of the material deficiency in the NDA and the Study Data Deletion. For instance, Shendelman stated that the NDA was "in the very late stages of regulatory review" (FS65) and "we're under review at the FDA with a PDUFA date of November 28th this month…" (FS68). In the light of the circumstances under which they were made, these statements were materially misleading because they falsely implied that the NDA was progressing as planned towards approval, while omitting that the NDA was materially deficient and that the FDA was unable to verify clinical results for 11 patients as a result of the Study Data Deletion. *Novavax, Inc.*, 645 F. Supp. 3d at 518, 520

14

(holding that statements "about the timeline for regulatory approval" that omitted "contamination and purity issues" misrepresented the "ability to obtain regulatory approval and produce" and were actionable "[u]nder the circumstances"); *In re Allergan PLC Sec. Litig.*, 2019 WL 4686445, at *23 (S.D.N.Y. Sept. 20, 2019) (holding that statements that are literally true when viewed in isolation "can be misleading in context if it leaves investors with a false impression").

Shendelman's relied-upon authority demonstrates that these statements, in the context of this case, are materially misleading to the reasonable investor. For instance, in *Biovail,* unlike here, the complaint did not allege that the statement failed to disclose material facts that rendered it misleading. *Biovail Corp.*, 615 F. Supp. 2d at 230. Similarly, in *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1129 (2nd Cir. 1994), the court found that statements about the adequacy of a loan loss reserve that turned out to be false but did not conceal material facts were inactionable "fraud-by-hindsight," whereas here, Shendelman's statements omitted facts that were known to her at the time and would have been of immense interest to the reasonable investor. *See also In re MELA Sciences, Inc. Secs. Litig.,* 2012 U.S. Dist. LEXIS 144150, at *12 (S.D.N.Y. Sept. 19, 2012) (finding statements inactionable when the complaint "does not allege facts showing that the statements regarding the timing of approval were false when made," whereas here, Shendelman concealed that the Dosing Errors related NDA deficiencies and Study Data Deletion posed severe risks to the NDA's approval prospects); *Bazzelle v. NovoCure Ltd.*, 2025 WL 843668, at *9 (S.D.N.Y. Mar. 18, 2025) (finding statements can be "misleading by omission . . . only when the omitted contrary facts substantially undermine the conclusion that a reasonable investor would reach from the statement").

**B.**    **The Complaint Adequately Alleges A Strong Inference of Shendelman's Scienter.**

In determining whether scienter is properly pled, "courts must, as with any motion to dismiss…accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 322 (2007). The test is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. The inference of scienter "need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences,'" but must be "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. "[A] tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps'. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012); *see also Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020).

When all of Plaintiff's allegations of Shendelman's scienter are taken together, the Complaint alleges a strong inference of scienter as to Shendelman. Shendelman's attempt to isolate and challenge each allegation separately fail.

**1.**    **The Complaint Alleges Motive to Commit Fraud**

**a)**    **Shendelman's Stock Sales Support a Strong Inference of Scienter.**

First, where a plaintiff adequately alleges conscious misbehavior or recklessness, there is no requirement to assess the defendant's motive at this time. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000); *In re Delcath Sys. Sec. Litig.*, 36 F. Supp. 3d 320, 334 n.4 (S.D.N.Y. 2014) (motive unnecessary where allegations of knowing misconduct are sufficiently particularized). As discussed below, the Complaint alleges a strong inference of conscious misbehavior or recklessness. Thus, Defendant's attempt to rebut scienter based on a lack of motive is misplaced.

16

Throughout the Class Period, Defendant Shendelman sold more than 1.15 million shares, or **13.8%,** of her Applied common stock, of which 72% was sold on June 10, 2024 and August 12-14, 2024 (¶¶ 335-336), within the three months after Shendelman received the Form 483 on May 3, 2024 and learned that Applied could not recover the deleted source data for 11 clinical patients and that the FDA could not verify that clinical data included in the NDA (no later than May 9, 2024). Shendelman made a profit of **$6.7 million** on all her stock sales. ¶¶ 335-338.  This provides strong evidence of motive and scienter. *See, e.g., In re Oxford Health Plans*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (stock sales of 11 and 17% sufficient to plead scienter when "suspiciously timed").

