**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE APPLIED THERAPEUTICS SECURITIES LITIGATION | Case No.  1:24-cv-09715 (DLC) (VF)<br><br>CLASS ACTION |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, APPROVAL OF PLAN OF ALLOCATION AND AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES**

**WOLF POPPER LLP**
Joshua W. Ruthizer
Robert C. Finkel
Emer Burke
Samuel Coffin
845 Third Avenue, 12th Floor
New York, New York 10022

Lead Counsel for Lead Plaintiff Dr. Martin Dietrich and the Class

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ............................................................................................................... 1

OVERVIEW OF THE ACTION .......................................................................................... 2

TERMS OF THE SETTLEMENT ....................................................................................... 6

IMPLEMENTATION OF THE NOTICE PROGRAM ...................................................... 7

ARGUMENT ...................................................................................................................... 8

I.       The Court Should Grant Final Approval of the Settlement ................................... 8

      A.       Rule 23(e)(2)(A): Lead Plaintiff and Lead Counsel Have Adequately Represented the Class ............................................................................................................ 9

      B.       Rule 23(e)(2)(B): The Settlement Was Negotiated at Arm's Length ..................... 9

      C.       Rule 23(e)(2)(C): Relief Provided to the Class is Adequate and Reasonable in Light of the Risks, Costs, Delays, and Complexity of the Litigation ................... 10

            1.       Rule 23(e)(C)(i) and Grinnell Factors 1, 4, 5, and 6: The Costs, Risks, and Delay of Trial and Appeal; the Complexity, Expense and Likely Duration of the Litigation; and the Risks of Establishing Liability, Damages, and Maintaining the Class Through Trial ....................................................... 12

            2.       Rule 23(e)(2)(C)(ii): The Proposed Method for Distributing Relief Is Effective ............................................................................................... 13

            3.       Rule 23(e)(2)(C)(iii): The Anticipated Attorneys' Fees and Expenses Are Reasonable ............................................................................................ 14

            4.       Rule 23(e)(2)(C)(iv): Any Agreement Required to be Identified Under Rule 23(e)(3) ......................................................................................... 14

      D.       Rule 23(e)(2)(D): The Settlement Treats Class Members Equitably Relative to One Another ...................................................................................................... 14

      E.       Grinnell Factor 2: The Reaction of the Class to the Settlement ......................... 15

      F.       Grinnell Factor 3: The Stage of the Proceedings ............................................... 15

      G.       Grinnell Factor 7: The Ability of Defendants to Withstand a Greater Judgment . 15

      H.       Grinnell Factors 8 and 9: The Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation .......................... 16

II.     The Class Should be Finally Certified .................................................................. 17

III.    The Plan of Allocation Is Fair and Reasonable and Should Be Finally Approved ............. 17

IV.     The Fee and Expense Application Should Be Granted ........................................................ 19

      A.     The Legal Standard for an Award of Attorneys' Fees .......................................... 19

      B.     The Requested Attorneys' Fee is Reasonable Under the Percentage of the Fund Method .................................................................................................................... 20

      C.     The Requested Attorneys' Fee is Reasonable Under the *Lodestar "Cross-Check"* Method .................................................................................................................... 21

      D.     The Requested Attorneys' Fees are Reasonable Under the *Goldberger* factors .. 23

            1.     The Time and Labor Expended by Counsel ............................................. 23

            2.     The Magnitude and Complexities of the Litigation ................................. 24

            3.     The Risks of the Litigation ...................................................................... 24

            4.     The Quality of Representation .................................................................. 25

            5.     The Requested Fee in Relation to the Settlement ..................................... 26

            6.     Public Policy Considerations ................................................................... 26

      E.     The Application for the Reimbursement of Litigation Costs and Expenses is Reasonable and Should be Approved .................................................................... 27

      F.     CONCLUSION...................................................................................................... 28

WORD COUNT CERTIFICATION ............................................................................................ 28

## TABLE OF AUTHORITIES

**Cases**

*Arbuthnot v. Pierson*,
607 F. App'x 73 (2d Cir. 2015)........................................................................... 10

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
472 U.S. 299 (1985) ........................................................................................ 19

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ........................................................................................ 19

*Christine Asia Co. v. Jack Yun Ma*,
No. 15-MD-2631 (CM) (SDA), 2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019)................. 12, 14

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)................................................................................. 9

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007).................................................................................. 9

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001).................................................................................. 10

*Goldberger v. Integrated Res.*,
209 F.3d 43 (2d Cir. 2000)......................................................................... 19, 20, 24

*Hicks v. Stanley*,
No. 01 Civ. 10071(RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005)............................... 26

*In re "Agent Orange" Prod. Liab. Litig.*,
597 F. Supp. 740 (E.D.N.Y. 1984) ....................................................................... 17

*In re Austrian & German Bank Holocaust Litig.*,
80 F. Supp. 2d 164 (S.D.N.Y. 2000)...................................................................... 10

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012)..................................................................... 15

*In re Bisys Sec. Litig.*,
No. 04 Civ. 3840(JSR), 2007 WL 2049726 (S.D.N.Y. July 16, 2007) ................................ 25

*In re Bumble, Inc. Sec. Litig.*,
No. 22-cv-624 (DLC), ECF 93 (S.D.N.Y. Aug. 8, 2023)........................................... 21

*In re China Sunergy Sec. Litig.*,
No. 07 Civ. 7895(DAB), 2011 WL 1899715 (S.D.N.Y. May 13, 2011)................................ 27

*In re Colgate-Palmolive Co. ERISA Litig.*,
36 F. Supp. 3d 344 (S.D.N.Y. 2014)...................................................................... 20

*In re Comverse Tech., Inc. Sec. Litig.*,
No. 06–CV–1825 (NGG)(RER), 2010 WL 2653354 (E.D.N.Y. June 24, 2010) ........ 21, 24, 25

*In re Credit Default Swaps Antitrust Litig.*,
    No. 13md2476 (DLC), 2016 WL 2731524 (S.D.N.Y. April 26, 2016) ................................... 18

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    MDL No. 12-2389, 2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) ........................................... 16

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    No. 02-CV-3400 CM PED, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) .................. 16, 25, 26

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    No. 12–Civ–8557 (CM). 2014 WL 7323417  (S.D.N.Y. Dec. 19, 2014) ................................ 22

*In re Lloyd's Am. Trust Fund Litig.*,
    96 Civ. 1262 (RWS), 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ................................ 21, 22

*In re Merrill Lynch Tyco Research Sec. Litig.*,
    249 F.R.D. 124 (S.D.N.Y. Apr. 16, 2008) ......................................................................... 18

*In re MetLife Demutualization Litig.*,
    689 F. Supp. 2d 297 (E.D.N.Y. 2010) .............................................................................. 8, 27

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ...................................................................................... 21

*In re PPDAI Grp. Inc. Sec. Litig.*,
    No. 18-CV-6716 (TAM), 2022 WL 198491 (E.D.N.Y. Jan. 21, 2022) ............................ 14, 20

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    85 F. Supp. 410 (S.D.N.Y. 1997) ..................................................................................... 24

*In re Veeco Instruments Inc. Sec. Litig.*,
    No. 05 MDL 01695(CM), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ............................... 21

*In re Warner Communications Sec. Litigation*,
    618 F. Supp. 735 (S.D.N.Y. Aug. 21, 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) .................... 25

