**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE APPLIED THERAPEUTICS SECURITIES LITIGATION | Case No. 1:24-cv-09715 (DLC) (VF) <br><br> CLASS ACTION |

**DECLARATION OF JOSHUA W. RUTHIZER IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, APPROVAL OF PLAN OF ALLOCATION, AND AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES**

**WOLF POPPER LLP**
Joshua W. Ruthizer
Robert C. Finkel
Emer Burke
Samuel Coffin
845 Third Avenue, 12th Floor
New York, New York 10022

Lead Counsel for Lead Plaintiff Dr. Martin Dietrich and the Class

**TABLE OF CONTENTS**

I.    History of the Action ........................................................................................... 2

    A.    The Commencement of the Action and the Appointment of Lead Plaintiff........... 2

    B.    The Amended Complaints and Defendants' Motions to Dismiss.......................... 3

    C.    Discovery Efforts................................................................................................ 7

    D.    The Mediation.................................................................................................... 8

    E.    The Stipulation of Settlement and Preliminary Approval................................... 10

II.    The Terms of the Settlement............................................................................... 14

III.    The Risks Faced in Prosecuting this Action ...................................................... 15

    A.    Applied's Financial Condition........................................................................... 15

    B.    Risks Concerning the Merits of Lead Plaintiff's Claims .................................... 16

IV.    Lead Plaintiff's Distribution of Notice to the Class in Compliance with the Preliminary Approval Order ........................................................................................................ 19

    A.    Mailing of the Postcard Notice and Publication of the Summary Notice............. 19

    B.    The Settlement Website ..................................................................................... 22

    C.    Requests for Copies of the Longform Notice and Claim Form ........................... 22

V.    The Reaction of the Class to the Settlement to Date .......................................... 23

VI.    The Settlement is Fair, Reasonable, and Adequate to the Class........................ 24

    A.    The Acquisition and the Warrants ..................................................................... 24

    B.    The Percentage Recovery of the Settlement Represents an Excellent Result for the Class Given the Risks of Continued Litigation........................................................ 25

VII.    The Plan of Allocation is Fair and Reasonable.................................................. 26

VIII.    Lead Counsel's Fee and Expense Application................................................... 28

    A.    Lead Counsel's Request for an Award of Attorneys' Fees.................................. 28

        1.    The Time and Labor Required to Achieve the Settlement ....................... 29

        2.    The Quality of the Result Achieved by Lead Counsel ............................ 31

i

      3.     The Skill and Experience of Lead Counsel.................................................. 31

      4.     The Fully Contingent Nature of the Fee and the Extensive Risks of the Litigation.............................................................................................. 31

      5.     The Reaction of the Settlement Class to Date ........................................... 32

      6.     Lead Plaintiff's Endorsement of the Fee Application............................... 32

B.     Lead Counsel's Costs and Expenses......................................................................... 33

I, Joshua W. Ruthizer, declare pursuant to 28 U.S.C. §1746 as follows:

1.      I am a partner of the law firm of Wolf Popper LLP ("Wolf Popper"), Lead Counsel to Court-appointed Lead Plaintiff Dr. Martin Dietrich in this Action.  I am a member in good standing of the New York Bar and admitted to practice in the United States District for the Southern District of New York.[1]

2.      I submit this Declaration in support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement, Approval of Plan of Allocation, and an Award of Attorneys' Fees and Litigation Expenses ("Motion").

3.      I have personal knowledge of the matters set forth herein based on my active participation in, and supervision of, the Action, and if called upon as a witness, I could and would testify competently thereto.  Also, for the avoidance of doubt, I fully agree with all the factual statements contained in the memorandum of law filed herewith, and if called upon as a witness, I could and would testify competently to those facts as well.

4.      Attached as Exhibit 1 to this Declaration is a true and correct copy of the Declaration of Dawn M. Cody Regarding: (I) Mailing and Emailing of Notice; (II) Publication of the Summary Notice; and (III) Report on Requests for Exclusion Received to Date, dated February 11, 2026 ("Cody Declaration").

5.      Attached as Exhibit 2 to this Declaration is the Declaration of Dr. Martin Dietrich in Support of Motion For Final Approval of Class Action Settlement, Approval of Plan of Allocation, and an Award of Attorneys' Fees and Litigation Expenses, dated February 12, 2026 ("Dietrich Declaration").

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings ascribed to them in the Amended Stipulation of Settlement, dated November 20, 2025 (the "Stipulation," ECF 126). Unless otherwise noted, all references to "¶_" are to the Stipulation.

1

**I.      History of the Action**

      **A.      The Commencement of the Action and the Appointment of Lead Plaintiff**

6.      This Litigation is a class action alleging claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

7.      The Litigation was commenced on December 17, 2024, when *Alexandru v. Applied Therapeutics, Inc. et al.*, No. 1:24-cv-09715 (S.D.N.Y.), was filed by another investor.  The *Alexandru* complaint alleged claims on behalf of a class of investors who purchased or otherwise acquired Applied Therapeutics, Inc. ("Applied") securities between January 3, 2024 and December 2, 2024, inclusive.  ECF 1.

8.      On December 20, 2024, the Court issued an order setting a deadline of February 18, 2025 pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(A), for members of the alleged class to file motions for appointment as lead plaintiff.  ECF 9.  The Order also scheduled a hearing for March 7, 2025 to consider the filed motions for appointment as lead plaintiff.

9.      A related action was filed on December 27, 2024 titled *Ikram v. Applied Therapeutics, Inc. et al.*, No. 1:24-cv-09973 (S.D.N.Y.).  *Ikram* ECF 1.  On January 7, 2025, the Court accepted *Ikram* as related to *Alexandru*, and on January 14, 2025 issued an Order binding *Ikram* to the schedule set in *Alexandru*.  *Ikram* ECF 11.

10.      On February 18, 2025, Dr. Dietrich and eight other investors filed motions for appointment as lead plaintiff.  ECFs 18-48.

11.      On March 7, 2025, the Court held a pre-trial conference to address the pending motions for appointment as lead plaintiff.  On March 11, 2025, the Court issued an Order that

consolidated *Alexandru* and *Ikram* into the Litigation, appointed Dr. Dietrich as Lead Plaintiff, and approved Lead Plaintiff's selection of Wolf Popper LLP as Lead Counsel.  ECF 59.

**B.    The Amended Complaints and Defendants' Motions to Dismiss**

12.    The Court's March 11, 2025 Order also set deadlines for (i) Lead Plaintiff to file an amended complaint, (ii) the Defendants to answer or file motions to dismiss that amended the complaint, (iii) the parties to file joint or separate proposals for a schedule for further pre-trial proceedings, including proposed schedules for discovery and briefing on any motion for class certification and preferences for the forum and timing of settlement communications, and (iv) the parties to file a proposed protective order and a proposed order concerning discovery of electronically stored information ("ESI").  ECF 59.

13.    The Court's March 11, 2025 Order allowed Lead Plaintiff, in the event a motion to dismiss was filed, to file a letter "indicating a desire to further amend its complaint in response to the motion."  The Court's Order cautioned that it was "unlikely that Lead Plaintiff will be granted any further opportunities to amend."  *Id*.

14.    Lead Plaintiff's First Amended Consolidated Complaint for Violations of the Federal Securities Laws was filed on May 2, 2025 (the "FAC").  ECF 72.