Shendelman argues that her sales raise no inference of scienter because (a) the March and June sales were purportedly nondiscretionary sales to cover tax obligations, and (b) the total amount of sales was insufficient. SBr. at 9-11. Shendelman is wrong. First, the March and June sales made up just 33% of the total stock sold by Shendelman during the Class Period, rendering the argument inapplicable for the majority of her sales. Even for the sales that were ostensibly for tax purposes, Shendelman has failed to substantiate *why* the selling of stock was necessary to achieve this goal, and asks the Court to accept her conclusory defense without any basis as to why these tax obligations could not have been met through cash.

Moreover, Shendelman is wrong that the amount she sold is insufficient to plead scienter. Courts have held that that even stock sales that "were comparatively small in amount" but were "unusual because of their timing" can evince scienter, and that insider sales of similar amounts can evince a finding of scienter under similarly suspicious circumstances. *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 475 (S.D.N.Y. 2013) (stock sales by two executives sufficient to plead scienter even though they were "comparatively small in amount" but were "unusual because of

17

their timing"); *In re Oxford Health Plans*, 187 F.R.D. at  139; *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 542 (S.D. Ohio 2000) (similar); *Marksman Partners LP v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (stock sales of 20% and $6.3 million sufficient to plead scienter).

Shendelman's reliance on *In re Travelzoo Inc. Sec. Litig.*, 2013 WL 128734, at *10 (S.D.N.Y. Mar. 29, 2013), is misplaced. *Travelzoo* states that the Court must evaluate whether stock sales evidence scienter under the totality of the circumstances. *Id.* Here, under the totality of the circumstances, the amount of the sales and the suspicious timing of the stock sales while in possession of material negative information evince scienter.  Shendelman's other cited authority is distinguishable. *See, e.g., Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (holding that sale was not sufficiently unusual to plead scienter when, among other factors not present, the sale was announced in advance and occurred because options became exercisable); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006) (holding that sales were "insufficient to establish motive" because "the dispositive factor is that other insiders, including the other two individual defendants, did not sell during the putative class period[,]" unlike here, where Perfetti also sold shares while the NDA was pending but after the Form 483 was received).

### b) Shendelman's Need to Vest 2.2 Million Restricted Stock Units Supports a Strong Inference of Scienter

The Complaint alleges that Shendelman received a 2.2 million restricted stock unit incentive award in December 2023, and that for 400,000 of 2.2 million restricted stock units to vest, Applied's common stock needed to trade above $6.00 per share for 20 consecutive trading days, something that had never happened. The Complaint also alleges that this requirement was achieved immediately following Shendelman's materially false and misleading statements on September 18, 2024 about the positive nature of the cancellation of the advisory committee

18

meeting (FS51-58), while omitting the known negative regulatory updates that the NDA was materially deficient, the Form 483, the Study Data Deletion, and that the FDA could not verify all the clinical data in the NDA. Applied's common stock price increased $3.20 per share, or $68.9%, on September 18, 2024, and traded above $6.00 per share for the next 20 trading days. That $3.20 per share increase increased the value of her personal Applied holdings by nearly $25 million. ¶¶ 94, 342-354.

These are not, as Shendelman contends, "generic allegations" that could apply to any corporate executive. SBr. at 11-12. The Complaint alleges a motive specific to her to ensure that 400,000 restricted stock units could vest. Courts have found that such *specific* economic motives can show motive and opportunity to evidence scienter. *See, e.g., In re Didi Global Inc. Sec. Litig.*, 2024 WL 1119483, at *16-17 (S.D.N.Y. Mar. 14, 2024) (noting "specific economic motives alleged . . . are not so general that they could be imputed to any company or its officers" in finding motive and opportunity) (emphasis in original); *Skiadas*, 2020 WL 3268495, at *11 (motive where defendant had "different incentives from a generic corporate insider"). Shendelman's cited authority does not suggest otherwise. *See Kalnit v. Eichler*, 264 F.3d 131,139 (2d Cir. 2001) (stating that "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud"); *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) (stating that scienter can be pled where, like here, the complaint alleged direct link between the compensation package and the fraudulent statements because of the "magnitude of the compensation and the defendants' motive to sweep problems under the rug").