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) ................................................................................ 19

*Martinek v. AmTrust Financial Services, Inc.*,
    Case No. 19 Civ. 8030 (KPF), 2022 WL 16960903 (S.D.N.Y. Nov. 16, 2022) ...................... 25

*Micholle v. Ophthotech Corp.*,
    No. 1:17-cv-00210 (VSB) (GWG), ECF 147-2 (S.D.N.Y. Sep. 16, 2022) ............................ 22

*Missouri v. Jenkins*,
    491 U.S. 274 (1989) ....................................................................................................... 22

*Monserrate v. Tequipment, Inc.*,
    11 CV 6090 (RML), 2012 WL 5830557 (E.D.N.Y Nov. 16, 2012) ..................................... 21

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    No. 17-cv-5543, 2021 WL 76328 (S.D.N.Y. Jan. 7, 2021) ................................................ 12

iv

*Pantelyat v. Bank of Am., N.A.*,
    16-cv-8964 (AJN), 2019 WL 402854 (S.D.N.Y. Jan. 31, 2019) ........................................ 10, 16

*Reichman v. Bonsignore, Brignati & Mazzotta,*
    *P.C.*, 818 F.2d 278 (2d Cir. 1987).......................................................................................... 26

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
    No. 01–CV–11814(MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004)................................. 24

*Thompson v. Metro Life Ins. Co.*,
    216 F.R.D. 55 (S.D.N.Y. 2003) ................................................................................................ 9

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005)................................................................................................... 8, 19

**Statutes**

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ................................... 2

Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).................................. 2

**Other Authorities**

Edward Flores & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation*: 2024
    Full-Year Review at 26, Figure 23 (NERA Jan. 22, 2025)....................................................... 11

**Rules**

Fed. R. Civ. P. 23(a) ............................................................................................................... 1, 6

Fed. R. Civ. P. 23(b) ............................................................................................................... 1, 6

Fed. R. Civ. P. 23(e)(2)....................................................................................................... 8, 9, 14

**Regulations**

17 C.F.R. sec. 240.10b-5.......................................................................................................... 2

**INTRODUCTION**

Dr. Martin Dietrich ("Lead Plaintiff")[1] submits this brief in support of his motion for final approval of the Settlement, approval of the proposed Plan of Allocation, and an award of attorneys' fees and the reimbursement of litigation costs ("Motion").

The proposed Settlement, if finally approved, will resolve all claims against Defendants in exchange for a cash payment of $15,000,000 and Warrants to purchase up to 1,000,000 shares of Applied common stock at a price of $0.48 per share, the closing price of Applied common stock on August 19, 2025, the date the Settlement was reached. The Settlement is the product of good-faith arm's-length negotiations between highly experienced counsel, facilitated by a well-respected mediator, and is a favorable outcome in light of the substantial risks and costs attendant to continued litigation.

Lead Plaintiff submits that there has been no change in circumstances that would change the Court's preliminary approval of the Settlement and certification of the Class for Settlement purposes. ECF 127. All elements of Rule 23(a) and (b)(3) are still met. The Settlement, which will provide the Class with a substantial immediate cash benefit, remains fair, reasonable, and adequate. Also, the Plan of Allocation treats all Class Members equitably, and all Claimants will participate in the Settlement on a *pro rata* basis, based on a recognized loss formula consistent with Plaintiff's expert's damage analysis.

Lead Plaintiff and Lead Counsel also request a Fee and Expense Award to Lead Counsel of attorneys' fees of 20% of the Settlement Fund, or $3 million plus 20% of any Warrant Proceeds,

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings ascribed to them in the Amended Stipulation of Settlement dated November 20, 2025 ("Stipulation"), previously filed at ECF 126. Unless otherwise noted, all references to "¶ ___" are to the Stipulation; and internal citations and quotation marks are omitted.

and reimbursement of litigation expenses of $46,313.15.  Lead Counsel's attorneys' fees' request of 20% of the settlement is within the range of fees awarded in this Circuit, and the request for a reimbursement of expenses should be granted as they were all reasonably incurred.

**OVERVIEW OF THE ACTION**

### A.    The Allegations of the Complaint

This is a securities class action on behalf of a "Class" of all investors that purchased or otherwise acquired the publicly traded common stock of Applied on a U.S.-based during the January 3, 2024 through December 2, 2024 "Class Period."  The Second Consolidated Amended Class Action Complaint ("Complaint" or "SAC," ECF 99) alleges that Defendants made materially false and misleading statements, with scienter, in violation of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 concerning, among other things: the viability of Applied's New Drug Application to the FDA for govorestat to treat Classic Galactosemia, a rare genetic metabolic disorder that can be fatal if untreated ("NDA"); Defendants' interactions with the FDA concerning the NDA; the reliability of the data underlying the NDA; and alleged known material deficiencies with the NDA.

Specifically, the Complaint alleges that (a) between March and June 2021, as part of Applied's ACTION-Galactosemia Kids Study ("Pediatric Study"), 19 of the 47 subjects enrolled at a clinical site received only approximately 80% of the intended dose of govorestat due to a labeling error ("Dosing Errors"); (b) the Dosing Errors were a violation of the clinical trial protocol that Applied agreed to with the FDA regarding the Pediatric Study; (c) Defendants knew (i) about the Dosing Errors and that violated the clinical trial protocol for the Pediatric Study, (ii) that information about the Dosing Errors and the associated clinical data ("Dosing Errors Clinical Data") was required by to be included in the NDA, (iii) that the NDA failed to include this information, and instead reported clinical data as if the patients received the correct dose, and (iv)

2

as a result, the NDA was materially deficient and failed to comply with FDA regulations.  ECF 99, ¶¶ 65-87.

The Complaint also alleges that (a) on March 27, 2024, one of Applied's vendors deleted clinical source data for all 47 patients enrolled in the Pediatric Study ("Study Data Deletion"), which was discovered by the FDA between April 23 and May 3, 2024 during an inspection of a clinical test site, (c) the Study Data Deletion was a violation of the clinical trial; (d) on May 3, 2024, the FDA issued a FDA Form 483 to Applied that detailed the Study Data Deletion and two other objectionable conditions ("Form 483"), which was also discussed with Defendant Shendelman; (e) on May 9, 2023, Applied responded to the Form 483 and informed the FDA that deleted source data for 11 subjects could not be recovered; and (f) therefore, by May 9, 2024, the Defendants knew (i) about the Study Data Deletion, (ii) that the FDA knew Applied had violated FDA regulations and the clinical trial protocol for the Pediatric Study, and (iii) that the FDA could not verify clinical results of the Pediatric Study as part of its NDA review.  *Id.*

The Complaint alleged that the failure to disclose these facts rendered Defendants' statements materially false and misleading, and caused the price of Applied's common stock to trade at artificially inflated levels during the Class Period, until the market learned the truth through, among other things, the November 27, 2024 disclosure of a complete response letter ("CRL") from the FDA to Applied rejecting the NDA and the December 3, 2024 publication by the FDA of a Warning Letter to Applied that identified the Study Data Deletion and failure to include information about the Dosing Errors and Dosing Errors Clinical Data in the NDA. Lead Plaintiff alleged that as a result of these and other disclosures, from November 27, 2024 through December 20, 2024, the price of Applied's common stock plummeted $7.69 per share, or 89.7%, causing significant damages to Lead Plaintiff and the Class.  *Id.* ¶¶ 384-410.