15.    On May 16, 2025, the parties filed a joint proposal for a schedule of pre-trial proceedings, in response to the Court's March 11, 2025 Order.  ECF 77.

16.    On May 23, 2025, Applied answered the FAC, and the Individual Defendants (Defendants Shendelman and Perfetti) each separately moved to dismiss the FAC.  ECFs 78-86.

17.    On May 27, 2025, even though Shendelman's and Perfetti's motions to dismiss were still pending, the Court issued an Order lifting the PSLRA discovery stay, stating "[f]or the sake of clarity, discovery is not stayed with respect to the individual defendants."  ECF 87.  The

Order set a deadline for the parties to exchange their Rule 26(a)(1) initial disclosures, and scheduled a Court conference to set a pre-trial schedule for the Litigation.

18.    On June 6, 2025, consistent with the Court's March 11, 2025 Scheduling Order, Lead Plaintiff informed the Court that it would amend the FAC in response to the pending motions to dismiss the FAC.  ECF 94.

19.    On June 9, 2025, the Court denied the pending motions to dismiss the FAC as moot and set a schedule for the Defendants to respond to the expected second amended complaint.  ECF 95.

20.    On June 12, 2025, the Court held a Rule 16 pre-trial conference where the Court and the parties discussed a schedule for pre-trial proceedings.  On June 13, 2025, the Court issued a Pretrial Scheduling Order that set a schedule and deadlines for (i) the parties to complete fact and expert discovery, (ii) Lead Plaintiff to move for class certification, and (iii) the parties to move for summary judgment or file a joint pretrial order.  ECF 98.

21.    On June 13, 2025, Lead Plaintiff filed the Second Consolidated Amended Class Action Complaint (the "Complaint" or "SAC").  ECF 99.  The Complaint alleged that Defendants violated Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5.  The Complaint's allegations were brought on behalf of a "Class" of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Applied on a U.S. based exchange between January 3, 2024 and December 2, 2024, inclusive (the "Class Period"), and who were damaged thereby.  *Id.* ¶ 1.

22.    The Complaint alleged that Defendants made materially false and misleading statements, with scienter, in violation of Section 10(b) and Rule 10b-5 during the Class Period concerning, among other things: the viability of Applied's New Drug Application to the U.S. Food

4

and Drug Administration ("FDA") for govorestat to treat Classic Galactosemia ("Galactosemia"), a rare genetic metabolic disorder that can be fatal if untreated (the "NDA"); Defendants' interactions with the FDA concerning the NDA; the reliability of the data underlying the NDA; and alleged known material deficiencies with the NDA. *Id*. ¶¶ 3-21.

23.     Specifically, the Complaint alleged that (a) between March and June 2021, as part of Applied's ACTION-Galactosemia Kids Study (the "Pediatric Study"), 19 of the 47 subjects enrolled at a clinical site—over 40% of the study population—received only approximately 80% of the intended dose of govorestat due to a labeling error (the "Dosing Errors"); (b) the Dosing Errors were a violation of the clinical trial protocol that Applied agreed to with the FDA for the conduct of the Pediatric Study; (c) Defendants knew (i) about the Dosing Errors and that they constituted a violation of the clinical trial protocol for the Pediatric Study, (ii) that information about the Dosing Errors and the clinical data recorded for patients who received the Dosing Errors (the "Dosing Errors Clinical Data") was required by FDA regulation and guidance to be included in the NDA, (iii) that the NDA failed to include this information, and instead reported clinical data as if the patients received the full, correct dose, and (iv) as a result, the NDA was materially deficient and failed to comply with FDA regulations.  The Complaint alleged that the failure to disclose these facts rendered Defendants' statements materially false and misleading. *Id*. ¶¶ 65-87.

24.     In addition, the Complaint alleged that (a) on March 27, 2024, one of Applied's vendors for the Pediatric Study deleted clinical source data for all 47 patients enrolled in the study (the "Study Data Deletion"), (b) between April 23 and May 3, 2024, the FDA conducted an inspection of a clinical test site and discovered the Study Data Deletion, (c) the Study Data Deletion was a violation of the clinical trial protocol for the Pediatric Study; (d) at the conclusion

5

of the inspection, on May 3, 2024, the FDA issued an FDA Form 483 to Applied that detailed the Study Data Deletion and two other objectionable conditions (the "Form 483"), and also discussed the Form 483 with Defendant Shendelman; (e) on May 9, 2023, Applied responded to the Form 483 and informed the FDA that deleted source data for 11 subjects could not be recovered; and (f) therefore, by May 9, 2024, the Defendants knew (i) about the Study Data Deletion, (ii) that the FDA knew Applied had violated FDA regulations and the clinical trial protocol for the Pediatric Study, and (iii) that the FDA could not verify clinical results of the Pediatric Study as part of its NDA review. The Complaint alleged that the failure to disclose these facts rendered Defendants' statements materially false and misleading. *Id.* .

25. The Complaint also alleges that these alleged misrepresentations and omissions caused the price of Applied's common stock to trade at artificially inflated levels during the Class Period, until the market learned the truth through, among other things, the November 27, 2024 disclosure of a complete response letter ("CRL") from the FDA to Applied rejecting the NDA and the December 3, 2024 publication by the FDA of a Warning Letter from the FDA to Applied that identified the Study Data Deletion and failure to include information about the Dosing Errors and Dosing Errors Clinical Data in the NDA. Lead Plaintiff alleged that as a result of these and other disclosures, from November 27, 2024 through December 20, 2024, the price of Applied's common stock plummeted $7.69 per share, or 89.7%, causing significant damages to Lead Plaintiff and the Class. *Id.* ¶¶ 84-410.

26. In connection with the preparation of the FAC and the SAC, Lead Counsel, among other things: (a) reviewed Company SEC filings, press releases, other public statements by Defendants, publicly available FDA documents, analyst reports and news articles concerning the Defendants, (b) retained an investigator to gather information and locate potential witnesses, and

6

(c) spoke with potential witnesses and consulted with professionals and experts in the pharmaceutical industry.

27. On June 27, 2025, the Individual Defendants each moved to dismiss the Complaint pursuant to Rule 12(b)(6), and Applied separately filed an Answer to the Complaint. Lead Plaintiff opposed the motions, and the motions were fully briefed as of July 18, 2025. ECFs 100-113. At the time of the Settlement, the Court had not yet ruled on the motions to dismiss.

**C.      Discovery Efforts**

28. On March 31, 2025, Lead Counsel made a Freedom of Information Act ("FOIA") Request to the FDA for documents related to, among other things, the NDA filed by Applied for govorestat to treat Galactosemia, communications between Applied and the FDA related to the NDA, the CRL, and the Form 483.

29. On April 4, 2025, Lead Counsel received an acknowledgement letter for the FOIA Request, in which the FDA stated, among other things, that the FDA was unable to respond within the statutory required period and that it may take up to 24 months for the request to be processed.

30. On or about May 8, 2025, members of Lead Counsel spoke with a representative of the FDA concerning the FOIA Request.

31. On May 30, 2025, the parties filed a joint proposed protective order and joint proposed order concerning discovery of ESI, both in response to the Court's March 11, 2025 Order. The Court entered the proposed protective order and proposed ESI order on June 2, 2025. ECFs 88-89, 91-92.

32. On June 13, 2025, pursuant to the Court's March 27, 2025 Order (ECF 87), all parties served their Rule 26(a)(1) Initial Disclosures.