>       **2.     The Complaint Alleges Strong Circumstantial Evidence of Conscious
>               Misbehavior or Recklessness**
>
>               **a)      The Complaint Alleges that Shendelman Knew that the NDA
>                       Was Materially Deficient and that the FDA Knew Applied Had
>                       Violated FDA Regulations, Which Supports Scienter**

A complaint gives rise to a strong inference of scienter by pleading the defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 311. The Complaint alleges that Shendelman knew, or at the very least was privy to information about and severely reckless in not knowing, (a) about the Dosing Errors and that they were a violation of the clinical trial protocol for the Pediatric Study, (b) that information about the Dosing Errors and the Dosing Errors Clinical Data was required to be included in the NDA under FDA regulations and guidance, (c) that the NDA omitted any information about the Dosing Errors or Dosing Errors Clinical Data, and instead reported the NDA Clinical Data Errors, (d) that the Study Data Deletion occurred, (e) that Applied could not recover the electronic data for 11 test subjects, and (f) that the FDA could not verify all the clinical data submitted with the NDA. ¶¶ 88-301. The Complaint also alleges that Shendelman knew, or was reckless in not knowing, that these issues posed grave risks to the NDA's approval prospects. ¶¶ 335-371. Indeed, in later reporting in the Intercept on Applied's failed NDA, Professor Henry Greely, a renowned medical ethics expert and law professor at Stanford University stated, "It's certainly a serious problem for a company that doesn't report this fully to FDA." ¶ 325. In addition, the Complaint alleges that that this information was material to investors, and the omission of this information rendered Shendelman's Class Period statements materially false and misleading. These allegations are sufficient to plead scienter. *See Teligent, Inc.*, 2020 WL 3268531, at *19 allegations that CEO knew of problems associated with an NDA from a Form 483 sufficient to allege that he "knew facts or had access to information suggesting

20

that [his] public statements were not accurate"); *Gorlamari v. Verrica Pharms.*, 2024 WL 150341, at \*7-8, 10 (E.D. Pa. Jan. 11, 2024) (scienter adequately alleged where FDA feedback would "inhibit, rather than facilitate, timely approval").[8]

Initially, Shendelman argues only that her awareness of the Study Data Deletion and the Dosing Errors does not support scienter. This misinterprets the Complaint and ignores Plaintiff's other allegations that Shendelman knew that the NDA was materially deficient, the FDA had discovered violations of FDA regulations, and the FDA could not verity clinical data submitted with the NDA. ¶¶ 335-371.

Shendelman then argues that the Complaint fails to allege scienter, because to do so "a plaintiff must allege the executive knew an issue would necessarily prevent approval," and because "Applied's interactions with the FDA supported Shendelman's reasonable belief that approval was possible." SBr. at 12-13; 14-15. But this is not the exclusive standard, as is demonstrated by Shendelman's cited cases. For instance, in *In re Sanofi Securities Litigation*, the court stated that plaintiff must show "sufficient factual allegations to indicate that defendants understood that their public statements were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility[,]" which is precisely what the Complaint alleges. 87 F. Supp. 3d 510, 534 (S.D.N.Y.

---

[8] The fact that the Form 483 did not mention the Dosing Errors is immaterial. SBr. 15. The Complaint alleges numerous specific facts to evidence that Shendelman knew about the Dosing Errors and material deficiencies in the NDA starting at the beginning of the Class Period. Further, Shendelman argues that "It is unreasonable to believe that if patients had received the intended higher dose, the results would be less statistically significant." These facts weigh against Plaintiff's assertion that Shendelman should have known that the Dosing Errors would prevent approval; they certainly do not support an inference of recklessness or fraud." SBr. 15. However, if the Dosing Errors Clinical Data supported approval, then the only reason for Dr. Shendelman not to include the information about the Dosing Errors in the NDA is because she thought their existence, and the clinical trial protocol violation, would lead to rejection of the NDA. Further, Shendelman's argument ignores the fact that Applied also reported data as if patients who got the wrong dose got the correct dose – or, incorrect data.