### B.    Procedural History of the Litigation

On March 11, 2025, the Court entered an Order appointing Dr. Dietrich as Lead Plaintiff and Wolf Popper as Lead Counsel pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").  ECF 59.  On May 2, 2025, Lead Plaintiff filed a Consolidated Amended Complaint ("FAC").  ECF 72.  On May 23, 2025, Applied answered the FAC, and Shendelman and Perfetti moved to dismiss the FAC.  *See* ECF 78-80, 82-85.  Although the motions to dismiss were still pending, on May 27, 2025, the Court issued an Order lifting the PSLRA statutory discovery stay, requiring Rule 26(a)(1) initial disclosures, and scheduling a conference to set a pre-trial schedule.  ECF 87.  The Order stated that "[f]or the sake of clarity, discovery is not stayed with respect to the individual defendants."  ECF 87.

On June 12, 2025, the parties appeared for a pre-trial conference, and on June 13, 2025, the Court entered a Scheduling Order (ECF 98).  On June 13, 2025, the parties exchanged initial disclosures.  On July 3, 2025, Plaintiff served initial requests for production of documents and interrogatories on Defendants, and on August 4, 2025, Defendants each served responses.  Declaration of Joshua Ruthizer in Support of the Motion, dated February 12, 2026, and filed herewith ("Ruthizer Decl."), ¶ 33.

The Court's March 11, 2025 Order (ECF 59) allowed Lead Plaintiff to file a letter "indicating a desire to further amend its complaint in response to [a motion to dismiss]," and cautioned that it was "unlikely that Lead Plaintiff will be granted any further opportunities to amend."  *Id.*  On June 6, 2025, Lead Plaintiff filed a letter to further amend the FAC.  On June 9, 2025, the Court denied the pending motions to dismiss as moot.  ECF 95.

On June 13, 2025, Lead Plaintiff filed the SAC.  ECF 99.  On June 27, 2025, Applied answered the SAC (ECF 106), and Shendelman and Perfetti moved to dismiss the SAC (ECF 100-

105, 107-108). Lead Plaintiff opposed both motions, which were fully briefed on July 18, 2025. ECF 109-113.

Given the case's merits and the Company's financial circumstances, the parties agreed to engage in private mediation to try and expeditiously resolve the Action. In advance of the mediation, Applied made a limited initial production of documents totaling 255 pages on August 5, 2025, comprised of certain priority documents Lead Plaintiff requested be produced before the mediation. These documents contained important information underlying the SAC's allegations regarding information that was first revealed to the market by the FDA in the CRL and Warning Letter. The parties exchanged detailed mediation statements, and a mediation session before Jed Melnick was held on August 19, 2025. Mr. Melnick, who is affiliated with JAMS, has over twenty years of experience mediating complex business disputes, including many securities fraud class actions. After a full-day mediation, the parties ultimately agreed to the Settlement based on Mr. Melnick's proposal.

On November 4, 2025, Lead Plaintiff filed a stipulation of settlement and a Motion for Preliminary Approval. ECF 119-122. On November 19, 2025, the Court held a telephone hearing concerning the stipulation and the motion. ECF 123. On November 20, 2025, Lead Plaintiff filed an Amended Stipulation of Settlement (the Stipulation), which included certain edits requested by the Court at the November 19, 2025 conference. ECF 126. Later that day, the Court issued the Preliminary Approval Order, which, among other things, (a) preliminarily approved the Settlement; (b) approved the form, content, and manner of providing notice of the Settlement to the Class, and set December 19, 2025 as the "Notice Date" by which Notices would be distributed; (c) set (i) a Settlement Hearing for March 19, 2026, (ii) deadlines for Class Members to object to or opt out of the Settlement of February 26, 2026, and (iii) a deadline for Class Members to submit

Proofs of Claim and Release ("Claim Forms") of April 8, 2026; (d) for settlement purposes, certified the Class pursuant to Rules 23(a) and 23(b)(3) and appointed Dr. Dietrich as Class Representative and Wolf Popper as Class Counsel; (g) appointed Angeion Group LLC ("Angeion) as Claims Administrator and directed Lead Counsel and Angeion to effectuate the Notice Program. ECF 127, ¶¶ 1-8, 10-11, 14-19

On December 11, 2025, Applied issued a press release announcing that it had entered into a merger agreement with Cycle Group Holdings Limited ("Cycle") pursuant to which Cycle commenced a tender offer to acquire all of the outstanding shares of Applied common stock for $0.088 per share in cash plus one non-transferrable contingent value right ("CVR") that entitles the holder to receive potential additional payments (the "Acquisition"). *See* ECF 132.

On December 15, 2025, the parties filed a joint letter motion requesting that the Court approve an addition to the Longform Notice to advise the Class of the Acquisition. The Court granted the motion on December 16, 2025. ECF 130-131.  Cycle completed the Acquisition on February 3, 2026, and paid aggregate consideration of approximately $14.3 million.  Ruthizer Decl. ¶ 52.

<u>**TERMS OF THE SETTLEMENT**</u>

Th Settlement requires the Company to pay or cause to be paid $15,000,000 in cash plus the Warrants.  ¶¶ 1.53, 2.2.  Once Taxes, Tax Expenses, Notice and Administrative Costs, a Court-awarded Fee and Expense Award, any Warrant Exercise Expenses, any Warrant Registration Expenses, and any other Court-approved costs or fees are deducted from the Settlement Fund, the remaining balance plus any Warrant Proceeds (*i.e.*, the Net Settlement Fund), will be distributed to Authorized Claimants pursuant to the Stipulation and Plan of Allocation.  ¶ 6.3.  There will be no reversion to Defendants of any portion of the Settlement Fund.  ¶ 2.20. In exchange, Lead Plaintiff and each Class Member will be deemed to have fully released any and all Released

6

Plaintiff's Claims against Defendants and the other Defendants' Releasees, and will be forever barred and enjoined from prosecuting any and all Released Plaintiff's Claims against any of the Defendants' Releasees. ¶ 5.1.

Lead Counsel is still evaluating the impact of the Acquisition on the Warrants. However, because the Acquisition consideration is significantly below the strike price for the Warrants of $0.48 per share, the Warrants are likely to have minimal value.

The Stipulation anticipates that Lead Counsel will file a Fee and Expense Application for an award of attorneys' fees and reimbursement of litigation costs expenses (a Fee and Expense Award), which are not a condition or material term of the Settlement, and are not the subject of any agreement between the parties. ¶ 8.1.

### IMPLEMENTATION OF THE NOTICE PROGRAM

On December 19, 2025, Angeion (a) mailed 57 copies of the Postcard Notice to stockholders of record of Applied common stock and emailed 6 Postcard Notices, (b) published the Summary Notice on *PR Newswire*, and (c) established the Settlement Website (www.apltsecuritiessettlement.com), which contained, among other things, copies of the Longform Notice, the Claim Form, the Stipulation, the Motion for Preliminary Approval, and the Preliminary Approval Order, as well information concerning the deadlines for Class Members to object or opt-out of the Settlement or submit Claim Forms. Ruthizer Decl. Ex. 1 (Declaration of Dawn M. Cody Regarding: (I) Mailing and Emailing of Notice; (II) Publication of the Summary Notice; and (III) Report on Requests for Exclusion Received to Date ("Cody Decl.")) ¶¶ 6-7, 19-20, 27.