33. On July 3, 2025, Lead Plaintiff served on all Defendants its Request for Production of Documents to All Defendants ("RFPs") and its First Set of Interrogatories Direct to All

Defendants ("Interrogatories").  The Defendants all served individual responses to the RFPs and the Interrogatories on August 4, 2025.

34.    On July 16, 2025, Plaintiff provided Defendants with a list of 13 groups of documents requested in the RFPs that Plaintiff requested Defendants prioritize for production in advance of the August 19, 2025 mediation.  Counsel to Applied and Lead Plaintiff thereafter met and conferred concerning these priority document requests and production prior to the mediation.

35.    On August 5, 2025, Applied produced 255 pages of documents, including insurance policies relevant to the claims in the Litigation and other documents that contained important information underlying the allegations of the SAC with respect to information that was first revealed to the market by the FDA in the CRL and Warning Letter.

**D.    The Mediation**

36.    Given the case's merits and the Company's financial circumstances, the parties agreed to engage in private mediation in an attempt to expeditiously resolve the Action while the motions to dismiss were pending.

37.    On July 25, 2025, Applied filed a letter with the Court to inform the Court that the parties were scheduled to participate in a mediation on August 19, 2025.  ECF 144.

38.    On August 19, 2025, the Settling Parties participated in a full-day confidential in-person settlement mediation with Jed D. Melnick, Esq.  Mr. Melnick, who is affiliated with JAMS, has over twenty years of experience mediating complex business disputes, including many securities fraud class actions.  Prior to the mediation, the parties submitted and exchanged detailed mediation statements concerning issues such as the merits of Lead Plaintiff's claims, damages, and ability to pay.

39.     In connection with the mediation and Lead Plaintiff's mediation statement, Lead Counsel consulted with a damages expert concerning potential Class-wide damages related to the allegations of the Complaint. Lead Counsel's damages expert estimated that:

a.     the Class's best-case maximum estimated aggregate damages based on all of the SAC's alleged stock price declines in response to alleged corrective disclosures that also had statistical significance was $377.5 million;

b.     the Class's maximum aggregated damages for the November 29, 2024 one-day stock drop (which is also the most significant stock drop) in response to the first alleged corrective disclosure on November 27, 2024 was $348.8 million;

c.     if Defendants' arguments concerning scienter for statements related to the Dosing Errors were accepted (*see* Section III (B) below), and as a result the Class Period started on May 9, 2024, when Applied was informed that the FDA had learned of the Study Data Deletion, rather than January 4, 2024, then the Class's maximum aggregate damages were $241.6 million; and

d.     If the Class Period started on May 9, 2024, then the Class's maximum aggregated damages for the November 29, 2024 one-day stock drop was $217.4 million.

40.     Notably, the percentages discussed above assume (a) Lead Plaintiff would be able to prove every aspect of his claims on liability and his damages model would be accepted by the jury in full, (b) Lead Plaintiff's damages expert correctly estimated the manner in which shares traded during the Class Period, *i.e.*, how many shares were purchased during the Class Period, without offsetting sales by the same investor, and held to the end of the Class Period, and (c) after

9

a judgment in favor of Lead Plaintiff and the Class, all damaged Class Members filed claims on all shares purchased during the Class Period and all such Claims were approved.

41.     Following good-faith negotiations, on August 19, 2025, the Settling Parties reached an agreement-in-principle to resolve the Litigation, subject to the negotiation of a formal stipulation of settlement and approval by the Court.  The agreement was the result of a proposal by Mr. Melnick.

42.     The agreement-in-principle included payment to the Class of fifteen million dollars ($15,000,000) and the issuance of Warrants to purchase up to 1,000,000 shares of Applied common stock, with an exercise price of $0.48 per share, the closing price of Applied common stock on August 19, 2025, with such Warrants to expire on the one-year anniversary of the Effective Date of the Stipulation.  The agreement also provided that in the event Applied is acquired or merged or otherwise engaged in or was subject to an extraordinary transaction that could impact the value of the Warrants prior to the Effective Date, the Warrants would be considered issued and outstanding for purposes of such a transaction.

43.     On August 22, 2025, the next business day after the mediation, the parties filed a joint letter motion with the Court informing the Court that a settlement had been reached and asking the Court to stay proceedings to allow the parties to negotiate and finalize the settlement documentation.  The Court granted the motion on August 25, 2025.  ECFs 115-116.

**E.      The Stipulation of Settlement and Preliminary Approval**

44.     The parties thereafter negotiated the terms of the stipulation of settlement, the language of the notices to the Class, and the terms of the Warrants.

45.     On November 4, 2025, Lead Counsel filed a copy of a stipulation of settlement and an Unopposed Motion for (I) Preliminary Approval of Class Action Settlement, (II) Certification

of the Class for Settlement Purposes, (III) Approval of Notice to the Settlement Class and (IV) Scheduling of a Final Approval Hearing. ECFs 119-122.

46.    On November 14, 2025, Applied filed a declaration with the Court stating that "[p]ursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715(b), Applied, on behalf of all Defendants, has mailed [on November 13, 2025] the required notice of the settlement agreement in the Action [] to all appropriate federal and state officials, including the United States Attorney General and the Attorneys General of all U.S. states and territories."  ECF 125.

47.    On November 19, 2025, the Court held a telephonic hearing to discuss the proposed stipulation of settlement and Lead Plaintiff's motion.  ECF 123.  On November 20, 2025, Lead Plaintiff filed an Amended Stipulation of Settlement, which made certain edits to the exhibits to the Stipulation requested by the Court at the November 19, 2025 conference.  ECF 126.

48.    Later that day, the Court issued the Preliminary Approval Order.  ECF 127.  The Preliminary Approval Order, among other things,

        a.    Certified for settlement purposes a "Class" of "all Persons and entities who purchased or otherwise acquired Applied common stock on a U.S. based exchange between January 3, 2024 and December 2, 2024, inclusive. Excluded from the Class are: (i) Defendants; (ii) the current and former officers, directors, and employees of Applied (the "Excluded Persons"); (iii) any person or entity that purchased Applied securities in the March 1, 2024 Private Placement (the "Private Placement Investors"); (iv) members of Defendants', Excluded Persons', or Private Placement Investors' immediate families, legal representatives, heirs, successors or assigns; and (v) any entity in which Defendants, the Excluded Persons, or the Private Placement

11

Investors have or had a controlling interest." Also excluded from the Class will be any person who would be a member of the Class but who validly and timely submits a request for exclusion;

b.    Appointed Lead Plaintiff as Class Representative and Lead Counsel Wolf Popper LLP as Class Counsel;

c.    Scheduled a Settlement Hearing for March 19, 2026;

d.    Appointed Angeion Group LLC as the Claims Administrator;

e.    Set the Notice Date as December 19, 2025;

f.    Approved the form, substance, and requirements of the Notice Program, including (a) mailing, or emailing where practicable, a Postcard Notice to potential Class Members, (b) publishing a Summary Notice on PR Newswire or a similar wire service, (c) and publication of the Settlement Website, www.apltsecuritiessettlement.com, where copies of the Longform Notice, Proof of Claim and Release ("Claim Form"), and other relevant documents can be downloaded. The Postcard Notice and Summary Notice both directed Class Members to the Settlement Website;

g.    Set a deadline for Class Members to submit a Claim Form of April 8, 2026;

h.    Set a deadline for Class Members to object to the Settlement or opt-out of the Settlement of February 26, 2026, and set forth the manner in which an objection or request for exclusion must be made.