2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016). In *Gillis*, the court found that plaintiffs failed to plead scienter because the complaint did not allege facts that defendants "knew or had access to non-public information contradicting their public statements[,]" whereas here, the Complaint alleges that Shendelman knew but concealed highly material facts that rendered her statements misleading. 197 F. Supp. 3d at 601. *Gillis* also states that there is scienter "if the management is reckless in dealing with such adverse facts," *id.* at 579, which is exactly the situation the Complaint alleges here.

Similarly, Applied's interactions with the FDA further evinced that Shendelman knew her statements were materially misleading. Shendelman's receipt of the Form 483 informed her that the FDA knew of the Study Data Deletion. Further, it is not just that Shendelman received the Form 483, but rather, that as a result, she knew that data could not be recovered for 11 patients, and that the FDA could not verify all the clinical data submitted with the FDA, and that Applied had violated clinical trial protocols and FDA regulations. This was far more than mere "interim feedback," and is sufficient to plead scienter. Shendelman's cited authority is distinguishable and in fact supports a finding of scienter in this case. *See, e.g., In re Alkermes Public. Ltd. Co. Securities Litigation*, 523 F. Supp. 3d 283, 295 (E.D.N.Y. 2021) (finding that communications with the FDA that merely "express[ed] concerns regarding [defendant's] trial methodology[,]" but did not pose severe risks to approval, insufficient to raise an inference of scienter); *In re Checkpoint Therapeutics Sec. Litig.*, 2025 WL 1434400, at *23, 27 (S.D.N.Y. May. 19, 2025) (finding that Form 483, that was disclosed by the company publicly before the FDA issued a CRL, was insufficient to support scienter when "all other data known" was consistent with timely approval, whereas here, the Form 483 was not disclosed by Applied, and Shendelman knew as a result of the Form 483 that the FDA could not verify all clinical data in the NDA); *In re MELA*

22

*Sciences*, 2012 WL 4466604, at *6 (scienter allegations that "says nothing of defendants' knowledge when making the representations" insufficient, unlike here where the Complaint alleges Shendelman knew of the undisclosed facts).

Moreover, the fact that the FDA did not immediately reject the NDA does not undercut an inference of scienter. SBr. at 17. The mere fact that the FDA did not immediately issue a CRL was not an "encouraging regulatory decision" as she contends, and in fact is not material, let alone dispositive, to the recklessness of her conduct. *Sanofi*, 87 F. Supp. 3d at 545 (finding that the FDA's decision to lift a clinical hold, allow further clinical trials, among others, "muted" prior negative feedback about clinical methodology, whereas here, the FDA merely did not issue a CRL).

Further, the Complaint alleges far more than Shendelman's optimism, as she contends, but rather that she knowingly concealed material facts from investors. SBr. at 17-18. This argument asks the Court to ignore the totality of factual allegations showing that Shendelman knew but concealed the NDA's deficiencies, which distinguishes this case from her cited authority. *See, e.g., Shields*, 25 F.3d at 1129 (finding statements that were false but unknowingly so inactionable, whereas here, Shendelman knowingly misled investors).

### b) Plaintiffs' Other Allegations Support a Strong Inference of Scienter

*First,* Shendelman was by Applied's own disclosures a key employee. However, the Complaint does not rely solely on that role to evidence her knowledge and recklessness. Rather, the Complaint alleges other specific facts to evidence her knowledge. For example, Shendelman received the Form 483 and FDA discussed its findings with her. Shendelman also had an integral role of designer of the Pediatric Study and analysed its results, and was also an author of the Pediatric Study Results. She was also the senior most executive involved in regulatory compliance.