Also on December 19, 2025, Angeion mailed a "Nominee Letter" to 4,155 nominees who may have held Applied common stock in street name for beneficial owners, instructed nominees to (a) provide the name and contact information of potential Class Members to Angeion, who

would then send to those potential Class Members a copy of the Postcard Notice or a link to the

Postcard Notice and Claim Form, or (b) request copies of the Postcard Notice or links for mailing

or emailing by the nominee.  As of February 10, 2026, Angeion has received from nominees

contact information for 1,770 potential Class Members and requests for 33,970 copies of the

Postcard Notice and 20,424 copies of links. In total, as of February 10, 2026, 60,382 notifications

have been made to potential Class Members or their nominees, including 39,864 Postcard Notices

and 20,518 link emails. *Id.* ¶ 10, 14-17.

## ARGUMENT

### I.      The Court Should Grant Final Approval of the Settlement

"There is a strong judicial policy in favor of settlements, particularly in the class action

context."  *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 330 (E.D.N.Y. 2010); *see*

*also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005).  Federal Rules of

Civil Procedure Rule 23(e)(2) instructs that the court should consider the following factors when

determining whether a settlement is "fair, reasonable, and adequate":

> (A) the class representatives and class counsel have adequately represented the
> class; (B) the proposal was negotiated at arm's length; (C) the relief provided for
> the class is adequate, taking into account: (i) the costs, risks, and delay of trial
> and appeal; (ii) the effectiveness of any proposed method of distributing relief to
> the class, including the method of processing class-member claims; (iii) the terms
> of any proposed award of attorney's fees, including timing of payment; and (iv)
> any agreement required to be identified under Rule 23(e)(3); and (D) the proposal
> treats class members equitably relative to each other.

The Second Circuit also considers the following "*Grinnell* Factors," some of which overlap

with Rule 23(e)(2):

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction
> of the class to the settlement, (3) the stage of the proceedings and the amount of
> discovery completed, (4) the risks of establishing liability, (5) the risks of
> establishing damages, (6) the risks of maintaining the class action through the
> trial, (7) the ability of the defendants to withstand a greater judgment, (8) the
> range of reasonableness of the settlement fund in light of the best possible

> recovery, [and] (9) the range of reasonableness of the settlement fund to a possible
> recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).  For a settlement to be deemed

substantively and procedurally fair, reasonable, and adequate, not every factor must be satisfied.

"[R]ather, the court should consider the totality of these factors in light of the particular

circumstances." *Thompson v. Metro Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003).

The proposed Settlement readily satisfies Rule 23(e)(2) and the *Grinnell* factors.

Accordingly, the Settlement should be approved.

### A.    Rule 23(e)(2)(A): Lead Plaintiff and Lead Counsel Adequately Represented the Class

The determination of adequacy "typically entails inquiry as to whether: 1) plaintiff's

interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys

are qualified, experienced and able to conduct the litigation."  *Cordes & Co. Fin. Servs. v. A.G.*

*Edwards & Sons, Inc.,* 502 F.3d 91, 99 (2d Cir. 2007) (citations omitted).

Here, Lead Plaintiff's interests are not antagonistic to the interest of the other members of

the Class.  Further, Lead Plaintiff and Lead Counsel have adequately represented the Class by

investigating potential claims, and thereafter diligently and vigorously prosecuting the Action

since February 2025.  The Preliminary Approval Order also found that "Lead Plaintiff and Lead

Counsel have adequately represented the interests of the Class." ECF 127 ¶ 3.  Accordingly, this

factor favors approval of the settlement.

### B.    Rule 23(e)(2)(B): The Settlement Was Negotiated at Arm's Length

Rule 23(e)(2)(B) requires that a proposed settlement be procedurally adequate *i.e.*,

negotiated at arm's length.  The Settlement was negotiated at arm's length with the assistance of a

mediator, and was the result of a mediator's proposal, which evinces that the settlement was

negotiated at an arm's length.  *See, e.g., In re Austrian & German Bank Holocaust Litig.*, 80 F.

Supp. 2d 164, 173-74 (S.D.N.Y. 2000), *aff'd sub nom. D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a "mediator's involvement" during negotiations "helps to ensure that the proceedings were free of collusion and undue pressure"). This factor also favors approval of the Settlement.

  **C.**  <u>**Rule 23(e)(2)(C): Relief Provided to the Class is Adequate and Reasonable in Light of the Risks, Costs, Delays, and Complexity of the Litigation**</u>

In assessing a settlement for approval, courts consider "not whether the settlement represents the best possible recovery, but how the settlement relates to the strengths and weaknesses of the case." *City of Providence v. Aéropostale, Inc.*, 2014 WL 1883494, at *9 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015). A court need only determine whether the settlement falls within a range of reasonableness that "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Pantelyat v. Bank of Am., N.A.*, No. 16-cv-8964, 2019 WL 402854, at *7 (S.D.N.Y. Jan. 31, 2019).

The $15,000,000 cash recovery represents the following percentages of potential damages, as calculated by Lead Plaintiff's damages expert using a traditional "one-day drop" model related to the alleged corrective disclosures:[2]

- approximately 4% of the Class's best-case maximum estimated aggregate damages of $377.5 million based on all of the SAC's alleged stock price declines in response to alleged corrective disclosures that also had statistical significance;

- approximately 4.3% of the Class's maximum aggregated damages of $348.8 million for the November 29, 2024 one-day stock drop (which is also the most significant stock drop) in response to the first alleged corrective disclosure on November 27, 2024;

---

[2] Defendants do not concede the accuracy of Lead Plaintiff's damages expert's calculation of potential damages.

- approximately 6.2% of the Class's maximum aggregate damages of $241.6 million if Defendants' arguments concerning scienter for statements related to the alleged Dosing Errors were accepted, and as a result the Class Period started on May 9, 2024, when Applied was informed that the FDA had learned of the Study Data Deletion, rather than January 4, 2024; and

- approximately 6.9% of the Class's maximum aggregate damages of $217.4 million for the November 29, 2024 one-day stock drop, if the Class Period started on May 9, 2024.

Notably, the percentages discussed above assume (a) Lead Plaintiff would be able to prove every aspect of his claims on liability and his damages model would be accepted by the jury in full, (b) Lead Plaintiff's expert's trading model proves accurate, and (c) after a judgment in favor of Lead Plaintiff and the Class, all damaged Class Members filed claims on all shares purchased during the Class Period and all such Claims were approved.

The $15 million risk-free Settlement represents a percentage well within the range of potential maximum recoveries in a securities fraud class action. A recent report from National Economic Research Associates, Inc. ("NERA") identified the median percentage recovery in settlements of class actions during the period January 2016 through December 2025 involving aggregate investor losses between $200 million to $399 million to be *2.7%*, less than the percentage implied by the Settlement Amount here.[3]  NERA also calculated that the median ratio of settlement to investor losses for all settlements reached in 2025 was 1.5%, significantly below 4%-6.9% of potential damages represented by the Settlement here. Thus, the Settlement Amount is well within the range of reasonableness. *See, e.g., Pearlstein v. BlackBerry Ltd.*, No. 13 Civ. 7060 (CM) (KHP), 2022 WL 4554858, at *6 (S.D.N.Y. Sept. 29, 2022) (noting that the "median

---

[3] See Ruthizer Decl. ¶¶ 106-109; Edward Flores & Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2025 Full-Year Review (NERA Jan. 21, 2026), available at www.nera.com/content/dam/nera/publications/2026/PUB_2025_Recent_SCA_Trends_Full-Year_0121.pdf.

recovery [in securities class actions was] of 4.2% of damages in 2021"); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, No. 17-cv-5543, 2021 WL 76328, at *3 (S.D.N.Y. Jan. 7, 2021) (noting that "the range previously approved by judges in this District" was 3% to 11% of estimated damages).