49.    On December 11, 2025, while Lead Counsel and the Claims Administrator were preparing for dissemination of the Notices by the December 19, 2025 Notice Date, defendant Applied issued a press release announcing that it had entered into a merger agreement with Cycle

Group Holdings Limited ("Cycle") pursuant to which Cycle would commence a tender offer to acquire all of the outstanding approximately 154.0 million shares of Applied common stock for a per share price of $0.088 per share plus one non-transferrable contingent value right ("CVR") that entitles the holder to receive potential additional payments (the "Acquisition"). ECF 132-1. The CVR provides payments based on the following:

- Up to $0.10 per CVR in cash payable upon FDA approval of a new drug application for any galactosemia indication prior to the eighth anniversary of closing.

- Up to $0.10 per CVR in cash payable upon FDA approval of a new drug application for the CMT-SORD indication prior to the eighth anniversary of closing.

- Up to $0.20 per CVR in cash payable upon the first achievement of worldwide net sales of any product covered by the CVR by Cycle, its affiliates or licensees equal to or exceeding $200 million dollars in any four-quarter fiscal period prior to the tenth anniversary of closing.

- Each CVR holder will also be entitled to receive their pro rata share of any cash of Applied in excess of $500,000 at closing (capped at $1.5 million) ("Closing Cash Payment"). [*Id.*]

50.    The Acquisition was unanimously approved by Applied's Board of Directors. *Id.*

51.    On December 15, 2025, the parties filed a joint letter motion requesting that the Court approve an addition to the Longform Notice so that the Class could be advised of the Acquisition. ECF 130. On December 16, 2025 the Court granted the motion. ECF 131.

52.    Applied's February 3, 2026 Form 8-K filed with the SEC announcing completion of the Merger announced "the aggregate consideration paid by [Cycle] in the Offer and the Merger to acquire the Shares was approximately $14.3 million,"[2] which amounts to a per-share

---

[2] https://www.sec.gov/ix?doc=/Archives/edgar/data/0001697532/000119312526034559/d93556d8 k.htm.

consideration (likely including a Closing Cash Payment) of $0.09288 per share for each of the approximately 154.0 million shares outstanding.

53.    On February 3, 2026, Applied filed a notice apprising the Court that Cycle had completed the acquisition of Applied.  ECF 132.

## II.    The Terms of the Settlement

54.    The Settlement requires the Company to pay or cause to be paid $15,000,000 in cash plus the Warrants.  ¶¶ 1.53, 2.2.

55.    Once Taxes, Tax Expenses, Notice and Administrative Costs, a Court-awarded Fee and Expense Award, any Warrant Exercise Expenses, any Warrant Registration Expenses, and any other Court-approved costs or fees are deducted from the Settlement Fund, the remaining balance plus any Warrant Proceeds (*i.e.*, the Net Settlement Fund), whether consisting only of cash or a combination of cash and securities, will be distributed to Authorized Claimants pursuant to the Stipulation and Plan of Allocation.  ¶ 6.3.

56.    There will be no reversion to Defendants of any portion of the Settlement Fund.  ¶ 2.20.

57.    In exchange, Lead Plaintiff and each Class Member will be deemed to have fully and finally released any and all Released Plaintiff's Claims against Defendants and the other Defendants' Releasees, and will be forever barred and enjoined from prosecuting any and all Released Plaintiff's Claims against any of the Defendants' Releasees.  ¶ 5.1.

58.    The Stipulation anticipates that Lead Counsel will file a Fee and Expense Application for an award of attorneys' fees and reimbursement of litigation costs expenses (a Fee and Expense Award), however such awards are not a condition or material term of the Settlement, and are not the subject of any agreement between the parties.  ¶ 8.1.

### III.     The Risks Faced in Prosecuting this Action

#### A.     Applied's Financial Condition

59.     At the time of the mediation, Applied's financial condition was precarious.

60.     Applied's SEC filings after the end of the Class Period contained "going concern" warnings.  In Applied's Form 10-K for the fiscal year ended December 31, 2024, dated April 15, 2025, Applied's independent outside auditor stated it had substantial doubt about Applied's ability to continue as a going concern for 12 months after the date of filing.[3]

61.     In Applied's Form 10-Q for the fiscal quarter ended March 31, 2025 (dated May 14, 2025), Applied's management and independent outside auditor stated there was a substantial doubt regarding Applied's ability to continue as a going concern for a period of 12 months beyond the date of filing.[4]

62.     In Applied's Form 10-Q for the fiscal quarter ended June 30, 2025 (dated August 13, 2025), Applied's management and independent outside auditor again stated there was a substantial doubt regarding Applied's ability to continue as a going concern for a period of 12 months beyond the date of filing.[5]

63.     Further, as of June 30, 2025, Applied had cash and cash equivalents on hand of approximately $30.4 million (not including liabilities of $20 million), and had a net loss for the

---

[3] Applied's 2024 10-K, available at www.sec.gov/ix?doc=/Archives/edgar/data/0001697532/000095017025053840/aplt-20241231.htm, at 42, 95, F-1, F-8.

[4] Applied's 2025 First Quarter Form 10-Q, available at www.sec.gov/ix?doc=/Archives/edgar/data/0001697532/000095017025070557/aplt-20250331.htm, at 9, 34, 45.

[5] Applied's 2025 Second Quarter Form 10-Q, available at www.sec.gov/ix?doc=/Archives/edgar/data/0001697532/000095017025108172/aplt-20250630.htm, at 9, 35, 46.

first six months of fiscal 2025 of $43.2 million, implying a burn rate (spending more money than revenue) of nearly $22 million per quarter.[6]  Therefore, when the Settlement was reached, Applied was projected to have just $8 million in cash on hand by September 30, 2025, which would likely be insufficient to cover its already-existing liabilities.  And as noted above, Applied was ultimately acquired by a third party for aggregate consideration of approximately $14.3 million.

64.    Moreover, the $15 million Settlement also represented almost the entire amount of funds available under the Company's relevant insurance policies, which would only decrease by continued litigation to the detriment of the Class.

**B.    Risks Concerning the Merits of Lead Plaintiff's Claims**

65.    At the time the Settlement was reached, Perfetti's and Shendelman's motions to dismiss were still pending.  While Lead Plaintiff and Lead Counsel believe that Lead Plaintiff would have been successful in defeating Defendants' motions to dismiss, there was a risk that Defendants would be partially or fully successful at the motion to dismiss stage.

66.    For example, the Court could have been convinced by Defendants' arguments that certain of the alleged false statements were inactionable puffery or non-actionable expressions of optimism regarding the regulatory process.  ECF 105 at 23-25 (arguing that statements expressing confidence in approval or describing FDA interactions as "on track" were immaterial corporate optimism and not guarantees).  Defendants also argued that several challenged statements were accurate statements of objective fact about the status of the FDA review (including statements about "progress," the PDUFA date, and the NDA's late-stage review), and therefore not actionable

---

[6] Applied's 2025 Second Quarter Form 10-Q, available at www.sec.gov/ix?doc=/Archives/edgar/data/0001697532/000095017025108172/aplt-20250630.htm, at 4.

absent allegations that those facts were false when stated.  *See* ECF 105 at 23–24, 26; *see also* ECF 101 at 13–15.