23

As such, she was aware of the Dosing Errors, Dosing Errors Clinical Data, and that the NDA reported the wrong data, omitted required information, and was materially deficient. The fact that she was a key employee of a company that had between 22 and 35 employees during the Class Period further serves to enhance the allegations of her knowledge and scienter. *See Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 326 (S.D.N.Y. 2018) (holding "evidence depicting Defendants' central roles in" drug development and NDA "drafting" supports scienter); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 349-50 (E.D. Pa. 2014) (finding scienter because defendants were "all alleged to have been in position to know of departures from [clinical trial] protocol, statistical manipulation, and the like."). Shendelman's argument otherwise ignores these other allegations and should be rejected.

**Second,** the govorestat NDA was Applied's only product with a path to FDA approval, which made FDA approval the only route to achieve revenue generation, and a core operation to Applied, which further contributes to the already-strong inference of scienter. *See In re Y-mAbs Theraps., Inc. Sec. Litig.*, 2024 WL 451691, at *13 (S.D.N.Y. Feb. 5, 2024) (scienter supported because drug was the "lead product candidate," the company was responsible for FDA submissions, and defendants made "detailed statements" on "the progress of the" FDA submission and supervised FDA communications). These facts provide complimentary evidence of scienter here. While Shendelman wrongly casts doubt on the core operations doctrine, it is applied by courts in circumstances that are less severe than here. *See Okla. Firefighters Pension & Ret. Sys. v. Lexmark*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. Mar. 19, 2019) (bolstering scienter when fraud amounted to 29% of revenues); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) (bolstering scienter when fraud amounted to 21% of revenues).

*Third,* Shendelman spoke regularly and in detail about the govorestat NDA, which thereby put her knowledge of the subject at issue and adds to an inference of scienter. *See Christiansen v. Spectrum Pharms., Inc.*, 2024 WL 246020, at \*16 (S.D.N.Y. Jan. 23, 2024) (scienter adequately alleged where executive "repeatedly spoke to investors about pozi's development and the FDA review process, suggesting" his awareness of relevant information); *Gauquie v. Albany Molec. Rsch., Inc.*, 2016 WL 4007591, at \*2 (E.D.N.Y. July 26, 2016) (communications about issue supports the inference that defendants knew contradictory information).

*Fourth,* Shendelman's separation, which was described as a termination in her separation agreement, and occurred weeks after the revelations of the CLR and Warning Letter were made public, and a news report stating that she misled her own investors, raises a strong inference that the termination was not voluntary, and contributes to scienter. *See Fresno Cty. Emps. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017) (timing and circumstances of defendants' resignations contributed to inference of scienter). Shendelman's cited authority does not suggest otherwise, and she instead argues that this is a "conclusory allegation" that lacks "a single particularized fact" connecting her departure to the supposed fraud. *See In re UBS AG Sec. Litig.*, 2012 WL 4471265, at \*18 (S.D.N.Y. Sept. 28, 2012), *aff'd, City of Pontiac Policeman's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) (finding that, unlike here, departure of a non-defendant that was not described as a termination was insufficient to add to scienter).

*Fifth,* Shendelman's post-Class Period statements made on the May 6, 2025 episode of the "Some Future Day" podcast with Marc Beckman regarding the govorestat NDA and communications with the FDA during the Class Period bolster the strong inference of scienter. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72-73, 76 (2d Cir. 2001) ("Pre-class" and "post-class period data may be relevant to . . . what a defendant knew or should have known during the class

25

period"). In particular, Shendelman's misleading and deflecting statement that the reason the NDA was denied was "FDA bureaucracy about how data was transferred [] through an electronic system handled in the clinical trial which ultimately resulted in the drug not being approved" evinces that she continues to be less than 100% truthful about the issues that led to the NDA rejection, which contributes to an inference of scienter.

Shendelman argues that statements have relevance to scienter only where they "confirm what defendant knew or should have known during the class period," and that the "alleged podcast statements reveal nothing." SBr. at 22; *Sinay v. CNOOC Ltd.*, 2013 WL 1890291, at *8 (S.D.N.Y. May 6, 2013). But this assertion is conclusory, and does not contradict Plaintiff's well-pled allegations that Shendelman knew of the NDA's deficiencies and the FDA's discovery of violations of FDA regulations and clinical trial protocols.