> **1.    Rule 23(e)(C)(i) and Grinnell Factors 1, 4, 5, and 6: The Costs, Risks, and Delay of Trial and Appeal; the Complexity, Expense and Likely Duration of the Litigation; and the Risks of Establishing Liability, Damages, and Maintaining the Class Through Trial**

"In evaluating the settlement of a securities class action, federal courts, including this Court, have long recognized that such litigation is notably difficult and notoriously uncertain. As such, settlement is favored where trial of [the] class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court." *Christine Asia Co. v. Jack Yun Ma*, No. 15-MD-2631 (CM) (SDA), 2019 WL 5257534, at *10 (S.D.N.Y. Oct. 16, 2019).

In this case, there were risks to proving liability, damages, and maintaining a class through trial. *See* Ruthizer Decl. ¶¶ 65-74. At the time the Settlement was reached, Shendelman's and Perfetti's motions to dismiss were pending. While Lead Plaintiff believes that he would have been successful in defeating Defendants' motions to dismiss, there was a risk that Defendants' motions would be partially or fully granted. For example, the Court could have been convinced by Defendants' arguments that certain of the alleged false statements were inactionable puffery. *See* ECF 105 at 23-25. Similarly, the Court could have found merit to Defendants' contention that Shendelman's or Perfetti's Class Period stock sales did not evidence motive, and there was insufficient circumstantial evidence of knowledge to find that Shendelman's or Perfetti's statements were made with requisite scienter. *See* ECF 101 at 15-22; ECF 105 at 12-23. Moreover, if the Court partially denied the motions to dismiss, then the Class Period could have been

significantly narrowed. Also, if the motions to dismiss were granted, Applied, which answered the SAC, could have then moved for judgment on the pleadings or for summary judgment, which could have ended the Action without any recovery for the Class.

If the motions to dismiss were denied, Defendants likely would have opposed class certification and moved for summary judgment. If Lead Plaintiff and Lead Counsel succeeded in having the Class certified and defeating Defendants' expected motion for summary judgment, Lead Plaintiff would be required to prove all elements of his claims to prevail at trial, while Defendants would need to only succeed on one defense to potentially defeat the entire action. There was also no guarantee the Class would prevail in full on the issue of damages, and even if they did, how the Court's rulings on any motion for summary judgment and complex expert testimony matters—even if solely related to liability matters—would affect damages or how the case might be presented to a jury.

Defendants could also appeal, which could extend the lawsuit for years, and risk reversal. A prolonged litigation would take years and incur additional significant costs that would reduce the limited funds available to provide recourse for the Class.

These risks and complexities in prosecuting this action underscore the desirability of this Settlement, and support approval of the Settlement.

### 2. Rule 23(e)(2)(C)(ii): The Proposed Method for Distributing Relief Is Effective

As discussed below in Sections III and IV, the distribution of the Notices and Claim Form complied with the Preliminary Approval Order, due process, and all relevant laws, and the method for distributing the Settlement Fund – the proposed Plan of Allocation – is also effective and fair.

### 3. Rule 23(e)(2)(C)(iii): The Anticipated Attorneys' Fees and Expenses Are Reasonable

Rule 23(e)(2)(iii) instructs court to look to "the terms of any proposed award of attorney's fees, including timing of payment." The award of attorneys' fees or reimbursement of expenses are not a condition or material term of the Settlement, and are not the subject of any agreement between the parties. The Stipulation authorizes payment of attorneys' fees "immediately" upon issuance of the Court's fee award (¶ 8.2), which is a common and unobjectionable provision when the settlement agreement (as is the case here) contemplates that the Court retains jurisdiction to resolve any disputes related to the disposition of settlement funds. *See In re PPDAI Grp. Inc. Sec. Litig.,* 2022 WL 198491, at *14, n.14 (E.D.N.Y. Jan. 21, 2022).

As discussed in Section V, below, the Fee and Expense Application is reasonable should be granted.

### 4. Rule 23(e)(2)(C)(iv): Any Agreement Required to be Identified Under Rule 23(e)(3)

The parties have entered into a confidential Supplemental Agreement that allows Applied to terminate the Settlement if a certain threshold of class members meeting certain criteria request exclusion from the class. ¶ 9.3. "This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement." *Christine Asia Co.*, 2019 WL 5257534, at *15.

### D. Rule 23(e)(2)(D): The Settlement Treats Class Members Equitably Relative to One Another

In this case, the Settlement Agreement's release language (see ¶¶ 1.43-1.47, 5.1-5.5) treats all Class Members equitably relative to one another. Subject to Court approval, all Class Members will be giving Defendants an identical release. Further, as discussed below (Section IV), the Plan

14

of Allocation treats all Class Members equitably based on the timing of their acquisitions and sales of Applied common stock. Therefore, this factor weighs in favor of approval.

### E.     Grinnell Factor 2: The Reaction of the Class to the Settlement

As set forth in the Preliminary Approval Order, requests for exclusion must be received by, and objections must be filed by, February 26, 2026. As of February 10, 2026, Angeion has not received any requests for exclusion or objections.  Ruthizer Decl. Ex. 1 (Cody Decl.) ¶¶ 35, 37. Lead Counsel is not aware of any requests for exclusion or objections received to date. Ruthizer Decl. ¶¶ 92-94. Lead Counsel will report on any objections or opt outs received in its reply brief. Lead Plaintiff supports the Settlement. *Id.*  Ex. 2 (Declaration of Lead Plaintiff); ECF 121-1.

### F.     Grinnell Factor 3: The Stage of the Proceedings

While assessing this factor "the question is whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement.'" *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 267 (S.D.N.Y. 2012). At the time the Settlement was reached, discovery had commenced. Although limited, those documents contained important information, and information underlying the Complaint's allegations had also been publicly released by the FDA. The resulting accumulation of information permitted Lead Plaintiff and Lead Counsel to knowledgably evaluate the merits and circumstances of their case, and the Settlement. Lead Plaintiff respectfully submits that the stage of the proceedings is a neutral Grinnell factor.

### G.     Grinnell Factor 7: The Ability of Defendants to Withstand a Greater Judgment

At the time of the Settlement, there was significant doubt that Defendants would be able to withstand a greater judgment. Applied's post-Class Period SEC filings contained "going concern"

15

warnings, and Applied was projected to have just $8 million in cash on hand by September 30, 2025, which would likely be insufficient to cover its already-existing liabilities. Ruthizer Decl. ¶ 63. The $15 million Settlement represents 21% of Applied's $69 million market capitalization on the date when the Settlement was reached, and is more than the $14.3 million aggregate consideration for the Acquisition. The $15 million Settlement also represented almost the entire amount of funds available under the Company's relevant insurance policies, which would only decrease by continued litigation to the detriment of the Class. Ruthizer Decl. ¶ 64.