67.    Similarly, the Court could have found merit in Defendants' scienter arguments. Defendants argued that Plaintiff failed to plead a strong inference of motive because the alleged Class Period stock sales were modest in size, represented only small percentages of the individual defendants' total holdings, and, in several instances, were executed to satisfy tax-withholding obligations upon the vesting of restricted stock units.  *See* ECF 105 at 8–11; *see also* ECF 101 at 16–18 (arguing that the SAC fails to allege suspicious timing or unusual trading patterns sufficient to support motive).

68.    Moreover, the Court could have credited Defendants' scienter arguments and concluded that Plaintiff failed to plead a strong inference of fraudulent intent.  Defendants argued that the SAC does not allege particularized facts showing that Shendelman or Perfetti knew the NDA would be rejected, and instead improperly relies on hindsight following the FDA's November 2024 Complete Response Letter.  *See* ECF 101 at 19–22; *see also* ECF 105 at 12–18.

69.    Defendants further argued that the regulatory record undercut any inference of conscious misbehavior or recklessness.  They pointed out that the FDA did not issue a CRL at earlier stages of review and did not identify the Dosing Errors as a basis for rejection in the Form 483, which, they contended, was inconsistent with Plaintiff's theory that Defendants knowingly concealed an inevitable denial.  *See* ECF 105 at 4–6, 12–14; *see also* ECF 101 at 7–8, 19–20.  The Court could have agreed that these circumstances weakened Plaintiff's scienter allegations and failed to give rise to a "strong inference" of fraudulent intent under the PSLRA..

70.    Even if the Court had declined to dismiss the action in its entirety, it could have substantially narrowed the scope of the case.  For example, the Court could have concluded that

17

the allegations concerning the Dosing Errors, events that occurred in 2021, did not plausibly establish that Defendants acted with scienter at the time of earlier Class Period statements made in January through April 2024.  In that event, the Court could have limited any viable claim to statements made only after Defendants received the Form 483 and responded to it in May 2024, on the theory that the SAC plausibly alleged notice of heightened regulatory scrutiny only as of that point.  Such a ruling would have eliminated several months from the beginning of the Class Period and excluded numerous challenged statements from the case.

71.    In addition, the Court could have differentiated among the individual defendants and among specific statements, sustaining claims as to some but dismissing others.  For example, the Court could have determined that certain pre-Form 483 statements lacked a sufficient nexus to the alleged omissions, or that particular statements attributed to one defendant did not give rise to a duty to disclose additional regulatory details.  A partial dismissal of that nature would have materially reduced the scope of discovery, narrowed the issues for class certification, and significantly decreased potential damages exposure.

72.    Also, if the motions to dismiss were granted, Applied, which answered the SAC, could have then moved for judgment on the pleadings or for summary judgment, which could have ended the Action without any recovery for the Class.

73.    If the motions to dismiss were denied, Defendants likely would have opposed class certification and moved for summary judgment.  If Lead Plaintiff and Lead Counsel succeeded in having the Class certified, Defendants likely would have filed a Rule 23(f) petition for review of the decision by the Second Circuit.  If Lead Plaintiff and Lead Counsel were successful in defeating Defendants' expected motion for summary judgment, Lead Plaintiff would be required to prove

all elements of his claims to prevail at trial, while Defendants would need to only succeed on one defense to potentially defeat the entire action.

74.    There was also no guarantee the Class would prevail in full on the issue of damages, and even if they did, how the Court's rulings on any motion for summary judgment and complex expert testimony matters—even if solely related to liability matters—would affect damages or how the case might be presented to a jury.

75.    Defendants could also file an appeal from any jury verdict, which could further extend the lawsuit for years, and risk reversal. A prolonged litigation would take years and incur additional significant costs that would reduce the limited funds available to provide recourse for the Class.

IV.    **Lead Plaintiff's Distribution of Notice to the Class in Compliance with the Preliminary Approval Order**

A.    **Mailing of the Postcard Notice and Publication of the Summary Notice**

76.    The Preliminary Approval Order directed Angeion to, on or before December 19, 2025, "mail by First Class Mail, or email, where practicable" the Postcard Notice to "all Class Members who can be identified with reasonable effort." ECF 127, ¶ 8(b). A copy of the Postcard Notice is attached to the Cody Declaration (Ex. 1) as Exhibit A.

77.    On December 19, 2025, Angeion caused the Postcard Notice to be sent by First-Class Mail to these 57 potential Class Members of record who were identified by stockholder information provided by Defendants' counsel. Ex. 1 (Cody Decl.), ¶ 6.

78.    The Preliminary Approval Order directed that on or before December 19, 2025, Angeion "shall cause the Summary Notice to be published once over PRNewswire or a comparable national wire service with similar reach." ECF 127, ¶ 8(c). Angeion caused the Summary Notice

19

to be transmitted once over PRNewswire on December 19, 2025.  Ex. 1 (Cody Decl.), ¶ 20 and Exhibit F.

79.    The Preliminary Approval Order also directed Angeion to "use reasonable efforts to give notice to nominee purchasers such as brokerage firms and other persons or entities who purchased Applied common stock during the Class Period (between January 3, 2024 and December 2, 2024, inclusive) as record owners but not as beneficial owners."  ECF 127, ¶ 10.  As in most class actions of this nature, the vast majority of potential Class Members are beneficial purchasers whose securities are held in "street name" by nominees – *i.e.*, the securities are purchased by brokerage firms, banks, institutions, and other third-party nominees in the name of the nominee, on behalf of the beneficial purchasers.  The names and addresses of these beneficial purchasers are known only to the nominees.

80.    On December 19, 2025, Angeion caused a "Nominee Letter" to be mailed to the 4,155 records contained in Angeion's Broker Database.  The Nominee Letter included the same instructions provided in the Special Notice to Securities Brokers and Other Nominees section identified on page 10 in the Notice.  The reverse side of the Postcard Notice, which provides recipients with a summary of information concerning the Litigation and the Settlement, the deadlines for Class Members to object to or opt-out of the Settlement, the deadline for Class Members to submit a Claim Form, and directs recipients to the Settlement Website and Longform Notice for more information and copies of the Claim Form, was included as part of the Nominee Letter.  Ex. 1 (Cody Decl.), ¶ 10.  A copy of the Nominee Letter is attached to Ex. 1 (Cody Decl.) as Exhibit C.

81.    Angeion also provided a copy of the Longform Notice and Claim Form to the Depository Trust Company ("DTC") for posting on its Legal Notice System ("LENS").  Ex. 1

(Cody Decl.), ¶ 11.  A copy of the Longform Notice and Claim Form are attached to Ex. 1 (Cody Decl.) as Exhibits D and E, respectively.

82.     The Preliminary Approval Order directed that:

nominees and custodians shall WITHIN SEVEN (7) CALENDAR DAYS of their receipt of the Postcard Notice either: (a) provide to the Claims Administrator the name, last known address, and email address of each beneficial owner for whom they are nominee or custodian; (b) request copies of the Postcard Notice for the Claims Administrator sufficient to send to all beneficial owners for whom they are nominee or custodian, which will be provided to nominees or custodians free of charge, and WITHIN SEVEN (7) CALENDAR DAYS of receipt, mail the Postcard Notice directly to all such persons or entities, or (c) request the link to the Postcard Notice and Proof of Claim and Release form from the Claims Administrator, and WITHIN SEVEN (7) CALENDAR DAYS of receipt, email the link directly to all beneficial owners for whom they are nominee or custodian. [ECF 127, ¶ 10.]