### 3.    Taken Together, Plaintiff's Allegations Support a Strong Inference of Scienter

The inquiry under *Tellabs* is: "[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" 551 U.S. at 326. Plaintiff has alleged myriad facts to infer that, at the start of the Class Period and at all times throughout, Shendelman knew, or recklessly disregarded, the NDA was materially deficient and in violation of FDA regulations and guidance. The Complaint also alleges that no later than May 9, 2024, Shendelman knew of, or recklessly disregarded, the Study Data Deletion and that as a result the FDA could not verify the clinical data underlying the NDA, another violation of FDA regulations. Taken together with Defendant's other allegations, including suspicious insider sales and that govorestat was Applied's only path to revenue generation, the complaint alleges a strong and cogent inference that Shendelman made materially

false and misleading statements with an intent to deceive, manipulate, or defraud. *See id.* at 326 (mandating holistic analysis).

## C.    The Complaint Properly Alleges Shendelman's Violation of Section 20(a)

Shendelman's only challenge to Plaintiff's Section 20(a) claim is that the Complaint fails to plead a primary violation of the Exchange Act. As stated above, the Complaint adequately alleges that Shendelman violated Section 10(b) and Rule 10b-5. Shendelman's argument, contesting Plaintiff's control-person claims should therefore be rejected. *See City of Austin Police v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 311 (S.D.N.Y. 2013).

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Shendelman's motion to dismiss in its entirety. While Plaintiff has already been given one opportunity to amend, the Court has not yet issued an opinion concerning the sufficient of Plaintiff's allegations. If the Court grants Defendant's motion in whole or in part, Plaintiff respectfully requests leave to amend. *See Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) ("[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead.").

Dated: July 11, 2025
      New York, NY

Respectfully submitted,

**WOLF POPPER LLP**

*/s/ Joshua W. Ruthizer*
Robert C. Finkel
rfinkel@wolfpopper.com
Joshua W. Ruthizer
jruthizer@wolfpopper.com
Emer Burke
eburke@wolfpopper.com
Samuel Coffin
scoffin@wolfpopper.com
845 Third Avenue, 12th Floor
New York, New York 10022
Telephone: (212) 759-4600

27

*Attorneys for Court-Appointed Lead Plaintiff*
*Dr. Martin Dietrich and Court-Appointed*
*Lead Counsel to the Proposed Class*

## LOCAL RULE 7.1(c) CERTIFICATION

I hereby certify that the foregoing Memorandum of Law complies with the word-count limitations set forth in Local Rule 7.1(c). The foregoing Memorandum contains 8,731 words, exclusive of the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, but does include material contained in footnotes, according to the word processing software used to prepare it.

Dated: New York, New York
      July 11, 2025

Respectfully submitted,

**WOLF POPPER LLP**

*/s/ Joshua W. Ruthizer*
Robert C. Finkel
rfinkel@wolfpopper.com
Joshua W. Ruthizer
jruthizer@wolfpopper.com
Emer Burke
eburke@wolfpopper.com
Samuel Coffin
scoffin@wolfpopper.com
845 Third Avenue, 12th Floor
New York, New York 10022
Telephone: (212) 759-4600

*Attorneys for Court-Appointed Lead Plaintiff Dr. Martin Dietrich and Court-Appointed Lead Counsel to the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of July, 2025, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will automatically send an email notification of such filing to all attorneys of record in the above-referenced case.

**WOLF POPPER LLP**

*/s/ Joshua W. Ruthizer*
Robert C. Finkel
rfinkel@wolfpopper.com
Joshua W. Ruthizer
jruthizer@wolfpopper.com
Emer Burke
eburke@wolfpopper.com
Samuel Coffin
scoffin@wolfpopper.com
845 Third Avenue, 12th Floor
New York, New York 10022
Telephone: (212) 759-4600

*Attorneys for Court-Appointed Lead Plaintiff Dr. Martin Dietrich and Court-Appointed Lead Counsel to the Proposed Class*