Accordingly, it is respectfully submitted that this factor favors preliminary approval.

### H.    Grinnell Factors 8 and 9: The Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation

Considering the best possible recovery, the risk-free Settlement is well within the range of approval and presents an excellent, prompt, and substantial recovery for the Class. *See Pantelyat*, 2019 WL 402854, at *7 (in determining a settlement's range of reasonableness, the court should consider "the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."). "In analyzing the size of the settlement compared to the best possible recovery and in view of the attendant risks, the issue for the Court is not whether the Settlement represents the best possible recovery, but how the Settlement relates to the strengths and weaknesses of the case." *In re Flag Telecom Holdings Ltd. Sec. Litig.*, No. 02-CV-3400 CM PED, 2010 WL 4537550, at *20 (S.D.N.Y. Nov. 8, 2010).

As discussed herein, there were significant risks to success of the litigation and the Defendants' ability to withstand a judgment greater than the Settlement Amount. Lead Plaintiff respectfully submits that the Settlement Amount is well within the range of reasonableness. *See In re Facebook, Inc. IPO Sec. & Derivative Litig.*, MDL No. 12-2389, 2015 WL 6971424, at *6 (S.D.N.Y. Nov. 9, 2015) (citing *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762

16

(E.D.N.Y. 1984) ("The fact that the settlement amount may equal but a fraction of potential recovery does not render the settlement inadequate. Dollar amounts are judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case.")).

## II.    The Class Should be Finally Certified

In its Preliminary Approval Order, the Court, for settlement purposes, certified the Class and appointed Lead Plaintiff as Class Representative and Wolf Popper as Class Counsel. Lead Plaintiff respectfully submits that circumstances have not changed, and requests that the Court finally certify the Class for settlement purposes and confirm Lead Plaintiff's and Lead Counsel's appointments.

## III.    Notice Satisfied Due Process and Complied with the Preliminary Approval Order

The Court approved Notice Program follows a standard and effective process, including a Postcard Notice that was sent to potential Class Members, a Summary Notice that was published on a national wire service, and a Settlement Website from where Class Members may obtain the Longform Notice and the Claim Form. The Claims Administrator distributed the Notices in accordance with the Preliminary Approval Order. *See* Ruthizer Decl. Ex. 1 (Cody Decl.) ¶¶ 5-13; Section B, above. Notice also satisfied the requirements of the Rule 23, due process, and the PSLRA. *Blackberry,* 2022 WL 4554858 (in securities action, finding that similar notice plan constituted "the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort.").

## IV.    The Plan of Allocation Is Fair and Reasonable and Should Be Finally Approved

The Proposed Plan of Allocation, which is set forth on page 11 of the Longform Notice, is fair and should be approved. The premise of the Plan of Allocation is that the true value of Applied common shares during the Class Period was $1.69 per share, the closing price on December 3,

17

2024, after the disclosure of the CRL and the Warning Letter. Under the Plan of Allocation, shares of Applied common stock purchased during the Class Period and held through at least November 29, 2024, will be assigned a Recognized Loss based on several factors, including purchase price, sale price, and the per share decline in Applied's common stock on November 29, December 2, and December 3, 2024.

Class Members must submit a Claim Form, either by mail or online, by the deadline of April 8, 2026. Based on the information provided by Claimants, the Claims Administrator will determine their eligibility to participate (i.e., whether they are an Authorized Claimant) and calculate each Authorized Claimant's *pro rata* share based on the Authorized Claimant's Recognizes Loss compared to the total of all Authorized Claimants' Recognized Losses, and Lead Plaintiff will be subject to the same formula for distribution of the Settlement as other Class Members. Before rejecting a Claim in whole or in part, the Claims Administrator will communicate with the Claimant in writing, to give the Claimant the chance to remedy any curable deficiencies in the Claim submitted. ¶ 6.8. Any claim disputes that cannot be resolved will be presented to the Court for resolution. *Id.* No Authorized Claimant will receive a distribution of less than $10.00 in cash or ten whole shares of common stock, calculated on an adjusted basis.

Thus, the Plan of Allocation, which adopts a procedure to equitably distribute the Net Settlement Fund on a *pro rata* basis, is fair and adequate. *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 135 (S.D.N.Y. Apr. 16, 2008) (plan "that calls for the pro rata distribution of settlement proceeds on the basis of investment loss is presumptively reasonable"); *see also In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at \*4 (S.D.N.Y. April 26, 2016) (approving plan that estimated price inflation caused by the defendants' conduct and then entitled each claimant to a  recovery "based on its pro rata share" of the loss).

18

## V.    The Fee and Expense Application Should Be Granted

Lead Counsel respectfully requests that the Court approve its Fee and Expense Application for an award of attorneys' fees of 20% of the Settlement Fund, or $3 million plus 20% of any Warrant Proceeds, and reimbursement of litigation costs and expenses of $46,313.15, plus interest on these amounts at the same rate earned by the Settlement Fund.  The requested fee is 4% below the maximum percentage fee negotiated between Lead Plaintiff and Lead Counsel prior to the filing of the Action.  *See* ECF 121-1 ¶ 28.

### A.    The Legal Standard for an Award of Attorneys' Fees

"When attorneys create a common fund from which members of a class are compensated for a common injury, they are entitled to a reasonable fee – set by the court – to be taken from the fund." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 354 (S.D.N.Y. 2005).  This common fund doctrine incentivizes plaintiffs and counsel to litigate the case vigorously, deterring securities misconduct.  As noted by the Supreme Court, private actions "provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985).  Moreover, the common fund doctrine prevents unjust enrichment and ensures that class members do not benefit from a lawsuit without paying for its costs.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

In an analysis of the "reasonableness" of a fee application, courts may use either the "percentage of the fund" method or the "lodestar" method.  *See Wal-Mart*, 396 F.3d at 121-22.  In the Second Circuit, the trend is toward using the percentage method as it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Id.* at 122.  However, when using this percentage-of-the-fund method, courts can also look to counsel's "hours as a 'cross check' on the reasonableness of the requested percentage," *Goldberger v. Integrated Res.,* 209 F.3d 43, 50 (2d Cir. 2000), "to ensure

19

that an otherwise reasonable percentage fee would not lead to a windfall." *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 353 (S.D.N.Y. 2014).

Whether the court uses the percentage-of-the-fund method or the lodestar approach, it should continue to consider the traditional criteria that reflect a reasonable fee in common fund cases, including: (i) the time and labor expended by counsel; (ii) the magnitude and complexity of the litigation; (iii) the risks of the litigation; (iv) the quality of representation; (v) the requested fee in relation to the settlement; and (vi) public policy considerations. *See Goldberger*, 209 F.3d at 50. Consideration of the *Goldberger* factors demonstrates that the requested fee is fair and reasonable.