83.     The Longform Notice also included this requirement, and the Postcard Notice and Summary Notice contained summaries of this requirement, and directed recipients to the Longform Notice for more information. *See* Ex. 1 (Cody Decl.), Exs. A, D, F.

84.     Through February 10, 2026, Angeion received 1,770 records of potential Class Members from individuals or brokerage firms, banks, institutions, and other nominees, and has promptly mailed or emailed the Postcard Notice to these individuals.  Angeion has also received requests from nominees for 33,970 Postcard Notices and 20,424 links to the Postcard Notice and Claim Form, which Angeion fulfilled and those nominees were required to promptly distribute to their customers.  Ex. 1 (Cody Decl.), ¶¶ 14-16.

85.     In total, through February 10, 2026, a total of 60,382 notifications have been disseminated to potential Class Members and their nominees.  This total includes 39,864 Postcard Notices sent via First-Class Mail and 20,518 links to the Postcard Notice and Claim Form sent via email. Ex. 1 (Cody Decl), ¶ 17.

**B.    The Settlement Website**

86.    The Preliminary Approval Order directed Angeion to established a case-specific website, www.APLTSecuritiesSettlement.com, and to publish the following documents on this Settlement Website in forms available for download: the Longform Notice, the Claim Form, the Stipulation, the Complaint, the motion for preliminary approval of the Settlement, and the Preliminary Approval Order.  The Preliminary Approval Order also directed Angeion to publish on the Settlement Website the deadlines for Class Members to submit Objections, requests for exclusion, and Claim Forms.  ECF 127, ¶¶ 8(d), 8(e).

87.    On December 19, 2025, Angeion established the Settlement Website, which contains copies, in forms available for download, of the Longform Notice, the Claim Form, the Stipulation, the Complaint, the motion for preliminary approval of the Settlement, and the Preliminary Approval Order.  The Settlement Website also provides general information regarding the case and its current status and deadlines for Class Members to submit Objections, requests for exclusion, and Claim Forms.  The Settlement Website also includes copies, in forms available for download, of other important documents, including the Postcard Notice, the Summary Notice, and the briefing on defendants Shendelman's and Perfetti's motions to dismiss.  Angeion will update the website as necessary throughout the administration of the Settlement.  Ex. 1 (Cody Decl.), ¶¶ 26-29.

88.    As of February 10, 2026, the Settlement Website has been visited 2,335 times.  Ex. 1 (Cody Decl.), ¶ 28.

**C.    Requests for Copies of the Longform Notice and Claim Form**

89.    The Preliminary Approval Order directs Angeion to "mail or email a copy of the Longform Notice and Proof of Claim and Release form to any Class Member that requests one by phone, email, or mail."  ECF 127, ¶ 8(d).

22

90. Through February 10, 2026, Angeion has received two such requests for copies of the Longform Notice and Claim Form by phone. Angeion promptly sent copies of the Longform Notice and Claim Form in response to these requests by email or mail. Ex. 1 (Cody Decl.), ¶¶ 30-32.

## V.    The Reaction of the Class to the Settlement to Date

91. The deadline for Class Members to request exclusion from the Settlement is February 26, 2026. Also, the deadline for Class Members to object to the Settlement, the proposed Plan of Allocation (which is discussed below in Section VII), or the Fee and Expense Application (which is discussed below in Section VIII), is February 26, 2026.

92. Through February 10, 2026, Angeion has not received any requests for exclusion from the Settlement or objections to the Settlement, the proposed Plan of Allocation, or the Fee and Expense Application. Ex. 1 (Cody Decl.), ¶ 35.

93. Through the date of this Declaration, Lead Counsel is not aware of any objections to the Settlement, the Plan of Allocation, or the proposed Fee and Expense Application. Lead Counsel is also not aware of any requests for exclusion from the Settlement. Lead Counsel will provide a further update on any requests for exclusion or objections in connection with its reply submission on March 12, 2026.

94. Since the December 19, 2025 Notice Date through the date of this Declaration, Lead Counsel has received emails or phone calls from three potential Class Members. These calls and emails involved questions about the Settlement. None of the potential Class Members raised any objections or concerns with the Settlement, the Plan of Allocation, or the potential Fee and Expense Application.

95. Also, Lead Plaintiff fully supports the Settlement. *See* Ex. 2 (Dietrich Decl.).

23

**VI.    The Settlement is Fair, Reasonable, and Adequate to the Class**

    **A.    The Acquisition and the Warrants**

96.    The Warrants that were negotiated as part of the Settlement provided for the purchase of up to 1,000,000 shares of Applied Common Stock at an exercise price of $0.48 per share, the closing price of Applied common stock on August 19, 2025, the date the settlement was reached.

97.    The purpose of the Warrants was to provide additional compensation to the Class in the event Applied's financial condition recovered.

98.    Unfortunately, after the Settlement was reached, Applied's financial condition continued to deteriorate.

99.    On November 13, 2025, Applied filed its Form 10-Q for the quarter ended September 30, 2025, which contained another going concern warning.  Applied incurred a net loss of $62.1 million for the three quarters ended September 30, 2025, had no ongoing source of revenues to cover its expenses, and as of quarter end had only $11.9 million in cash and cash equivalents and total liabilities of $34.9 million.[7]

100.    On December 11, 2025, Applied common stock closed at $0.2169 per share.  As reported in the Tender Offer Documents, as of December 19, 2025, there were 153,957,727 shares of Applied common stock issued and outstanding, implying a market capitalization of approximately $33.4 million.

---

[7] Applied's 2025 Third Quarter Form 10-Q, available at www.sec.gov/ix?doc=/Archives/edgar/data/0001697532/000119312525278818/aplt-20250930.htm, at 4, 8-9.

101.    After the market closed on December 11, 2025, Applied announced the Acquisition.  The next day Applied common stock closed at $0.1173 per share.  At this per share price, Applied had a market capitalization of approximately $18.05 million.

102.    On February 3, 2026, Applied announced that the Acquisition had closed.  *See* ECF 132.  The price of Applied common stock closed at $0.1030 per share that day, implying a market capitalization of $15.86 million.  As stated above, the aggregate consideration paid by Cycle for Applied was approximately $14.3 million, or $0.09288 per share.

103.    Pursuant to the terms of the Stipulation, the Warrants are to be issued to Lead Plaintiff and the Class 14 days after the Court grants final approval to the Settlement.  ¶ 2.7.  Pursuant to the terms of the Warrant, "Applied shall cause any successor entity in a Fundamental Transaction in which the Company is not the survivor (the "Successor Entity") to assume in writing all of the obligations of the Company under this Warrant."  ECF 126, Ex. C § 3(d).

104.    Lead Counsel is still evaluating the impact of the Acquisition on the Warrants.  However, because the Acquisition consideration is significantly below the strike price for the Warrants of $0.48 per share, the Warrants are likely to have minimal value.

**B.    The Percentage Recovery of the Settlement Represents an Excellent Result for the Class Given the Risks of Continued Litigation**

105.    The $15 million cash settlement, not including the Warrants, is an excellent result for the Class.

106.    A recent report by National Economic Research Associates, Inc. ("NERA") reports that the median percentage recovery in settlements of class actions during the period January 2016 through December 2025 involving aggregate investor losses between $200 million to $399 million to be *2.7%*.  *See* Edward Flores & Svetlana Starykh, Recent Trends in Securities Class Action

Litigation: 2025 Full-Year Review (National Economic Research Associates, Inc. Jan. 21, 2026) ("NERA Report").[8]  This information is reflected on page 27, Figure 23 of the NERA Report.