**B.** **The Requested Attorneys' Fees Are Reasonable Under the Percentage of the Fund Method**

The 20% fee request is within the range of percentage fees recently awarded in this Circuit in class action cases that settled for comparable amounts and at similar stages of litigation:

| Name of Case | Percentage of common fund | Stage of Litigation | Settlement Amount |
|---|---|---|---|
| *In re Tenaris S.A. Sec. Litig.*, 2024 WL 1719632 (E.D.N.Y. Apr. 22, 2024) | 33.33% | Early Discovery, After Motion to Dismiss was Denied | $9,500,000 |
| *In re Northern Dynasty Mins. Ltd.. Sec. Litig.*, 2024 WL 308242 (E.D.N.Y. Jan. 26, 2024) | 33.33% | After Motion to Dismiss was Denied, Before Discovery Began | $6,375,000 |
| *Rodriguez v. CPI Aerostructures, Inc.*, 2023 WL 2184496 (E.D.N.Y. Feb. 16, 2023) | 20% | Before Motion to Dismiss Briefing was Completed | $3,600,000 |
| *In re PPDAI Grp. Inc. Sec. Litig.*, 2022 WL 198491 (E.D.N.Y. Jan. 21, 2022) | 33.33% | While Motion to Dismiss was Pending | $9,000,000 |
| *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 2021 WL 76328 (S.D.N.Y. Jan. 7, 2021) | 25% | After the Motion to Dismiss was Denied, While Discovery was Ongoing | $12,000,000 |

This Court's reasoning in *In re Bumble, Inc. Sec. Litig.*, No. 22-cv-624 (DLC), ECF 93 (S.D.N.Y. Aug. 8, 2023), where the Court awarded a 15% fee, supports approval of the requested fees. *Bumble* was a Section 11 case where scienter and loss causation were not affirmative elements. *Bumble* did not involve complex issues of falsity with respect to FDA new drug approval processes. And *Bumble* did not involve a pre-litigation fee agreement where the percentage of attorneys' fees shifted depending on the stage of litigation when a recovery was obtained. *Id.* at 10.

Moreover, in *Bumble*, counsel requested fees of 25% of the Settlement based on over 4,800 hours of work and a lodestar of approximately $2.5 million. This Court concluded that 2,000 hours was reasonable and awarded a fee of 15% of the settlement, or $2.7 million. *Id.* at 8-9, 11, 16. The $2.7 million fee represented an effective multiplier of 2.6x the lodestar the Court found reasonable (2,000 / 4,800 = 41.7%; 41.7% x $2,500,000 = $1,042,500; $2,700,000 / $1,042,500 = 2.6). Here, Lead Counsel has spent fewer hours (1,949) than those deemed reasonable at this stage of litigation in *Bumble* on a more complex matter involving sophisticated issues regarding FDA approval in the biotechnical sector, and is seeking a lower 2.29 fee multiple.

**C.    The Requested Attorneys' Fees Are Reasonable Under the *Lodestar "Cross-Check"* Method**

The lodestar cross-check method also demonstrates that the fee requested is reasonable. The lodestar method requires a two-part analysis: "first, to determine the lodestar, the court multiplies the number of hours each attorney spent on the case by each attorney's reasonable hourly rate; and second, the court adjusts that lodestar figure (by applying a multiplier) to reflect such factors as the risk and contingent nature of the litigation, the result obtained, and the quality of the attorney's work." *City of Providence*, 2014 WL 1883494, at *13. Courts in this Circuit routinely award positive lodestar multipliers between two and more than five. *See e.g. In re*

21

*Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at \*5 (E.D.N.Y. June 24, 2010) ("Where … counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar"); *Lopez v. Fashion Nova,* 2021 WL 4896288, at \*3 (S.D.N.Y. Oct. 19, 2021) (noting that lodestars of up to eight times are regularly awarded in the Second Circuit). Moreover, courts have noted that a multiplier of 2.15 is considered "well within the range of multipliers that have been applied by courts in this Circuit in similar common fund cases." *Blackberry Ltd.,* 2022 WL 4554858, at \*10.[4]

In this case, Lead Counsel expended 1,949 hours on the Litigation, with a total lodestar value of $1,310,582.[5]  The lodestar is calculated using Lead Counsel's current rates,[6] which are comparable to the regular rates submitted by comparable firms for lodestar cross-checks in other securities class action fee applications.[7] Accordingly, the requested fee of $3 million represents a

---

[4] *See also Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2022) (multiplier of 4.65); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (multiplier of 3.97).

[5] The 1,949 hour lodestar does not take into account future hours over the next several months that will be spent by Lead Counsel overseeing the Claims administration process. Also, excluded from the lodestar calculation is (i) time specifically spent on issues relating to attorneys' fees; and (ii) time spent by attorneys who billed less than 5 hours.

[6] *See In re Veeco Instruments Inc. Sec. Litig*., No. 05 MDL 01695(CM), 2007 WL 4115808, at \*9 (S.D.N.Y. Nov. 7, 2007) ("The use of current rates to calculate the lodestar figure has been repeatedly endorsed by courts as a means of accounting for the delay in payment inherent in class actions and for inflation").

[7] To determine appropriate rates, courts look to those that are "normally charged in the community where the counsel practices, i.e., the 'market rate.'" *Blackberry*, 2022 WL 4554858 at \*10 (citing *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12–Civ–8557 (CM). 2014 WL 7323417, at \*38 (S.D.N.Y. Dec. 19, 2014).  Per this assessment, courts approve of billing rates that "rates are comparable to peer plaintiffs and defense firms litigating matters of similar magnitude and complexity and similar rates have been approved by courts in this district." *Id. See, e.g., Blackberry,* 2022 WL 4554858 at \*10 (awarding fees with rates ranging from $500 for associates to $1,200 for senior partners); *see also Micholle v. Ophthotech Corp.*, No. 1:17-cv-00210 (VSB) (GWG), ECF 147-2 (S.D.N.Y. Sep. 16, 2022) (awarding fees with rates ranging from $375-$435 for staff attorneys, $375-$620 for associates and $775-$1350 for partners/senior partners).

22

2.29 multiplier of the total lodestar (3,000,000 / 1,310,582 = 2.29), which is "at the lower end of the range of multipliers." *In re Lloyd's,* 2002 WL 31663577, at \*27. A positive multiple aligns counsel's interests with the Class in obtaining the best possible recovery, and incentivizes counsel to litigate the matter efficiently. Moreover, the positive multiplier is reasonable given the high risk, complex issues, skill of the attorneys, and the contingency nature involved in bringing this litigation, as discussed herein.  Therefore, the requested fee is also reasonable under the lodestar method.

    **D.    The Requested Attorneys' Fees are Reasonable Under the *Goldberger* factors**

    **1.    The Time and Labor Expended by Counsel**

Through February 12, 2026, Lead Counsel has spent 1,949 hours litigating this action, resulting in a lodestar of $1,310,582.  These hours demonstrate that Lead Counsel devoted the necessary time and effort to aggressively litigate the Action by, among other things, (a) investigating potential claims against Defendants; (b) preparing the FAC and reviewing Shendelman's and Perfetti's separate motions to dismiss the FAC and Applied's answer to the FAC; (c) preparing the SAC, reviewing Applied's answer to the SAC, and opposing Shendelman's and Perfetti's separate motions to dismiss the SAC; (d) serving discovery demands, reviewing Defendants' responses to those demands, and reviewing strategically-focused discovery in anticipation of the mediation; (e) consulting with a forensic economist to evaluate damages for the Class as a result of the Defendants' alleged violations of the Exchange Act; (f) preparing a detailed mediation statement and engaging in a mediation session with all Defendants overseen by an experienced mediator; (g) negotiating and drafting the Stipulation and Notice documents; (h) preparing the Preliminary Approval Motion; (i) preparing this Motion; and (j) overseeing the Claims Administrator's execution of the Notice Program.  Ruthizer Decl. ¶ 122.