107.   The 2.7% median recovery is *less* than the 4%-6.9% percentage of recovery implied by comparing the $15 million cash portion of the Settlement to the maximum recoverable damages estimated by Lead Plaintiff's damages consultant.

108.   NERA also calculated that the median ratio of settlement to investor losses for settlements reached in 2025 was 1.5%.  NERA Report at 28, Figure 24.  This is also significantly below the 4%-6.9% (assuming recovery) of potential damages represented by the Settlement here. As noted above, Lead Plaintiff's estimate of damages is based on the maximum value of Plaintiff's potential recovery, the accuracy of his expert's trading model, and assumes all claims will be filed.

109.   The NERA Report therefore evidences that the $15 million risk-free Settlement represents a reasonable percentage of the range of potential maximum provable damages.

## VII.   The Plan of Allocation is Fair and Reasonable

110.   As provided in the Stipulation, the Longform Notice and proposed Plan of Allocation, once Taxes, Tax Expenses, Notice and Administrative Costs, a Court-awarded Fee and Expense Award, any Warrant Exercise Expenses, any Warrant Registration Expenses, and any other Court-approved costs or fees are deducted from the Settlement Fund, the Net Settlement Fund will be distributed to Authorized Claimants pursuant to the Stipulation and Plan of Allocation.

111.   As set forth in the Court's Preliminary Approval Order and the Longform Notice, all Class Members who want to participate in the distribution of the Net Settlement Fund must

---

[8] The NERA Report is available at
https://www.nera.com/content/dam/nera/publications/2026/PUB_2025_Recent_SCA_Trends_Full-Year_0121.pdf .

26

submit a valid Claim Form with all required information postmarked, or submitted through the Settlement website, no later than April 8, 2026.

112.    As provided in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the Plan of Allocation approved by the Court.

113.    The proposed Plan of Allocation is set forth on page 11 of the Longform Notice, attached as Exhibit D to Ex. 1 (Cody Decl).

114.    The proposed Plan of Allocation was developed based on the damages calculations performed by Lead Plaintiff's damages consultant in connection with the mediation.

115.    The premise of the Plan of Allocation is that the true value of Applied common shares during the Class Period was $1.69 per share, the closing price on December 3, 2024, after the disclosure of the CRL and the Warning Letter.

116.    Under the Plan of Allocation, shares of Applied common stock purchased during the Class Period and held through at least November 29, 2024, will be assigned a Recognized Loss based on several factors, including purchase price, sale price, and the per share decline in Applied's common stock on November 29, 2024, December 2, 2024, and December 3, 2024.  Thus, the Plan creates a framework for equitable distribution of the Net Settlement Fund among Class Members based on the damages they suffered as result of their purchases of Applied common stock during the Class Period and related to the allegations of the Complaint.

117.    Based on the information provided by Claimants, the Claims Administrator will determine their eligibility to participate (i.e., whether they are an Authorized Claimant) and calculate each Authorized Claimant's *pro rata* share based on the Authorized Claimant's Recognizes Loss compared to the total of all Authorized Claimant's Recognized Losses, and Lead Plaintiff will be subject to the same formula for distribution of the Settlement as other Class

27

Members.    Before rejecting a Claim in whole or in part, the Claims Administrator will communicate with the Claimant in writing, to give the Claimant the chance to remedy any curable deficiencies in the Claim submitted.  ¶ 6.8.  Any claim disputes that cannot be resolved will be presented to the Court for resolution.  *Id.*  No Authorized Claimant will receive a distribution of less than $10.00 in cash or ten whole shares of common stock, calculated on an adjusted basis.

118.    In sum, the Plan of Allocation is designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Class Members based on losses they suffered on transactions in Applied common stock that were attributable to the conduct alleged in the Complaint.  Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable, and should be approved by the Court.

119.    As discussed above, to date, no objections to the proposed Plan of Allocation have been received. Any objections that may be received will be addressed in Lead Counsel's reply papers, which are due to be filed on or before March 12, 2026.

## VIII.    Lead Counsel's Fee and Expense Application

120.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court for a Fee and Expense Award of 20% of the Settlement Fund, or $3 million, plus 20% of any Warrant Proceeds, plus interest earned at the same rate as the Settlement Fund, and reimbursement of expenses in an amount of $46,313.15.

### A.    Lead Counsel's Request for an Award of Attorneys' Fees

121.    As stated in the Declaration of Dr. Martin Dietrich in Support of Lead Plaintiff's Unopposed Motion for Preliminary Approval of Class Action Settlement, Certification of the Class for Settlement Purposes, and Approval of Notice to the Settlement Class, dated November 3, 2025 ("LP PA Decl.," ECF 121-1), Wolf Popper and Dr. Dietrich negotiated the percentage of attorneys' fees that was subsequently memorialized in a retainer agreement at the outset of Wolf Popper's

28

retention.  The agreement that was negotiated provided for different caps on the attorneys' fees that could be requested by Wolf Popper depending on what stage of the litigation a resolution was reached, if any.  Dr. Dietrich negotiated a maximum amount of attorneys' fees of 20% if the litigation resolved before the start of fact discovery, and a maximum amount of attorneys' fees of 24% if the litigation resolved after the start of fact discovery and before a motion for class certification was filed.  There were three additional maximum amounts of attorneys' fees if the litigation resolved at a later point.

### 1. The Time and Labor Required to Achieve the Settlement

122.    Based on the time records of Wolf Popper, attorneys and staff at Wolf Popper worked approximately 1,948.80 hours on this litigation from inception through February 12, 2026, for a lodestar value of $1,310,582.00.  A breakdown of the hours worked by timekeepers at Wolf Popper is reflected below:

| NAME | POSITION/TITLE | HOURS | HOURLY RATE | LODESTAR |
|---|---|---|---|---|
| Robert C. Finkel | Senior Partner | 125.90 | $1,150.00 | $144,785.00 |
| Carl L. Stine | Senior Partner | 17.70 | $1,150.00 | $20,355.00 |
| Joshua W. Ruthizer | Partner | 550.10 | $950.00 | $522,595.00 |
| Matthew Insley-Pruitt | Partner | 7.60 | $950.00 | $7,220.00 |
| Emer Burke | Associate | 341.60 | $500.00 | $170,800.00 |
| Samuel Coffin | Associate | 823.10 | $495.00 | $407,434.50 |
| Sandra Vidal-Pellon | Of Counsel | 34.50 | $475.00 | $19,332.50 |
| Melissa Gianfagna | Senior Paralegal | 36.00 | $400.00 | $14,400.00 |
| Steven Fleisig | Financial Analyst | 6.10 | $600.00 | $3,660.00 |

123.    The more than 1,948.80 hours my firm expended on this case were reasonably spent, especially given the high-stakes, high-risk nature of this litigation.  I am the partner who oversaw Wolf Popper's activities in the litigation.  I worked to assign tasks and assignments to attorneys and staff with the appropriate level of seniority.

124.    The information set forth in this Declaration concerning Wolf Popper's time, including in the schedule above, was prepared from daily time records regularly prepared and maintained by Wolf Popper in the ordinary course of business.  I and attorneys and staff working under my direction reviewed my firm's daily time records to confirm their accuracy.  The purpose of this review was to confirm both the accuracy of the entries on the reports as well as the necessity for, and reasonableness of, the time and expenses committed to the Litigation.