23

### 2.    The Magnitude and Complexities of the Litigation

As discussed in Section I(C)(1), this litigation had many complexities, including (a) the need to prove falsity, scienter, and loss causation, and (b) achieve and maintain class certification. In light of the complexities here, the fee requested is reasonable. *See City of Providence*, 2014 WL 1883494, at *16 (finding that "difficult, complex, hotly disputed, and expert-intensive issues," favored requested fee).

### 3.    The Risks of the Litigation

The risks assumed by Lead Counsel is one of the most important *Goldberger* factors that the Court considers in determining the reasonableness of the fees requested. *Goldberger*, 209 F.3d at 54; *In re Comverse*, 2010 WL 2653354, at *5. "Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 985 F. Supp. 410, 417 (S.D.N.Y. 1997) ("Numerous courts have recognized that the attorney's contingent fee risk is an important factor in determining the fee award.").

Lead Counsel took the case entirely on contingency, expended 1,949 hours without any certainty of payment and assumed a serious risk of nonpayment given the risks and complexities inherent in the litigation and in the Company's financial position, both of which presented a real possibility that Counsel could entirely forgo compensation. Counsel was obligated to ensure sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the costs that a case of this complexity requires. Also, by focusing considerable time and resources on this fully contingent case, Lead Counsel forewent other opportunities. Therefore, this factor also weighs in favor of the requested fee.

24

### 4.    The Quality of Representation

The quality of the representation and the standing of Lead Counsel have been recognized as important factors in determining the reasonableness of a fee.  *See In re Flag Telecom Holdings,* 2010 WL 4537550, at *28; *In re Bisys Sec. Litig.*, No. 04 Civ. 3840(JSR), 2007 WL 2049726, at *3 (S.D.N.Y. July 16, 2007).

Lead Counsel is highly skilled and experienced in litigating complex securities class actions. For example, in 2022, Judge Katherine Polk Failla of this Court, in awarding attorneys' fees to Wolf Popper, stated that Wolf Popper "conducted the Litigation and achieved the Settlement with skill, perseverance and diligent advocacy; [and] Lead Counsel are highly experienced in class action litigation and securities class action litigation…." *Martinek v. AmTrust Financial Services, Inc.*, Case No. 19 Civ. 8030 (KPF), 2022 WL 16960903, at *2 (S.D.N.Y. Nov. 16, 2022). See also Ruthizer Decl. Ex. 3 (Firm Resume).

Throughout the litigation, Lead Counsel has exerted a diligent and concentrated effort to secure the best recovery for the Class. Suffice to say, had Counsel not been highly skilled the Class may not have received such an exceptional outcome, given the risks in the case.

In addition, Plaintiff's Counsel successfully faced a highly skilled and well-resourced defense counsel team three large and prestigious international law firms with significant experience litigating high-stakes securities actions: Wilmer Cutler Pickering Hale and Dorr LLP, Kirkland & Ellis LLP, and McGuireWoods LLP.  *See In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ("The quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsels' work."); *In re Flag Telecom Holdings*, 2010 WL 4537550, at *28 (same).

**5.       The Requested Fee in Relation to the Settlement**

"When determining whether a fee request is reasonable in relation to a settlement amount, 'the court compares the fee application to fees awarded in similar securities class-action settlements of comparable value.'" *In re Comverse*, 2010 WL 2653354, at *3 (citation omitted). As discussed in detail in Section V(B) above, the requested fee is within the range of percentage fees that courts in the Circuit have awarded in comparable cases.

**6.       Public Policy Considerations**

"Public policy concerns favor the award of reasonable attorneys' fees in class action securities litigation." *See In re Flag Telecom Holdings*, 2010 WL 4537550, at *29 (citation omitted). Further, Courts have recognized that in order to effectuate the "important public policy [of enforcing the securities laws] [], the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook." *Id; see also Maley*, 186 F. Supp. at 373 (S.D.N.Y. 2002) ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered."); *Hicks v. Stanley,* No. 01 Civ. 10071(RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) ("To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding."). As previously noted, there were substantial risks associated with the prosecution of the Action. Nonetheless, due to Lead Plaintiff's and Lead Counsel's diligence and resourcefulness, a substantial recovery was secured on behalf of investors who suffered severe injury. Accordingly, public policy favors granting Counsel's request.

**E.      The Reimbursement of Costs and Expenses is Reasonable and Should be Approved**

It is well-established that class counsel is entitled to reimbursement of litigation expenses from a common fund. *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.*, 818 F.2d 278, 283 (2d Cir. 1987); *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 143 (S.D.N.Y. 2008). Thus, as long as they were "incidental and necessary to the representation," reasonable expenses that are customarily charged to a client may be recovered. *In re China Sunergy Sec. Litig.*, No. 07 Civ. 7895(DAB), 2011 WL 1899715, at *6 (S.D.N.Y. May 13, 2011). Lead Counsel has incurred, and requests reimbursement of, $46,313.15 in litigation expenses through February 12, 2026. Ruthizer Decl. ¶ 142.

The Notices informed Class Members that Lead Counsel would request up to $50,000 in litigation costs and expenses. Lead Counsel's requested reimbursement is less than this amount. The three largest categories of expenses were mediation fees ($17,150), investigator fees ($9,459), and expert fees ($9,500). These and other incurred costs and expenses (such as legal research expenses) were reasonable and necessary to successfully prosecute the Action. *See In re MetLife*, 689 F. Supp. 2d at 364 (reimbursing "expert fees, electronic research charges, long distance telephone and facsimile charges, postage and delivery expenses, discovery costs, filing fees, photocopying, expenses associated with locating and interviewing dozens of witnesses, and out-of-town travel expenses"). And, these expenses were incurred with no guarantee of recovery for the benefit of Class members.[8]

---

[8] These costs and expenses do not include Notice and Administration Expenses, such as the cost of providing notice, the fees of the Claims Administrator, and Tax and Tax Expenses Pursuant to the Stipulation. Lead Plaintiff will ask the Court to allow any additional Notice and Administration Expenses when it files a motion for distribution of the Net Settlement Fund after the Claims process is complete.

## F.    CONCLUSION

For the foregoing reasons, the Court should grant the Motion. A proposed Final Judgment and Order of Dismissal with Prejudice was submitted as Exhibit B to the Stipulation (ECF 126). Lead Plaintiff will submit an updated proposed Order with its reply brief on or before March 12, 2026, which will include a list of any Class Members who submit requests for exclusion.

DATED: February 12, 2026                     Respectfully submitted,

                                             **WOLF POPPER LLP**


                                             By: */s/ Joshua W. Ruthizer*

                                             Joshua W. Ruthizer
                                             Robert C. Finkel
                                             Emer Burke
                                             Samuel Coffin
                                             845 Third Avenue, 12th Floor
                                             New York, New York 10022
                                             (212) 759-4600
                                             jruthizer@wolfpopper.com

                                             *Attorneys for Class Representative*
                                             *Dr. Martin Dietrich and the Class*

### WORD COUNT CERTIFICATION

Pursuant to Southern District of New York Local Civil Rule 7.1(c), the undersigned hereby certifies that this memorandum of law contains 8,709 words, excluding the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates. I utilized the word count of the word-processing program used to prepare the document in order to obtain that word count.

By: */s/ Joshua W. Ruthizer*

Joshua W. Ruthizer

28