125.    As a result of this review, reductions were made to both time and expenses in the exercise of billing judgment.  For example, I removed time spent by attorneys' who worked less than five hours on the matter.   Also, excluded from the lodestar calculation is time specifically spent on issues relating to attorneys' fees or Lead Counsel's Fee and Expense Application.  The lodestar figure also does not take into account the number of hours that will be spent by Lead Counsel on further briefing and argument related to the Motion between now and the Settlement Hearing, and on issues related to administration of the Settlement, processing of Claims, and disseminating payments to Class Members, which, given the April 8, 2026 claim submission deadline, is expected to continue well into 2026.

126.    The hourly rates shown are the current rates set by Wolf Popper for each individual. It is my understanding that Wolf Popper's hourly rates are comparable to the regular rates submitted by comparable firms for lodestar cross-checks in other securities class action fee applications.

### 2.    The Quality of the Result Achieved by Lead Counsel

127.    The Settlement provides for a recovery of $15 million in cash for the benefit of the Class.  For the reasons set forth above and in light of the substantial risks of the litigation, Lead Counsel believes that the Settlement represents a decidedly favorable result for members of the Class in the face of significant litigation risk.

### 3.    The Skill and Experience of Lead Counsel

128.    The skill and expertise of Lead Counsel also supports the requested fee.  Wolf Popper is highly experienced in the area of securities litigation and class actions, and has successfully prosecuted numerous securities litigations and securities fraud class actions on behalf of investors, as detailed in the firm resume attached as Exhibit 3.

129.    The quality of work by Lead Counsel should also be evaluated in light of the quality of the opposition counsel.  In this case, Defendants were each represented by three separate law firms - Wilmer Cutler Pickering Hale and Dorr LLP, Kirkland & Ellis LLP, and McGuireWoods LLP, three large and prestigious international law firms with significant experience litigating high-stakes securities actions like this.

### 4.    The Fully Contingent Nature of the Fee and the Extensive Risks of the Litigation

130.    Wolf Popper LLP undertook this litigation, including the prosecution of this Action, on an entirely contingent basis.  The risks by Lead Counsel in bringing those claims have been detailed above and those same risks are equally relevant to an award of attorneys' fees.

131.    From the outset, Lead Counsel understood that they were embarking on a complex, and expensive litigation with no guarantee of compensation for the substantial investment of time, money, and effort that the case would require.  Lead Counsel understood that Defendants would

31

raise numerous challenges to liability, damages, and class certification, and that there was no assurance of success.

132.    Lead Counsel ensured that ample resources were dedicated to it, and that funds were available to compensate staff and to advance the significant expenses that a case of this magnitude and complexity requires.  Lead Counsel vigorously prosecuted this Action for the benefit of the Class and received no compensation, while incurring over $46,000 in expenses.

133.    Lead Counsel bore risk that no recovery would be achieved.  Indeed, as summarized above, this case presented numerous risks that could have precluded any recovery. Also, success in contingent litigation such as this is never assured.  To the contrary, it takes hard work and diligence by skilled counsel to develop facts and theories that can result in a favorable outcome for the Class.

### 5.    The Reaction of the Settlement Class to Date

134.    The Notices informed the Class that Lead Counsel would seek an award of attorneys' fees of up to 20% of the Settlement Fund.

135.    The deadline for Class Members to object to the Fee and Expense Application is February 26, 2026.  As discussed above, to date, no objection to the Fee and Expense Application has been received.

136.    Any objections that may be received will be addressed in Lead Counsel's reply papers, which are due to be filed on or before March 12, 2026.

### 6.    Lead Plaintiff's Endorsement of the Fee Application

137.    As set forth in the accompanying Declaration of Dr. Martin Dietrich (Ex. 2 hereto), Dr. Dietrich fully supports Lead Counsel's request attorneys' fees of 20% of the Settlement Fund, or $3 million plus 20% of any Warrant Proceeds, and has concluded that the fee request is reasonable.  As stated in Dr. Dietrich's earlier declaration (ECF 121-1, ¶ 28), inasmuch as

discovery had started prior to the Settlement, Lead Counsel were entitled to a 24% fee under our agreement with Dr. Dietrich, but have agreed with Dr. Dietrich to request a fee of 20%.

138.    This Action involved great complexity, concerning FDA processes for new drug approvals. Although we are mindful that this Court at times has awarded fees of 15% of Settlement Amounts, in light of the prior fee agreement with Dr. Dietrich and the complexity of this matter, I submit that a 20% fee is warranted.

139.    In sum, Lead Counsel accepted this case on a fully contingent basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that a fee award of 20% is fair and reasonable.

### B.    Lead Counsel's Costs and Expenses

140.    Wolf Popper also seeks payment from the Settlement Fund of $46,313.15 in Litigation costs and expenses that were reasonably incurred in connection with commencing, litigating, and settling the claims asserted in this Action.

141.    From the beginning of the case, Lead Counsel were aware that they might not recover any of their expenses and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until such time as the Action might be successfully resolved. Wolf Popper also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds advanced by to prosecute the Action. Accordingly, Wolf Popper was motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

33

142. Wolf Popper incurred a total of $46,313.15 in costs and expenses connection with the prosecution of this Action as reflected in the books and records of the firm. These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred. These expenses were incurred without any guarantee of recovery and on behalf of the Class.

143. The firm's unreimbursed expenses are as follows:

| EXPENSES | CHARGE |
|---|---|
| Local Travel | $124.51 |
| Document Retrieval Charges | $289.00 |
| Electronic Discovery Vendor Charges | $830.17 |
| Photocopying, Printing, and Scanning | $1,351.95 |
| Expert Fees | $9,500 |
| Online Legal Research | $8,098.30 |
| Investigator Fees | $9,458.75 |
| Mediation Fees | $16,614.75 |
| Mailing Fees | $45.72 |
| **TOTAL** | **$46,313.15** |

144. Lead Counsel respectfully submits that all of these expenses were reasonably incurred in connection with the prosecution of the Action. For example, the Investigator Fees, which are approximately 20% of the total litigation expenses, were necessary part of Lead Plaintiff and Lead Counsel's investigation in connection with preparing the FAC and SAC. The Expert Fees, which are also approximately 20% of the total litigation expense, were necessary for Lead Plaintiff and Lead Counsel to prepare for mediation and negotiate a settlement that properly compensated Class Members. The Mediation Fees, which are approximately 35% of the total litigation costs, represent Lead Plaintiff's share of the fees to JAMS for the services of Mr. Melnick. The Legal Research Fees and Document Retrieval Charges, which amount to approximately 17% of the total litigation expenses, were necessary to, among other things, Lead

34

Counsel's factual investigation of the claims, the preparation of the FAC and SAC, and responding to Defendants' Motions to Dismiss.

145.    The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in class action litigation, including, among others, electronic discovery charges and copying and printing costs.

146.    The Notices informed the Class that Lead Counsel would seek reimbursement of litigation expenses in an amount not to exceed $50,000.  To date, no objection to the amount of litigation expenses has been received.  If any objection is received, Lead Counsel will address it in its reply papers on or before March 12, 2026.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 12th day of February, 2026.

/s/ *Joshua W. Ruthizer*
Joshua W. Ruthizer
**Wolf Popper LLP**
845 Third Avenue, 12th Floor
New York, NY 10022

35